# 21-2697(L)

## 21-2699(CON)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

SL-X IP S.A.R.L., SL-X TECHNOLOGY UK LTD., SL-X TECHNOLOGY USA LLC, SL-X TRADING EUROPE LTD. and SL-X TRADING USA LLC,

*Plaintiffs-Appellants,*

—against—

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, MERRILL LYNCH L.P. HOLDINGS, INC., MERRILL LYNCH PROFESSIONAL CLEARING CORP., CREDITSUISSE AG, CREDIT SUISSE SECURITIES (USA) LLC, CREDIT SUISSE FIRST BOSTON NEXT FUND, INC., CREDIT SUISSE PRIME SECURITIES SERVICES

(*Caption continued on inside cover*)

———

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

---

RISHI BHANDARI
ROBERT GLUNT
EVAN MANDEL
MANDEL BHANDARI LLP
80 Pine Street, 33rd Floor
New York, New York 10005
(212) 269-5600

*Attorneys for Plaintiffs-Appellants*

(USA) LLC, Credit Suisse First Boston Next Fund, Inc., Credit Suisse Prime Securities Services (USA) LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, J.P. Morgan Prime, Inc., J.P. Morgan Strategic Securities Lending Corp., J.P. Morgan Chase Bank, N.A., Morgan Stanley & Co. LLC, Prime Dealer Services Corp., Strategic Investments I, Inc., UBS AG, UBS Americas Inc., UBS Securities LLC, UBS Financial Services Inc., EquiLend LLC, EquiLend Europe Limited, EquiLend Holdings LLC, Morgan Stanley, Morgan Stanley Capital Management, LLC, Credit Suisse Group AG, Morgan Stanley Distribution, Inc.,

*Defendants-Appellees,*

Bank of America Corporation, The Goldman Sachs Group, Inc., Goldman Sachs Execution & Clearing, L.P., J.P. Morgan Chase & Co., J.P. Morgan Institutional Investments Inc., UBS Group AG, UBS Investment Bank, UBS Asset Management (US) Inc., UBS Fund Services (USA) LLC,

*Defendants.*

# <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to FRAP 26.1, Plaintiff-Appellant SL-x Trading USA LLC states that it is a privately held company whose majority shareholder is Plaintiff-Appellant SL-x Technology USA LLC. Plaintiffs-Appellants SL-x Technology USA LLC, SL-x Technology UK Limited, and SL-x Trading Europe Limited are privately held companies whose majority shareholder is Plaintiff-Appellant SL-x IP S.à.r.l. SL-x IP S.à.r.l. is a privately held corporation whose majority shareholder is Palamon Securities IP Holdings S.à.r.l., another privately held company. Palamon Securities IP Holdings S.à.r.l.'s majority shareholder is Palamon European Equity II, L.P., another privately held company.

No publicly held corporation owns more than 10% of the stock of SL-x Trading USA LLC, SL-x Technology USA LLC, SL-x Technology UK Limited, SL-x Trading Europe Limited, SL-x IP S.à.r.l., Palamon Securities IP Holdings S.à.r.l., Palamon Securities IP Holdings S.à.r.l., or Palamon European Equity II, L.P.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

JURISDICTIONAL STATEMENT ......................................................................5

ISSUES PRESENTED............................................................................................6

STATEMENT OF THE CASE................................................................................6

    I.      Local Rule 28.1 Statement ....................................................................6

    II.     Factual Background................................................................................8

           A.      Stock Loans and the Stock Lending Market...............................8

           B.      SL-x........................................................................................9

           C.      SL-x's Efforts To Sell To Defendants .....................................10

           D.      SL-x's Efforts To Sell To Third-Parties ..................................14

           E.      SL-x Pursues Alternative Efforts To Commercialize Its Technology................................................................................14

           F.      The SL-x Subsidiaries..............................................................15

           G.      *IPERS* Is Filed and SL-x Discovers Defendants' Conspiracy ..16

STANDARD OF REVIEW ...................................................................................18

SUMMARY OF ARGUMENT .............................................................................19

ARGUMENT ........................................................................................................21

    I.      SL-X'S SHERMAN ACT CLAIM IS TIMELY BECAUSE IT WAS FILED WITHIN FOUR YEARS OF ITS ACCRUAL.......................21

           A.      Defendants' Group Boycott Was a Continuing Violation........22

           B.      Damages Did Not Accrue Until the 2015 Sale Because They Were Uncertain Until that Date .............................................31

II.     DEFENDANTS' FRAUDULENT CONCEALMENT TOLLED THE STATUTE OF LIMITATIONS ..........................................................33

    A.     Concealment.............................................................................34

    B.     Ignorance.................................................................................44

    C.     Diligence .................................................................................47

III.     THE DONNELLY ACT CLAIM IS TIMELY...................................52

IV.     ARTICLE III IS SATISFIED IN THE PARENT ACTION ..............52

    A.     The SL-x Parent Has Standing....................................................52

    B.     Article III Standing Is Satisfied by the Existence and Participation of the SL-x Subsidiaries ......................................55

V.     THE STATE LAW CLAIMS SHOULD BE REINSTATED ............57

VI.     SL-X SHOULD BE GRANTED LEAVE TO AMEND THE COMPLAINTS ..................................................................................57

CONCLUSION .........................................................................................59

# TABLE OF AUTHORITIES

## **Cases**

*Barani v. Dep't of Def.*,
   518 F. App'x 48 (2d Cir. 2013) ...........................................................57

*Borger v. Yamaha Int'l Corp.*,
   625 F.2d 390 (2d Cir. 1980)................................ 24, 27, 30, 31

*BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC*,
   603 F. App'x 57 (2d Cir. 2015) ......................................................48

*Bruce Katz, M.D., P.C. v. Focus Forward, LLC*,
   __ F.4th __, 2022 WL 52914 (2d Cir. 2022) ...........................18

*Champagne Metals v. Ken-Mac Metals, Inc.*,
   458 F.3d 1073 (10th Cir. 2006)................................... 25, 29

*Charles Schwab Corp. v. Bank of Am. Corp.*,
   883 F.3d 68 (2d Cir. 2018)..............................................................50

*Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*,
   111 F.3d 1427 (9th Cir. 1996).......................................................27

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ..........................................................................43

*Creative Copier Servs. v. Xerox Corp.*,
   No. CIV.A. 301CV155SRU,
   2005 WL 2175138 (D. Conn. Sept. 2, 2005)................... 25, 27

*Cresci v. Mohawk Valley Cmty. Coll.*,
   693 F. App'x 21 (2d Cir. 2017) ......................................................58

*D'Addario v. D'Addario*,
   901 F.3d 80 (2d Cir. 2018)..............................................................32

*DXS, Inc. v. Siemens Med. Sys., Inc.*,
   100 F.3d 462 (6th Cir. 1996)..........................................................25

iv

*eComSystems, Inc. v. Shared Mktg. Servs., Inc.*,
  No. 8:10-CV-1531-T-33MAP,
  2012 WL 171083 (M.D. Fla. Jan. 20, 2012)........................................54

*Edward Hines Lumber Co. v. Vulcan Materials Co.*,
  No. 85 C 1142, 1985 WL 1189 (N.D. Ill. May 8, 1985) ....................54

*Fielding v. Tollaksen*,
  510 F.3d 175 (2d Cir. 2007)................................................................57

*Fountain v. Karim*,
  838 F.3d 129 (2d Cir. 2016)................................................... 19, 53, 57

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
  991 F.3d 370 (2d Cir. 2021)....................................................... 55, 56

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
  392 U.S. 481 (1968) .................................................... 23, 24, 27

*Harris v. City of New York*,
  186 F.3d 243 (2d Cir. 1999)................................................................48

*Hennegan v. Pacifico Creative Serv., Inc.*,
  787 F.2d 1299 (9th Cir. 1986).............................................................27

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  738 F. Supp. 2d 1011 (N.D. Cal. 2010) ..............................................41

*In re Credit Default Swaps Antitrust Litig.*,
  No. 13md2476 (DLC),
  2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014)......................... 35, 47, 49

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR,
  2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ........................................41

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
  14-MD-2573 (VEC),
  2016 WL 5794777 (S.D.N.Y. Oct. 3, 2016) ........................................34

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
  998 F.2d 1144 (3d Cir. 1993)..............................................................29

*In re Martin-Trigona,*
  760 F.2d 1334 (2d Cir. 1985) ...............................................56

*In re Mercedes-Benz Antitrust Litig.,*
  157 F. Supp. 2d 355 (D. N.J. 2001) .....................................39

*In re Napster, Inc. Copyright Litig.,*
  354 F. Supp. 2d 1113 (N.D. Cal. 2005) ...............................54

*In re Nine W. Shoes Antitrust Litig.,*
  80 F. Supp. 2d 181 (S.D.N.Y. 2000)..............................48, 50

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
  587 F. Supp. 2d 27 (D.D.C. 2008) .......................................43

*In re Resistors Antitrust Litig.,*
  No. 15-CV-03820-JD,
  2017 WL 3895706 (N.D. Cal. Sept. 5, 2017) ....................42

*In re Sumitomo Copper Litig.,*
  120 F. Supp. 2d 328 (S.D.N.Y. 2000)...........................33, 47

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...............................43

*Iowa Pub. Emps.' Ret. Sys. v.*
  *Merrill Lynch, Pierce, Fenner & Smith Inc.,*
  340 F. Supp. 3d 285 (S.D.N.Y. 2018)...............2, 36, 46, 47

*John Mohr & Sons v. Hanover Ins. Co.,*
  322 F. Supp. 184 (N.D. Ill. 1971) .......................................55

*Kahn v. Kohlberg, Kravis, Roberts & Co.,*
  970 F.2d 1030 (2d Cir. 1992).............................................30

*Kopchik v. Town of E. Fishkill, New York,*
  759 F. App'x 31 (2d Cir. 2018) ...........................................58

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
  797 F.3d 160 (2d Cir. 2015)................................................58

*Merced Irrigation Dist. v. Barclays Bank PLC,*
  165 F. Supp. 3d 122 (S.D.N.Y. 2016).............................34, 39

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*,
 198 F.3d 823 (11th Cir. 1999) ....................................................................... 33, 44

*Nouritajer v. Jaddou*,
 18 F.4th 85 (2d Cir. 2021) ...................................................................................18

*Osberg v. Foot Locker, Inc.*,
 862 F.3d 198 (2d Cir. 2017)................................................................................42

*Pace Indus., Inc. v. Three Phoenix Co.*,
 813 F.2d 234 (9th Cir. 1987)...............................................................................29

*Pinaud v. Cty. of Suffolk*,
 52 F.3d 1139 (2d Cir. 1995).................................................................................50

*PPX Enterprises, Inc. v. Audiofidelity, Inc.*,
 746 F.2d 120 (2d Cir. 1984).................................................................................22

*S.E.C. v. Power*,
 525 F. Supp. 2d 415 (S.D.N.Y. 2007)................................................................48

*Samsung Elecs. Co. v. Panasonic Corp.*,
 747 F.3d 1199 (9th Cir. 2014).............................................................. 24, 25, 32

*Schenker AG v. Société Air Fr.*,
 102 F. Supp. 3d 418 (E.D.N.Y. 2015) ........................................................ 35, 41

*Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*,
 366 F. Supp. 3d 516 (S.D.N.Y. 2018)....................................................34, 47, 50

*State of N.Y. v. Hendrickson Bros.*,
 840 F.2d 1065 (2d Cir. 1988)............................................................... 33, 34, 47

*TechReserves Inc. v. Delta Controls Inc.*,
 No. 13 CIV. 752 GBD,
 2014 WL 1325914 (S.D.N.Y. Mar. 31, 2014) ....................................................52

*United Nat. Records, Inc. v. MCA, Inc.*,
 609 F. Supp. 33 (N.D. Ill. 1984) .........................................................................41

*US Airways, Inc. v. Sabre Holdings Corp.*,
 938 F.3d 43 (2d Cir. 2019).................................................... 23, 24, 29, 30

*Vincent v. Reynolds Mem'l Hosp., Inc.*,
881 F.2d 1070 (4th Cir. 1989)................................................................29

*Vitale v. Marlborough Gallery*,
No. 93 CIV. (PKL) 6276,
1994 WL 654494 (S.D.N.Y. July 5, 1994) ...........................................25

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
401 U.S. 321 (1971) ................................................................... 23, 31

## **Statutes**

15 U.S.C. § 1 .............................................................................................5

15 U.S.C. § 15b .......................................................................................22

28 U.S.C. § 1291 .......................................................................................5

6 Del. C. § 18-803(a) ..............................................................................56

N.Y. Gen. Bus. Law § 340(5) .................................................................52

## **Rules**

Fed. R. Civ. P. 12 ...................................................................................45

Fed. R. Civ. P. 12(b)(1) ..........................................................................53

Fed. R. Civ. P. 15 ...................................................................................57

Fed. R. Civ. P. 15(a)(2) .............................................................................7

Fed. R. Civ. P. 17(a) .................................................................................7

Fed. R. Civ. P. 25(c) .................................................................................7

# INTRODUCTION

This is an antitrust action about the lending of stock. Defendants are primarily broker-dealers ("Broker Defendants") who collectively control this antiquated and highly opaque market. Broker Defendants use their position as entrenched intermediaries to charge borrowers and lenders monopolistic prices. Indeed, they are defending themselves in a separate class action lawsuit brought on behalf of all parties who borrowed or lent stock in the United States, *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 17 Civ. 6221 (KPF) (S.D.N.Y.) ("*IPERS*").

Plaintiffs SL-x IP S.à.r.l. ("SL-x Parent") and its subsidiaries, SL-x Trading Europe Limited, SL-x Technology UK Limited, SL-x USA Trading LLC, and SL-x Technology USA LLC (together, the "SL-x Subsidiaries," and, along with the SL-x Parent, "SL-x" or "Plaintiffs"), created an electronic stock lending platform. The platform provided price transparency – thereby enabling borrowers and lenders to obtain better pricing – and dramatically cut the transaction costs of stock loans. Defendants, who rely on the lack of transparency to protect their monopolistic pricing, conspired to boycott SL-x and other potential market entrants.

This is an appeal of the decision granting Defendants' motion to dismiss. The most striking thing about Defendants' motion was what it did not contain – any challenge to Plaintiff's detailed allegations of an antitrust conspiracy between some

of the largest banks in the world.  Indeed, a parallel class action involving substantially identical antitrust claims survived a motion to dismiss and is well on its way to class certification.  *See IPERS*, 340 F. Supp. 3d 285 (S.D.N.Y. 2018).

Here, though, the trial court (Richard J. Sullivan, J.) erroneously dismissed SL-x's antitrust claims.  Judge Sullivan based his decision on these two grounds:

**Statute of Limitations.**  The trial court ruled that all of SL-x's antitrust claims accrued when Defendants indicated "that they were not prepared to invest or become customers of SL-x."  SPA-14.  This constituted error for three reasons.  **First**, this is not the law.  Both this Court and the Supreme Court have held that a new antitrust claim accrues **each** time that there is a refusal to deal.  While there may be an exception to this rule where there is a "one-time, final, and irrevocable refusal to deal," no such exception applies here.  None of Defendants' refusals were final or irrevocable.

**Second**, SL-x filed its antitrust claims within four years (the applicable statute of limitations) of Defendants' 2015 purchase of SL-x's technology.  All claims arising out of that sale are timely.  The sale was the culmination of a classic starve-catch-and-kill illegal boycott strategy:  Defendants bought SL-x's technology solely to shelve it and prevent other potential market entrants from making use of it. Moreover, Defendants acquired the technology at a fire sale price that was obtained solely because of Defendants' illegal boycott.

**Third**, the law is clear that an antitrust claim does not accrue until the claim's damages can be calculated. Here, SL-x's damages could not be calculated until the 2015 sale because before the sale (a) there was no way to know how long Defendants' boycott would last, which must be known to calculate SL-x's lost sales, and (b) there was no way to know how much SL-x would receive in the sale, which is necessary to deduct from SL-x's fair market value without conspiracy in determining SL-x's damages.

The trial court also held – contrary to the *IPERS* court – that the statute of limitations should not be tolled because of Defendants' fraudulent concealment. The trial court held that four statements made by Defendants put SL-x on inquiry notice of the conspiracy. In reaching this conclusion, the trial court disregarded (1) conflicting statements from and conduct by the very same Defendants indicating that Defendants were actually considering SL-x's platform on the merits, (2) SL-x's continued commitment of time and money to market to Defendants (after those four statements were made) because SL-x did not realize it was being illegally boycotted, (3) other potential market entrants' commitment of resources because they too believed that there was no group boycott, and (4) SL-x's ignorance of many facts cited in its complaint – including Defendants' secret efforts to pressure other market participants not to use SL-x and other competitors' products – until the *IPERS* case was filed.

In short, whether (i) SL-x had a right to rely on Defendants' repeated assurances that they were considering the platform on the merits and, (ii) SL-x was ever on inquiry notice are disputed issues of fact that should not sustain a dismissal at the start of the case.

But, even if SL-x were on inquiry notice, dismissal was still erroneous. The trial court held that because SL-x was "on inquiry notice of the scheme, Plaintiffs cannot plead ignorance and due diligence." SPA-17. Again, this is an incorrect statement of the law. When a plaintiff is on inquiry notice, its claims remain tolled until the plaintiff either (i) discovers the claims or (ii) should through reasonable diligence have discovered them. Again, these are fact questions, and this Court has repeatedly held that a plaintiff has no obligation to plead diligence.

Thus, the trial court's dismissal for failure to demonstrate diligence at the pleading stage was erroneous. But even if diligence needed to be pled, SL-x identified approximately thirty separate meetings with Defendants in which it attempted to discover precisely why they were not signing onto Defendants' platform. Thus, SL-x successfully pled diligence even though it did not have to.

**Standing.** The trial court also dismissed the SL-x Parent's claims on the ground that the Parent lacks standing. All parties agree that the SL-x Subsidiaries have standing. However, the SL-x Parent has standing because (1) Defendants boycotted it, (2) there is a unity of interest between it and the Subsidiaries, and (3)

it is the successor to the Subsidiaries' antitrust claims. Even if the Parent lacks standing, the standing requirement is satisfied by the legal existence of the SL-x Subsidiaries and their participation in the Parent Action.

This Court should reverse the decision dismissing the two actions in its entirety.

## <u>JURISDICTIONAL STATEMENT</u>

The district court had subject matter jurisdiction over the original action because it arose under the laws of the United States, specifically 15 U.S.C. § 1. In an order dated September 30, 2021, the District Court granted Defendants' motion to dismiss the Complaints in both the case filed by the SL-x Parent ("Parent Action") and the case filed by the SL-x Subsidiaries ("Subsidiaries Action") and directed the Clerk of Court to close both Actions. SPA-20. The District Court Clerk has yet to enter a judgment in either case.

Plaintiffs timely filed notices of appeal on October 25, 2021. A-568-69, A-690-91. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether an antitrust action premised on a group boycott is timely when it is filed within four years of the defendants' purchase of the right to sell the boycotted product, which made the boycott final, permanent, and irrevocable?

2.      Whether the statute of limitations is tolled when the defendants' group boycott was successfully concealed from the plaintiffs, the defendants repeatedly misrepresented to the plaintiffs that they were genuinely considering using the plaintiffs' product, and the plaintiffs went to great lengths to understand and overcome the defendants' hesitancy to use the platform?

3.      Whether a plaintiff who was the victim of a group boycott and the successor to the same boycott has standing to bring antitrust claims? If not, whether the existence of entities that do have standing and those entities participation in the case satisfies the standing requirement?

## STATEMENT OF THE CASE

### I.    Local Rule 28.1 Statement

On November 1, 2018, the SL-x Parent brought federal and state antitrust claims and other state law claims against Defendants arising out of Defendants' group boycott of SL-x. A-15. Defendants moved to dismiss the Parent's Complaint on standing and statute of limitations grounds. SPA-2. Some of the EquiLend Defendants also moved to dismiss on personal jurisdiction grounds. *Id.* On

February 16, 2019, the trial court (Judge Richard J. Sullivan) denied SL-x's motion to file a supplemental declaration in opposition to the motion to dismiss about the SL-x's Subsidiaries assignment of the claims to the SL-x Parent, 2019 WL 8362064.

On April 18, 2019, the SL-x Parent sought leave under Fed. R. Civ. P. 15(a)(2), 17(a), and 25(c) to amend its Complaint to join the SL-x Subsidiaries or, in the alternative, to permit the SL-x Subsidiaries to ratify the SL-x Parent's action. A-341. The trial court denied the motion to amend or to ratify without prejudice. A-26 (5/17/19 Minute Entry).

On May 24, 2021, the SL-x Subsidiaries filed the Subsidiaries Action. A39. The parties agreed and the trial court ordered that (1) the two Actions would be consolidated, (2) the motion to dismiss the Parent Complaint "'shall be deemed responsive to the Subsidiary Complaint,'" and (3) Defendants would have a chance to supplement their motion to dismiss the Subsidiary Complaint. A-545. Defendants decided not to supplement their motion to dismiss. A-668-69.

The trial court issued an Order dated September 30, 2021 that denied EquiLend's motion to dismiss certain EquiLend Defendants, granted the motion to dismiss the Parent Complaint on standing grounds, and granted the motion to dismiss both Actions on statute of limitations grounds, 2021 WL 4523711.

## II. Factual Background

### A. Stock Loans and the Stock Lending Market

A stock loan is a financial transaction in which a borrower takes temporary title to shares of stock and, in exchange, the borrower pays a fee and posts collateral sufficient to cover the value of the borrowed stock. A-68 ¶68. Although there are many uses for stock loans, one common one is to enable the borrower to execute a so-called "short sale," a transaction in which a person borrows a share of stock and then sells it on the market. *Id.* ¶69.

The stock loan market is an "over-the-counter" ("OTC") market. A-70 ¶77. This means that there is no central marketplace or exchange by which borrowers and sellers can obtain pricing data, compare offers, or execute transactions directly. *Id.* Instead, stock loans are typically consummated through entrenched financial intermediaries who use their position to extract tolls from both lenders and borrowers. *Id.* Agent Lenders act as the intermediaries for stock lenders, which are often pension funds, foundations, and other owners of stock. *Id.* ¶¶79-80. Broker-Dealers serve as the intermediaries for borrowers, which are often investment firms such as hedge funds. A-70-71 ¶¶81, 85, A-165. Defendants Bank of America, Credit Suisse, Goldman Sachs, Morgan Stanley, and UBS are all prominent Broker-Dealers. A-71 ¶81. Broker-Dealers do not disclose to their clients the portion of the stock loan fees that the Broker-Dealers are keeping for themselves. *Id.* ¶82.

Because there is no central marketplace to connect lenders and borrowers, stock lending transactions are arranged through direct, bilateral communications between Agent Lenders and Broker-Dealers. *Id.* ¶83. These communications take place via phone or electronic messaging systems such as Bloomberg. *Id.* Since no real time pricing information is available – borrowers and lenders know only the rates they are personally quoted and have no idea (1) whether they are receiving a good price or (2) what portion of the price is being captured by the Agent Lenders and Broker-Dealers. A-72-73 ¶¶87, 92.

## B. SL-x

The SL-x Parent was founded in 2010 to create a centrally cleared electronic marketplace for stock loans. A-77 ¶¶106-09. Its founders had decades of experience in both financial technology and central counterparty platforms. *Id.* ¶109. In 2011, Palamon Capital Partners agreed to provide the funding that the SL-x Parent needed to reach its goal. *Id.* ¶110.

SL-x hired developers and built a groundbreaking, heavily-patented platform for facilitating stock loans. *Id.* The platform allowed Broker-Dealers and Agent Lenders to post bids and offers and provided various innovative ways that users could either match with counterparties automatically or negotiate with some or all available potential counterparties simultaneously. A-74 ¶94.

Importantly, SL-x provided a "ticker" that permitted all users to see real time

pricing data for all SL-x transactions. *Id.* ¶95. "By displaying this real time data, SL-x provided it users with vastly more information concerning market pricing for stock loans than was previously available, allowing them to better price loans." *Id.*

One of the biggest costs of stock loan transactions are the capital reserves that Broker-Dealers and Agent Lenders are required by law to take in order to account for the risk that a counterparty might not perform. A-75-76 ¶¶100-105. A European "clearinghouse" agreed to process SL-x's stock loan transactions, and SL-x was in discussions with American clearinghouses to perform the same function. *Id.* SL-x's centralized clearing would have reduced the capital costs of stock lending by up to 98%. A-76 ¶104. SL-x's platform also slashed the costs of stock lending by allowing users' backend systems to seamlessly execute trades and streamlining compliance and auditing. A-75 ¶¶98-99.

## C. SL-x's Efforts To Sell To Defendants

Even before SL-x completed its platform, it began efforts to commercialize its product. A-77-78 ¶111. These efforts continued until May 26, 2015, when SL-x sold its intellectual property to EquiLend. A-77-89 ¶¶111-86, A93 ¶204, A-212 (sale occurred on May 26, 2015), A-227 (same).

Many of SL-x's sales efforts were directed at Defendants. The Complaints alone detail approximately thirty meetings between SL-x and Defendants between 2011 and May 21, 2015. A-79-87 ¶¶117-69, A-93 ¶205. This figure does not

include countless emails and telephone calls between SL-x's employees and Defendants during the same period. Although no Defendant agreed in writing to use the SL-x platform, during these meetings, Defendants purported to have a diverse array of perspectives on the possibility of doing business with SL-x.

**EquiLend**. EquiLend is a consortium owned by Broker Dealers and Agent Lenders whose nominal purpose is to facilitate stock loans. A-78-79 ¶¶114-16. Although it does not permit "bids" and "asks" to be exchanged or transactions to be executed, it does provide an electronic bulletin board on which stock loan pricing can be posted and provides some back-end services that assist with the settlement of stock loans. *Id.*

In August 2011, SL-x proposed a partnership with EquiLend. A-79 ¶¶117-20. EquiLend rejected this proposal roughly six week later. *Id.* When SL-x shifted its sales efforts on the Broker Defendants, EquiLend then served as a forum where those Defendants could discuss whether to do business with SL-x and later facilitated Defendants' agreement to collectively boycott SL-x. A-117-18 ¶¶291-92. Once that boycott was successful, EquiLend bought SL-x's intellectual property on May 26, 2015 so that no other party could make use of it. A-93 ¶¶204-05, A212 (sale occurred on May 26, 2015), A-227 (same).

**Bank of America.** In meetings with SL-x, Bank of America said that it was interested in considering innovation solutions like SL-x but that there was an internal

debate about how best to access central clearing as well as concerns about how a relationship with SL-x would affect the bank's relationship with EquiLend.  A-79-80 ¶¶122-25.

**Credit Suisse.**  In 2012, Credit Suisse "expressed deep dissatisfaction with the EquiLend product" and told SL-x that it "would pursue SL-x as a [centralized clearing platform] solution in stock lending."  A-80-81 ¶¶127-30.  In 2013, SL-x demonstrated its product for Credit Suisse on several occasions.  A-81 ¶132.  In a 2013 meeting, a middle-level Credit Suisse executive both (a) "extolled the virtues of SL-x compared to the existing market tools and noted that he often wondered if, ten years in the future, market participants would laugh at the way that business had been conducted," and (b) warned "that EquiLend was like the mafia run by five crime families."  A-81 ¶¶133-34.  Later in 2013, the same mid-level executive said that the bank "had reversed its position and would only join after other large players – 'the Big Boys' – committed to the platform" and "warned that without approval from EquiLend, SL-x was unlikely to be able to achieve a foothold in the industry."  *Id.* ¶¶135-36.  Far more senior Credit Suisse executives continued to meet with SL-x for another year and during those meetings Credit Suisse "was very positive about the product."  A-82 ¶¶137-38.  Later, a bank executive said that the bank "would be using EquiLend for the foreseeable future."  *Id.* ¶139.

**Goldman Sachs**. Goldman Sachs first said that SL-x's acquisition of EquiLend "[wa]s something that we should have done 18 months ago." A-82 ¶140. It later said that it would not use SL-x because the platform would permit smaller banks, such as Jeffries, to enter the stock lending market and begin to compete with the Broker Defendants for market share. A-82-83 ¶¶142-43.

**JP Morgan**. In 2012 and the first half of 2013, during meetings, JP Morgan executives told SL-x that its product was better than EquiLend's and all Broker-Dealers would benefit from using it. A-83-84 ¶¶144-51. In August 2013, a JP Morgan employee explained that the bank had decided to "monitor market developments" and wait to see if others adopted SL-x before becoming a customer. A-84 ¶152. The employee "admit[ted] that 'there is general agreement among EquiLend Directors that industry advances should be achieved from within EquiLend' and that JP Morgan participated in discussions with other banks about industry direction at EquiLend meetings.'" *Id.* ¶153. Nevertheless, JP Morgan continued to talk with and meet with SL-x for over another year. A-84-85 ¶¶154-56. These meetings included Jamie Dimon, the bank's Chairman, CEO, and President, as well as the bank's Head of Prime Brokerage. *Id.* "Dimon was pleased by the prospect of capital savings in the stock lending business and claimed that others at the bank would continue discussions with SL-x about becoming a customer." *Id.* ¶154.

**Morgan Stanley**.  While Morgan Stanley repeatedly showed interest in SL-x's platform, it ultimately declined to trade on the platform.  A-85 ¶¶157-61.

**UBS**.  SL-x demonstrated its product for UBS, and its executive told SL-x that UBS was "eager to participate once the product was launched" and that the bank wanted an "equity participation" in SL-x.  A-86 ¶¶162-64.  Around the same time, a different executive "discussed the benefit of being 'inside the club' of EquiLend member banks to effectuate market changes" and "suggested that any market transition towards an SL-x platform and central clearing of stock trades would need to come from inside EquiLend."  *Id.* ¶168.  Later, the bank said that it was not willing to commit to sign onto SL-x's platform, but continued to meet with SL-x for ten months after it made the comment about EquiLend.  A-86-87 ¶¶167-69.

### D.    SL-x's Efforts To Sell To Third-Parties

SL-x also dedicated extensive resources to meeting with other Broker Dealers, Agent Lenders, and clearinghouses to persuade them to join SL-x.  A-87-89 ¶¶170-86.  SL-x later learned that these efforts did not succeed because Defendants continually threatened and pressured these market participants to prevent them from doing business with SL-x.  A-53 ¶7, A-88-89 ¶¶175-86, A-91 ¶¶192-93, A-92 ¶¶200-01.

### E.    SL-x Pursues Alternative Efforts To Commercialize Its Technology

While SL-x was meeting with Broker-Dealers, Agent Lenders, and

clearinghouses, it began exploring other ways to maximize its profits. SL-x entered into a deal with Markit – a purveyor of financial information – providing that the two platforms would link to each other so that they could deliver services to each other's customers. A-92 ¶¶196-97. Markit and SL-x also discussed the possibility that Markit would invest in SL-x. *Id.* ¶198. SL-x had similar discussions with GFI Group and engaged Wells Fargo to identify potential investors. *Id.* ¶¶200-01.

These efforts to commercialize SL-x ultimately resulted in EquiLend's purchase of SL-x's intellectual property on May 26, 2015. A-93 ¶¶204-05, A212 (sale occurred on May 26, 2015), A-227 (same). EquiLend never intended to use SL-x's technology, instead purchasing it only to prevent others from using it. A-93 ¶205.

## F.   The SL-x Subsidiaries

Over time, the SL-x Parent created subsidiaries to own certain assets and handle certain aspects of its operations. For instance, in 2013, the SL-x Parent created SL-x Technology USA LLC[1] and SL-x Trading USA LLC,[2] both Delaware corporations. The SL-x Parent similarly created two UK subsidiaries. A-291 ¶2. The SL-x Parent had full operational control over the SL-x Subsidiaries while they existed. *Id.* Indeed, the Subsidiaries never had any owners besides the SL-x Parent.

---

[1] *See* Delaware Division of Corporations File No. 5313465.
[2] *See* Delaware Division of Corporations File No. 5313462.

*Id.*

SL-x's UK subsidiaries were wound down in 2015 and 2016 and, after that time, the SL-x Parent continued their business. A-291-92 ¶3.

## G.     *IPERS* Is Filed and SL-x Discovers Defendants' Conspiracy

Even after SL-x's technology was sold to EquiLend, SL-x had no idea that Defendants had conspired to boycott SL-x or other market entrants. A-121-22 ¶300. In fact, SL-x's executives, after leaving SL-x, created another start-up dedicated to bringing an electronic, centrally cleared marketplace to the stock loan market. They continued to work on that startup long after SL-x's 2015 sale to EquiLend.

Two of the country's top antitrust law firms represented the *IPERS* plaintiffs and went to extraordinary lengths to uncover the conspiracy. *IPERS*, Dkt. #233-6 at 11:25-12:11.[3] The two firms spent nine months investigating the matter, including interviewing industry experts, various potential market entrants, former traders, leading academics, and high-level executives at Defendants. *Id.* This investigation was extremely costly. *Id.*

It was not until the *IPERS* case was filed that SL-x learned of the conspiracy. The *IPERS* Complaint identifies secret meetings, communications, conduct, and

---

[3] *Available at* https://pacer-documents.s3.amazonaws.com/119/479117/127125772747.pdf? (last accessed Feb. 7, 2022).

agreements between Defendants of which SL-x had previously been unaware.  A-90-91 ¶¶189-94.  In particular, the *IPERS* Complaint revealed that Defendants used secret meetings to enter into, refine, and further the conspiracy.  A-122 ¶301.  Similarly, these secret communications indicate that the Broker Defendants instructed EquiLend representatives including its CEO Brian Lamb not to "break rank" and not to take any independent actions in the marketplace until the "EquiLend banks" determined as a group whether they would support any of the new platforms.  A-90 ¶190.  In other electronic messages, Lamb bragged that Goldman Sachs had personally promised him that – thanks to the conspiracy – SL-x and other potential platforms like AQS would fail and EquiLend would continue to dominate the stock loan market.  A-90-91 ¶191.  Defendants also secretly pressured clearinghouses not to enter into clearing agreements with SL-x.  A-91 ¶193.  Defendants concealed their conspiracy by using secret names and code words like "Project Gateway."  A-122 ¶301.

Defendants actively misled SL-x and other market participants.  Along with pretending to give SL-x serious consideration (as discussed above), Defendants publicly misrepresented to SL-x and others that they supported a trading platform that could centrally clear stock loans.  A-122-23 ¶303.  While EquiLend publicly advertised that its purpose was to optimize efficiency in the stock lending market, in reality EquiLend was used to achieve the opposite purpose – preventing the opaque,

OTC securities lending market from evolving in a more efficient, centrally cleared electronic platform with improved price transparency.  A-123 ¶304.

The *IPERS* Complaint revealed that Defendants had conspired against AQS and DataExplorers.  A-98-105 ¶¶226-63.  AQS and Data Explorers were two other potential stock loan market entrants who engaged in significant efforts and received significant investments and other backing from market participants.  A-122 ¶302. These efforts and investments would not have happened had these savvy market participants known of Defendants' conspiracy to boycott SL-x and these two other potential entrants. *Id.*; A-98-105 ¶¶226-63.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6)," and "[i]n doing so," the Court "accept[s] all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor."[4] *Bruce Katz, M.D., P.C. v. Focus Forward, LLC*, __ F.4th __, 2022 WL 52914, at *1 (2d Cir. 2022).

In reviewing a Rule 12(b)(1) ruling on subject matter jurisdiction, the Court reviews legal conclusions *de novo* and any factual finding for clear error.  *See Nouritajer v. Jaddou*, 18 F.4th 85, 88 (2d Cir. 2021); *Fountain v. Karim*, 838 F.3d

---

[4] Unless noted otherwise, internal quotation marks, citations, and footnotes are omitted.

129, 134 (2d Cir. 2016). While the plaintiff bears the burden of proving that jurisdiction exists, "the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Fountain*, 838 F.3d at 134. "[T]he court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Id.*

## SUMMARY OF ARGUMENT

1. For two reasons, the trial court erred in holding that SL-x's antitrust claims were time-barred. First, a group boycott is a continuing antitrust violation that accrues each time there is an act in furtherance of the conspiracy that harms the plaintiff, unless there was a "one-time, final, and irrevocable refusal to deal." Here, there was no final or irrevocable refusal to deal until EquiLend's May 26, 2015 purchase of SL-x's intellectual property. Because both Actions were filed within four years of this purchase, both actions are timely. Further, because Defendants continually conspired with each other and pressured third parties not to do business with SL-x, their violation was necessarily a continuing one and SL-x's claims continued to accrue until the sale of its intellectual property.

Even if SL-x's claims satisfied all the criteria for accrual before May 26, 2015, they still did not accrue until that date because SL-x's damages could not be calculated until that date. Before that date, (a) there was no way to know how long

Defendants' boycott would last, which must be known to calculate SL-x's lost sales, and (b) there was no way to know how much SL-x would receive in the sale, which is necessary to deduct from SL-x's fair market value in the absence of a conspiracy in determining SL-x's damages.

Second, even if SL-x's antitrust claims accrued before May 26, 2015, they were equitably tolled because of Defendants' fraudulent concealment. Tolling is appropriate where (a) the defendants' tort was concealed, (b) the plaintiff remained ignorant of the claim, and (c) the continuing ignorance was not attributable to lack of diligence on the plaintiff's part. As the *IPERS* court found, Defendants' conspiracy was inherently self-concealing and Defendants affirmatively concealed it. SL-x reasonably relied on Defendants' repeated assurances that they were considering SL-x's platform on the merits and thus was not on inquiry notice of the antitrust claim. Even if SL-x were on inquiry notice, it satisfied all of its diligence obligations when it did everything in its power to understand and overcome Defendants' resistance to SL-x. In any event, a reasonable person would not have discovered Defendants' conspiracy until some point within four years of the filing of SL-x's actions.

2.  The SL-x Parent has Article III standing because it was boycotted by Defendants, there was a unity of ownership between it and its Subsidiaries, and it is the successor to the Subsidiaries. Even if the Parent does not have standing, the

standing requirement is satisfied by the existence of the SL-x Subsidiaries and their participation in the Parent Action.

3. The trial court declined to exercise supplemental jurisdiction over SL-x's state law claims solely because it dismissed SL-x's federal claim, and the state law claims should be reinstated when the federal claim is reinstated.

4. To the extent that any aspect of the trial court's dismissal is affirmed, SL-x should be given an opportunity to amend its complaint because a plaintiff should be provided such an opportunity after a trial court rules on a motion to dismiss.

## ARGUMENT

## I. SL-X'S SHERMAN ACT CLAIM IS TIMELY BECAUSE IT WAS FILED WITHIN FOUR YEARS OF ITS ACCRUAL

The SL-x Parent filed its action on November 1, 2018, and the SL-x Subsidiaries filed their action on May 24, 2019. A-15, A-39. However, all parties agreed below that the relevant date for computing the statute of limitations was November 1, 2018. SPA-13 n.6; A-175 (Defendants argue in the Parent Action that November 1, 2018 is the relevant date), A-655 ¶4 (Parties stipulate that the motions to dismiss the Parent Action "shall be deemed responsive to the Subsidiary Complaint."), A-668 (Defendants argue that "[t]he arguments in [Defendants' motions to dismiss Parent Complaint] apply with equal, if not greater, force to the" Subsidiaries Complaint.) Defendants are bound by this agreement. *See PPX*

*Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 123 (2d Cir. 1984) ("Having agreed on a set of facts, the parties [who adopted the stipulation], and this Court, must be bound by them; we are not free to pick and choose at will.")

But it does not matter: both the Parent and Subsidiaries Actions are timely even if they had both been filed on May 24, 2019. Sherman Act claims are subject to a four-year statute of limitations. 15 U.S.C. § 15b. SL-x's Sherman Act claim was filed within four years of its accrual because (a) it was a continuing violation that continued to accrue through the May 24, 2015 EquiLend sale and (b) the damages that the boycott caused SL-x could not be calculated until the EquiLend sale.

### A. Defendants' Group Boycott Was a Continuing Violation

Although both the Parent and Subsidiary Actions were filed within four years of the 2015 sale of SL-x's technology to EquiLend, the trial court, relying on two district court cases, held that the action was untimely because (a) "by late summer in 2014, the Broker Defendants had conveyed to SL-x that they were not prepared to invest in or become customers of SL-x" (SPA-14), and (b) "Plaintiffs have failed to establish an independent antitrust injury as a result of the 2015 sale" as a matter of law (SPA-18). The court reasoned that **the entirety of SL-x's injury was suffered the moment** that Defendants conveyed "that they were not prepared to invest or become customers of SL-x":

For plaintiffs, the injury realized in the 2015 sale – lost profits on the sale of their patents and business model – was the direct result of Defendants' refusal to deal with Plaintiffs in the years prior to the sale. Had Plaintiffs sold their patents at fire sale prices to a party other than EquiLend, or not sold them at all, they still would have realized the same injury resulting from Defendants' earlier anticompetitive conduct. In the words of Judge Underhill in *Creative Copier Services*, Plaintiffs' injury here was merely the "abatable but unabated inertial consequence" of Defendants' pre-limitations period boycott of SL-x. 2005 WL 2175138, at *1 (quotation marks omitted); *see also Vitale*, 1994 WL 654494, at *5.

SPA-18-19.

This is not the law.

"Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). But "in the case of a 'continuing violation', each overt act that is part of the violation and that injures the plaintiff… starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 67 (2d Cir. 2019). *Accord Zenith*, 401 U.S. at 338. For instance, a price-fixing conspiracy is continuing one and "each sale to the plaintiff" restarts the statute of limitations. *US Airways*, 938 F.3d at 67.

Like price-fixing conspiracies, refusals to deal are continuing violations. In *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 483, 502 n.15 (1968), the defendant began violating the antitrust laws in 1912 by refusing to sell shoe-

manufacturing equipment to the plaintiff, instead insisting that the plaintiff lease the machines. The Supreme Court rejected the argument that the claim was barred by the statute of limitations, holding that the refusal to deal "constituted a continuing violation of the Sherman Act and [ ] inflicted continuing and accumulating harm on" the plaintiff. *Id.* at 502 n.15. As the Court explained, "[a]lthough Hanover could have sued in 1912 for the injury being inflicted, it was equally entitled to sue in 1955." *Id.* This Court has read *Hanover Shoe* to mean that "damages arising from [defendant's] refusal to sell shoe-machinery to the plaintiff within the four years prior to the suit was not barred by the statute of limitations even though 'the earliest impact on [the plaintiff] of [the defendant's] lease only policy occurred in 1912.'" *US Airways*, 938 F.3d at 68 (quoting *Hanover Shoe*). In short, this Court held that **"[e]ach refusal to sell was a new actionable act."** *Id.* (emphasis added).

Some courts recognize an exceedingly narrow exception to this rule: the boycott may not be a continuing one where it was a "one-time, final, and irrevocable refusal to deal." *See Borger v. Yamaha Int'l Corp.*, 625 F.2d 390 (2d Cir. 1980) (Trial court "permit[ed] the jury to determine whether [plaintiff's] damages arose from a one-time, final, and irrevocable refusal to deal or from a refusal that was of a continuing nature and resulted in repeated wrongs.") *See also Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202-03 (9th Cir. 2014) (Violation is not a continuing one where "the initial refusal to deal was an irrevocable, immutable,

permanent and final decision."); *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1089 (10th Cir. 2006) ("[W]hether the continuing conspiracy exception applied in that case depended on whether the initial decision was 'final.'"); *DXS, Inc. v. Siemens Med. Sys.*, *Inc.*, 100 F.3d 462, 467 (6th Cir. 1996) (same).

This distinction between revokable and irrevocable refusals to deal is not novel. The two district court cases the lower court relied on set forth the very same standard. *See Creative Copier Servs. v. Xerox Corp.*, No. CIV.A. 301CV155SRU, 2005 WL 2175138, at *2 (D. Conn. Sept. 2, 2005) ("In the 'refusal to deal' context, whether a particular refusal is an independent act or simply a 'reaffirmation' of a prior refusal will typically turn on whether the initial refusal to deal is irrevocable, immutable, permanent and final."); *Vitale v. Marlborough Gallery*, No. 93 CIV. (PKL) 6276, 1994 WL 654494, at *5 (S.D.N.Y. July 5, 1994) ("If an initial refusal to deal with a party is final, the statute of limitations begins to run and does not restart when the plaintiff makes subsequent unsuccessful efforts to deal with the defendant."); SPA18-19 (citing *Creative Copier Services* and *Vitale*).

Under this standard, a refusal to deal that is "irrevocable, immutable, permanent, and final…. is the exception, not the rule." *Samsung Elecs.*, 747 F.3d at 1203. This is because, "[t]he typical antitrust continuing violation occurs ... when conspirators continue to meet to fine-tune their cartel agreement." *Id.* at 1204. For three reasons, this "exception" should not apply here.

25

### 1. There Was No Final or Permanent Refusal-To-Deal

First, as a factual matter, Defendants never conveyed any final or permanent group boycott to Defendants. Despite their secret conspiracy, Defendants communicated to SL-x extremely divergent sentiments about their willingness to do business with SL-x – none of which were permanent. Bank of America said that it was interested in SL-x but also that it had concerns. A-79-80 ¶¶122-25. UBS initially said that it would pursue SL-x, then said it would join if other large players joined, and ultimately that it would use EquiLend "for the foreseeable future." A-80-82 ¶¶126-39. Goldman Sachs said that SL-x should buy EquiLend and later that it would not do business with SL-x. A82-83 ¶¶140-43. JP Morgan said that SL-x's product was better than EquiLend's, it would "monitor market developments," and that it would continue to meet with SL-x. A-83-85 ¶¶144-56. UBS said it was "eager" to use SL-x's product, requested equity in SL-x, and suggested that the transition towards SL-x should come from within EquiLend. A-86-87 ¶¶162-69. EquiLend declined to do business with SL-x until it actually did so when it bought SL-x's platform. A-79 ¶¶117-19, A-93 ¶204. Even the district court concluded that Defendants did nothing more than "convey[ ] to SL-x that they were not prepared to invest or become customers of SL-x." SPA-14.

Defendants' conflicting and equivocal statements do not constitute an "irrevocable, immutable, permanent and final" group boycott as a matter of law. For

instance, in *Borger v. Yamaha International Corporation*, Yamaha testified that it conveyed that it "absolutely would NOT OPEN [plaintiff] as a Yamaha account." 625 F.2d at 393.   This Court ruled that, even if that (exceedingly definitive) testimony were true, "it would be pure speculation for the jury to determine that Yamaha's refusal to grant [plaintiff's] a franchise was forever irrevocable and award future profits." *Id.* at 398.

Similarly, in *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir. 1986), the court held that a conspiracy to shepherd tourists away from plaintiff's gift shop constituted a continuing antitrust violation because there was nothing "irrevocable, immutable, permanent and final" about it.   The court distinguished such ongoing conduct from a car manufacturer's refusal to integrate a plaintiff's afterburner into its automobile during the design stage because the plaintiff "could no longer produce afterburners that would be marketable even if the manufacturers refrained from further acts of conspiracy." *Id.   See also Hanover Shoe*, 392 U.S. at 502 n.15 (consistent lease-only policy that began in 1912 and continued through 1955 was a continuing violation); *Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 111 F.3d 1427, 1444 (9th Cir. 1996) (1990 refusal to deal restarted statute of limitations even though 1972 agreement contemplated later refusals to deal because "the 1972 Agreement was not a permanent and final decision that controlled the later act."); *Creative Copier Services*, 2005 WL 2175138, at *3

(refusal-to-deal policy that is revised is not final). There was no "one-time, final, and irrevocable refusal to deal." Even the trial court did not quarrel with this proposition.

### 2. Defendants Continually Conspired and Pressured Third-Parties

Second, because Defendants acted collectively and regularly pressured third-parties not to do business with SL-x, their group boycott was necessarily a continuing one. Defendants threatened and pressured competitor banks, agent lenders, clearinghouses, and other market participants to prevent them from doing business with SL-x. A-53 ¶7, A-88-89 ¶¶175-86, A-91 ¶¶192-93, A-92 ¶¶200-01. Under such circumstances, the initial refusal to deal was not final and irrevocable because it required continued collaboration among Defendants as well as efforts to strong-arm third parties:

> In the present case, the allegation is that the Established Distributors illegally decided to pressure third parties—the mills—not to supply aluminum to Champagne. Thus, here, the agreeing parties' initial decision did require further action. The subsequent actions (contacting and pressuring the mills when those mills were considering recognizing Champagne) were both "distinct from the act[ ] outside the limitations period" (the agreement to effect a boycott) and a "continu[ation] [of] the same conspiracy." The Established Distributors did not simply sit back and watch as the "unabated inertial consequences" of their (alleged) anticompetitive agreement harmed Champagne; rather, their actions within the limitations period "manifest[ed] a commitment to renewing" and enforcing that agreement….

*Champagne Metals*, 458 F.3d at 1089-90. *See also In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1172 (3d Cir. 1993) ("The existence of the continued [group boycott] conspiracy thus undermines [defendant's] argument that damages within the limitations period were caused solely from acts committed by the defendant outside the four-year [limitations] period."); *Vincent v. Reynolds Mem'l Hosp., Inc.*, 881 F.2d 1070 (4th Cir. 1989) (Unpublished Order) ("[U]nder the *Zenith Radio* analysis, each of the acts [in furtherance of the conspiracy to boycott] constitutes a separate cause of action.")

### 3. SL-x's Claims Accrued at the Time of the Sale

Third, Defendants' 2015 purchase of SL-x's technology was an entirely new and independent act that went above and beyond Defendants' prior agreement to boycott SL-x. As a result, claims arising out of the sale could not have accrued before it occurred. *See US Airways*, 938 F.3d at 67 ("[E]ach overt act that is part of the violation and that injures the plaintiff… starts the statutory period running again."); *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987) ("[S]eparate violations within the limitations period that are not controlled by the previous act or decision and which inflict new injury will restart the statute of limitations.").

This is particularly true when the antitrust violation arises out of the execution of a contract. In *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir.

2019), this Court held that, where a contract violated the antitrust laws, "entering into the 2006 contract…. began the running of the statute of limitations" because "[a] contract is a vehicle for determining at the time of contracting what should happen at some time thereafter." *See also Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1040 (2d Cir. 1992) ("[O]nce plaintiff has committed itself to the transaction, the claim accrues and thus the statute begins to run.").

The trial court determined that the sale did not cause SL-x any injury because any injury that SL-x suffered from the group boycott was necessarily suffered the moment that Defendants entered into the group boycott. SPA-18-19. This is legally and factually incorrect. Legally, as discussed above, unless there is a "one-time, final, and irrevocable refusal to deal," *Borger*, 625 F.2d at 398, "[e]ach refusal to sell" constitutes "a new actionable act," *US Airways*, 938 F.3d at 68. That did not happen here until Defendants bought SL-x's technology. Until that time, Defendants and third parties could have signed onto SL-x's platform.

But even factually, **had there been no group boycott in effect on the date of the sale, SL-x would have received the fair market value of its technology in the sale**. This fair market value would have reflected all of the future sales to Defendants and third parties that have occurred without the boycott.

## B. Damages Did Not Accrue Until the 2015 Sale Because They Were Uncertain Until that Date

In the alternative, SL-x's claims did not accrue until the 2015 sale because they could not be calculated prior to the sale. When a claim has otherwise satisfied the criteria for accrual but the damages remain uncertain, the claim does not accrue until damages become calculable. *Zenith*, 401 U.S. at 339 ("[I]t is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable.").

Before the 2015 sale, the entirety of SL-x's damages could not be calculated because it was unclear how long the boycott would last. As discussed above, in *Borger v. Yamaha International Corporation*, a refusal-to-deal case, Yamaha testified that it conveyed it "absolutely would NOT OPEN [plaintiff] as a Yamaha account." 625 F.2d at 393. This Court ruled that, even if testimony were true, the plaintiff could not recover post-trial damages as a matter of law because "it would be pure speculation for the jury to determine that Yamaha's refusal to grant [plaintiff's] a franchise was forever irrevocable and award future profits." *Id.* at 398. Here, Defendants' refusals were far less definitive than were Yamaha's and, as a result, SL-x's claim for any future damages could not be calculated – and thus did

not accrue – until the boycott became permanent with Defendants' 2015 theft of SL-x's business.

Additionally, to calculate the damages resulting from Defendants' total theft of SL-x's business, it is necessary to determine the difference between SL-x's fair market value in the absence of an illegal boycott and the amount that SL-x actually received in the 2015 sale. The former figure is relatively easy to calculate because the size of the total market and SL-x's likely market share are readily provable. However, it was impossible to determine the latter figure until there was an actual sale because the sale price was tied to market participants' idiosyncratic willingness-to-pay that was untethered to market size or market share. *See Samsung Elecs.*, 747 F.3d at 1205 ("Because the harm to Samsung challenged in this suit was speculative at the time of the initial wrong, the law of limitations in federal antitrust actions allowed Samsung to file suit once the harm crystallized in 2006."); *D'Addario v. D'Addario*, 901 F.3d 80, 93 (2d Cir. 2018) ("We have concluded that no civil RICO cause of action for treble damages accrues until the amount of damages becomes clear and definite."). As a result, SL-x's antitrust claims did not accrue until the 2015 sale to Defendants and are timely.

## II. DEFENDANTS' FRAUDULENT CONCEALMENT TOLLED THE STATUTE OF LIMITATIONS

Even had SL-x's Sherman Act claim accrued before Defendants' purchase of SL-x's intellectual property, the claim would still be timely because Defendants' fraudulent concealment tolled the statute of limitations.

"[A]n antitrust plaintiff may prove fraudulent concealment sufficient to toll the running of the statute of limitations if he establishes (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

Fraudulent concealment is generally a question of fact unsuitable for determination on the pleadings. Even at the summary judgment stage, determining the issue as a matter of law is "extraordinary and appropriate only in extreme circumstances." *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 347 (S.D.N.Y. 2000). *See also Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999), *amended in part*, 211 F.3d 1224 (11th Cir. 2000) (When it comes to fraudulent concealment, the court's obligation on summary judgment "to resolve all doubt against the nonmoving party…. is applied with particular stringency."); *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 526

(S.D.N.Y. 2018) ("[B]ecause resolution of a claim of fraudulent concealment is intimately bound up with the facts of the case, it often cannot be decided at the motion to dismiss stage."). *Accord Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 136–37 (S.D.N.Y. 2016); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 14-MD-2573 (VEC), 2016 WL 5794777, at *24 (S.D.N.Y. Oct. 3, 2016).

While the *IPERS* court held that all three elements of fraudulent concealment were successfully pled, Judge Sullivan held that the same conspiracy satisfied none of the required elements as a matter of law. SPA-14-17. This was incorrect.

### A. Concealment

This Court has held that an antitrust plaintiff "may prove the concealment element by showing either [1] that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or [2] that the wrong itself was of such a nature as to be self-concealing." *Hendrickson Bros.*, 840 F.2d at 1083. Here, both showings have been made.

### 1. The Conspiracy Was Self-Concealing

A scheme is "of such a nature to be self-concealing" if "it must remain concealed to be successful." *Hendrickson Bros.*, 840 F.2d at 1083. Price fixing conspiracies and group boycotts are generally held to be "self-concealing." *See Merced Irrigation*, 165 F. Supp. 3d at 135 (Price-fixing conspiracies are "inherently

self-concealing."); *Schenker AG v. Société Air Fr.*, 102 F. Supp. 3d 418, 424-25 (E.D.N.Y. 2015) (same); *In re Credit Default Swaps Antitrust Litig.*, No. 13md2476 (DLC), 2014 WL 4379112, at *15 (S.D.N.Y. Sept. 4, 2014) ("A group boycott of exchange trading has the characteristics of other types of conspiracies that have been held to be self-concealing.").

The *IPERS* court held that Defendants' conspiracy was "inherently self-concealing," on the grounds that "the alleged conspiracy required numerous participants, was designed to endure, and depended on concealment for its success." *IPERS*, 340 F. Supp. 3d at 333-34. Relying on the logic of *Hendrickson Bros.*, which found that a bid-rigging conspiracy was inherently self-concealing, the *IPERS* court concluded that the alleged conspiracy by Defendants could not have functioned without concealment. *Id.* Indeed, it is hard to imagine that stock borrowers, many of them sophisticated financial institutions in their own right, would continue to borrow over a trillion dollars of securities per year through the Broker Dealer-Defendants if the antitrust conspiracy and the inflated profits it generated were not concealed.

Judge Sullivan explained that he would not follow *IPERS* on this ground because he believed that the *IPERS* plaintiffs – unlike SL-x – had no direct communications with Defendants. SPA-15. As a threshold matter, this does not change the fundamental character of the conspiracy itself or whether it required

secrecy to function. For the reasons set forth below and in Judge Failla's ruling, *IPERS*, 340 F. Supp. 3d at 333-36, this Court should adopt the conclusions and reasoning of the *IPERS* court. But in reality, the *IPERS* case did involve direct communications, indeed, "Defendants threatened to terminate certain services if their hedge fund clients decided to trade on AQS or on SL-x" and those hedge funds are plaintiffs in that case. *IPERS*, 340 F. Supp. 3d at 299, 334-35.

Judge Sullivan pointed to four statements that Defendants made to SL-x that he concluded "demonstrate[ ] that the alleged conspiracy did not 'depend[] on concealment for its success.'" SPA-15-16 (quoting *IPERS*, 340. F. Supp. 3d at 334). But to reach this conclusion, Judge Sullivan had to disregard the context in which these comments were made as well as all of the other allegations in the 79-page Complaints.

First, Judge Sullivan pointed to "a February 2013 meeting, [at which] a Credit Suisse executive warned Plaintiffs that EquiLend was like 'the mafia run by five crime families.'" SPA-16 (quoting A-603 ¶139). But at that very same meeting, that same executive "extolled the virtues of SL-x compared to the existing market tools and noted that he often wondered if, ten years in the future, market participants would laugh at the way that business had been conducted." *Id.* ¶138. Indeed, in the *IPERS* case, Defendants themselves argued that this comment does not permit an inference of an illegal conspiracy:

And, moreover, we don't even know who the five families are. I know there are six defendants, so maybe they are five of us. Maybe they are five different entities. An allegation that says 'some group,' one of which is identified, but pled not to be part of the conspiracy, five of which or four of which maybe, I don't know, aren't identified at all, that is good enough, that is specific enough to make out a conspiracy case? It is meritless."[5]

It is difficult to swallow that this comment can both mandate an inference that Defendants disclosed the conspiracy yet fail to permit an inference that a conspiracy even exists when pled in a complaint.

Second, Judge Sullivan pointed to a meeting five months later at which the same Credit Suisse executive said that the bank "would only join after other large players – 'the Big Boys' – committed to the platform" and "warned that without approval from EquiLend, SL-x was unlikely to be able to achieve a foothold in the industry." A-603 ¶¶140-41, SPA-15-16. But while this comment may have suggested that SL-x had a hard road ahead of it, it does not disclose that SL-x's success was not merely "unlikely" but outright impossible because "the Big Boys," Credit Suisse and all of the other Broker Defendants, had already agreed not to do business with it.

---

[5] *IPERS* Dkt. #102 at 28-29, *available at* https://pacer-documents.s3.amazonaws.com/119/479117/127121697045.pdf? (last accessed Feb. 7, 2022).

Further, the Credit Suisse executive who made these statement was a middle manager with a "director" title, and Credit Suisse continued to meet with SL-x for another eighteen months after the "mafia" comment was made. A-602-03 ¶¶133, 138-40, 143. In fact, long after that comment, Credit Suisse's Global Head of Prime Services met with SL-x, learned about its platform, and was "very positive about the product." A-603 ¶¶142-43. This is an odd thing to do with a company that you have admitted to conspiring to boycott.

Third, Judge Sullivan pointed to an August 2013 statement by a JP Morgan executive "'that there is general agreement among EquiLend Directors that industry advances should be achieved from within EquiLend and that JP Morgan participated in discussions with other banks about industry direction at EquiLend meetings.'" SPA-16 (quoting A-606 ¶158). But knowing that EquiLend, "a potential competitor" to SL-x, did not support SL-x is a far cry from knowing that EquiLend's Broker Defendant owners were using EquiLend to coordinate a boycott of their own. A-601 ¶126.

Indeed, at this same meeting, JP Morgan did not even reject joining SL-x's platform. A-606 ¶157. And JP Morgan continued to talk with and meet with SL-x for over another year. *Id.* ¶¶158-61. These meetings included Jamie Dimon, the bank's Chairman, CEO, and President, as well as the bank's Head of Prime

Brokerage.  *Id.*  None of this is compatible with either an irrevocable refusal to deal or prior disclosure of a conspiracy.

Fourth, Judge Sullivan cited a September 2013 UBS executive's discussion of "the benefit of being 'inside the club' of EquiLend member banks to effectuate market changes" and "suggested" that "any market transition towards an SL-x platform and central clearing of stock trades would need to come from inside EquiLend."  A-608 ¶173, SPA-16.  Before this statement, this same executive told SL-x that UBS was "eager to participate once the product was launched."  A-608 ¶171.  And after the statement was made senior UBS executives continued to meet with SL-x for ten months.  *Id.* ¶¶173-74.

While these four comments suggested that some of the Broker Defendants – who owned EquiLend – may have preferred that EquiLend develop a platform with SL-x's capabilities, none of these communications stated that the bank was refusing to do business with SL-x, nevermind that the banks had conspired with each other to boycott SL-x.  As a result, they did not reveal the existence of a conspiracy.  *See Merced Irrigation*, 165 F. Supp. 3d at 136 ("[I]n spite of the fact that the Daily Index Prices were published openly, the issue is not whether plaintiffs knew that the prices paid were higher than they should have been, rather, the primary issue is whether the ... plaintiffs ... knew of the alleged conspiracy."); *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 373 (D. N.J. 2001) (same).

In short, none of the four isolated allegations addressed by the trial court justifies its conclusion that the conspiracy was not self-concealing as a matter of law. Further, when these allegations are understood in context of the great lengths to which the Defendants went to assure SL-x that they were considering the platform on the merits (as discussed both above and below), Defendants' concealment is abundantly clear.

## 2. *Defendants Actively Concealed the Conspiracy*

The trial court did not address SL-x's argument that even if the conspiracy were not inherently self-concealing, Defendants nevertheless chose to actively conceal it. The Complaint identifies four categories of specific affirmative conduct designed to obfuscate Defendants' anti-competitive agreement or otherwise mislead SL-x as to the existence of the collective boycott.

**First**, Defendants negotiated and sealed their anticompetitive agreements through a series of secret meetings and communications, including closed-door meetings of the EquiLend board, one-on-one meetings of Defendants' senior executives, and private electronic communications between conspirators to which Plaintiff was not a party. A-90-91 ¶¶189-94, A-118 ¶292, A-122 ¶301. Indeed, before the filing of the *IPERS* case, Plaintiff did not – and could not – know about the substance of these communications, including specific admonitions by EquiLend

CEO Brian Lamb that the conspirators not "break rank" before a collective decision about how to proceed concerning the new platforms.  A-90-91 ¶¶190-91.

These secret meetings and communications constitute affirmative acts of concealment. *Schenker*, 102 F. Supp. 3d at 425 (concealment pled where Defendants "engaged in secret meetings and private communications"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1024 (N.D. Cal. 2010) (concealment pled where "Defendants took steps to keep their meetings secret, such as varying meeting locations, limiting meeting attendees, avoiding note-taking, and agreeing to maintain the secrecy of meetings."); *United Nat. Records, Inc. v. MCA, Inc.*, 609 F. Supp. 33, 36–37 (N.D. Ill. 1984) (Secret meeting on March 25, 1974 "sufficient to create a question of fact regarding a fraudulent concealment claim.")

**Second**, Defendants concealed their actions through the use of secret names and code words like "Project Gateway" to disguise the nature of their conspiratorial conduct.  A-122 ¶301.  Even if SL-x had had access to the secret meetings and communications between the Defendants, it might not have been able to determine the true nature of their actions or the anti-competitive purposes underlying their behavior.  *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 309192, at *16 (N.D. Cal. Jan. 21, 2014) (concealment properly pled where defendants were "using code to refer to particular entities or topics"); *In re Resistors Antitrust Litig.*, No. 15-CV-03820-JD, 2017 WL 3895706, at *3 (N.D. Cal.

Sept. 5, 2017) (Allegation defendants "used code words… support[s] the allegation of fraudulent concealment.")

**Third**, Defendants made numerous false statements about their support for the emergence of transparent trading platforms like SL-x. Some of these statements were made directly to SL-x itself. A-78 ¶112, A80-81 ¶127-33, A-82 ¶138, A-83-86 ¶¶145-51, 154-55, 158-60, 162-66. Others were statements made for public consumption about Defendants' support for centralized trading platforms and efficiency in the securities lending market. A-123 ¶304. In making these statements, Defendants sought to convince SL-x that its technology would be evaluated on the merits and that individual Defendants were undertaking an independent review of whether it provided sufficient benefits to justify the cost. This was false, as Defendants had already agreed to act collectively, not individually, with respect to new market entrants and were privately threatening and pressuring third-parties not to do business with the entrants. A-53 ¶7, A-88-89 ¶¶175-86, A-91 ¶¶192-93, A-92 ¶¶200-01, A-98-105 ¶¶226-63.

"Such affirmative misrepresentations of a material fact are self-concealing acts." *Osberg v. Foot Locker, Inc.*, 862 F.3d 198, 211 (2d Cir. 2017); *Hendrickson Bros.*, 840 F.2d at 1084 (In bid-rigging scheme, "[t]he submission of accommodation bids was designed in part to make the low bid appear reasonable."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1119 (N.D. Cal.

2008) ("the complaint alleges many acts of fraudulent concealment during the relevant period, including defendants providing numerous specific pretextual reasons for the inflated prices").

**Fourth**, EquiLend purchased valuable SL-x and AQS intellectual property on the false pretext that it would use such technology to improve its products and offer greater efficiency and transparency in the securities lending market. A-92-93 ¶¶202-05, A-101-02 ¶247, A-122-23 ¶303. In truth, EquiLend never had any intention of actually using AQS or SL-x's technology and bought it only to prevent other market entrants from taking advantage of it. *Id.*

While each category of conduct would independently constitute affirmative acts of concealment, the Court should also view them collectively in determining whether concealment is properly alleged. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 33 (D.D.C. 2008) ("When considering an antitrust complaint, the allegations cannot be compartmentalized and considered in isolation as if they were separate lawsuits").

When considered in their entirety, the Complaints successfully allege both a self-concealing conspiracy and Defendants' affirmative concealment of the

conspiracy.  *See Morton's Mkt.*, 198 F.3d at 833-36 (reversing award of summary judgment on fraudulent concealment because a jury could have concluded that the defendant was either not on inquiry notice or could not have discovered the violation with due diligence); *In re Mercedes-Benz*, 157 F. Supp. 2d at 372 (Complaint successfully pled affirmative concealment by alleging conspirator urged secrecy at single meeting.)

### B. Ignorance

The Complaint pleads that SL-x had no actual knowledge of the conspiracy (A-121-22 ¶300), and the trial court did not find otherwise.  Instead, the lower court concluded that SL-x was on "inquiry notice" of the Defendants' conspiracy, *i.e.*, that SL-x had information that "would make a reasonable person suspicious enough to inquire further into the reasons why Defendants were rejecting the platform."  SPA-16-17.  Again, this was error.

In finding SL-x was on inquiry notice, other than the four statements by Defendants discussed in the preceding section, the trial court relied only on the allegation that Markit (an information services company) and Deutsche Bank "deci[ded] to reject SL-x after showing initial interest as 'unexpected[,] 'strange[,] and sudden[.]'"  SPA-17 (quoting A-609 ¶180, A-614 ¶204).  *See also* A-613 ¶201.  Judge Sullivan concluded that the behavior of these two third parties constituted

"general allegations about Defendants' conduct that suggested such conduct was 'unnatural and contrary to expectations.'" SPA-17.

That may have been one reasonable inference from the conduct, though making that determination would require additional context. But because the trial court was required to give SL-x the benefit of **every** reasonable inference on a motion to dismiss, it was error for the court to conclude that the **only** reasonable inference that can be drawn from two third-parties' odd behavior was that Defendants were engaged in an illegal antitrust conspiracy. It was also error because Markit ultimately did agree to do business with SL-x. A-92 ¶197.

And to the extent the trial court suggests Defendants' own behavior cast doubt on their repeated assertions to SL-x that they were considering SL-x on the merits, such a ruling is inconsistent with Fed. R. Civ. P. 12. Jamie Dimon and Defendants other senior executives looked SL-x executives in the eye and said that they were genuinely considering using SL-x. Defendants' argument that "you should have known Jamie Dimon was lying to you" – is at most an argument that can be made at trial. It is not a basis for dismissing a complaint.

Again, the lower court ignored, discounted, or otherwise outweighed facts showing there was no reason for SL-x to suspect a conspiracy – many of which were relied upon by the *IPERS* court when it reached the opposite conclusion:

- The Complaint itemizes multiple years of sales efforts, including meetings with dozens of individuals at major Agent Lenders, Broker-Dealers, and Clearinghouses. *Id.* A-79-89 ¶¶122-86. The Complaint further shows how SL-x tried to bypass or win-over skeptics within Defendants' organizations to help make sales. *E.g.* A-84-85 ¶¶154-55. None of this conduct is consistent with knowledge of the conspiracy.

- "Defendants made encouraging statements to SL-x executives about the platform and about central clearing more broadly, which statements misrepresented their true lack of enthusiasm." *See IPERS*, 340 F. Supp. 3d at 335.

- SL-x and other alternative platforms received substantial investments. A-77 ¶110, A-122 ¶302, A-98-105 ¶¶226-63. This "substantial investment support for the victim platforms shows that, at the least, it was not obvious that a conspiracy was in the works to destroy them." *IPERS*, 340 F. Supp. 3d at 337.

- The *IPERS* court "agree[d]" that the fact that "other industry participants and market regulators did not catch wind of the conspiracy shows… that

Plaintiffs could not have acquired knowledge of it through the exercise of reasonable diligence." *IPERS*, 340 F. Supp. 3d at 336.

Despite whatever comments it may have received from certain quarters, SL-x's conduct confirms that it had no idea that Defendants had reached a "general agreement" to boycott it and other new market entrants. No more is required at the pleading stage. *See Sonterra Cap.*, 366 F. Supp. 3d at 530 ("Plaintiffs adequately allege that they remained ignorant of the alleged scheme until a point within the relevant statutes of limitations."); *In re Credit Default Swaps Antitrust Litig.*, No. 13md2476 (DLC), 2014 WL 4379112, at *16 (S.D.N.Y. Sept. 4, 2014) (same); *In re Sumitomo Copper*, 120 F. Supp. 2d at 347 (same).

### C. Diligence

The trial court held that because Markit and Deutsche Bank's conduct "together with the statements allegedly made by executives of the Broker Defendants, was sufficient to put Plaintiffs on inquiry notice of the scheme, Plaintiffs cannot plead ignorance and due diligence." SPA-17. That is not how inquiry notice works.

Once a plaintiff is on inquiry notice, it has an obligation to use due diligence to investigate the tort. However, when a plaintiff cannot discover the conspiracy through a reasonable investigation, it is still entitled to tolling under the fraudulent concealment doctrine. *See, e.g.*, *Hendrickson Bros.*, 840 F.2d at 1085 (Fraudulent

concealment successfully shown where "jury found that neither the State nor the County could have, by exercising due diligence, discovered the existence of the conspiracies alleged in the complaint."); *In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000) (diligence properly pled where complaint alleged that plaintiffs "could not have discovered the conspiracy at an earlier date by the exercise of due diligence because of the affirmative, deceptive practices and techniques of secrecy employed by Defendants"); *S.E.C. v. Power*, 525 F. Supp. 2d 415, 426 (S.D.N.Y. 2007) (finding diligence properly pled where "the Complaint alleges affirmative acts by defendant [] to conceal the transaction's lack of economic substance and to prevent discovery of its fraudulent purpose and effect"). As a result, the mere fact that a plaintiff is on inquiry notice does not dispose of whether there is tolling for fraudulent concealment.

Further, this Court has repeatedly held that a plaintiff is not obligated to plead in its complaint that it exercised due diligence. *Harris v. City of New York*, 186 F.3d 243, 251 (2d Cir. 1999) ("[T]he statute of limitations is an affirmative defense under Rule 8(c) that Harris' pleading need not have anticipated."); *BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC*, 603 F. App'x 57, 59 (2d Cir. 2015) (Reversing dismissal of fraudulent concealment argument because "the statute of limitations is an affirmative defense, and a plaintiff is not required to plead, in a complaint, facts

sufficient to overcome an affirmative defense. Thus, requiring the [plaintiffs], at the motion to dismiss stage, to make a showing of reasonable diligence was premature.")

In any event, any suggestion that SL-x did not adequately plead diligence is meritless. SL-x's entire business was dedicated to doing two things: developing its platform and persuading others to use it. The Complaint describes **approximately thirty in-person meetings** between SL-x personnel and the Defendants themselves, meetings taken – in part – for the purpose of understanding and overcoming Defendants' resistance to doing business with SL-x. A-79-87 ¶¶122-69. The Complaint also details SL-x's extensive communications with other market participants, including Agent Lenders, Clearinghouses, and other financial investors. A-87-89 ¶¶170-86. Given that SL-x spoke to essentially everyone in the industry in connection with its sales efforts, and did so repeatedly over a period of years, it is hard to imagine how SL-x could have exercised more diligence in seeking to uncover the source of the sales resistance that it was experiencing.

SL-x's efforts to understand Defendants' motives easily satisfied the diligence requirement. *See In re Credit Default Swaps*, 2014 WL 4379112, at *16 (In group boycott action, due diligence requirement satisfied where "plaintiffs monitored news on the financial industry and CDS market, enlisted investment managers to track CDS pricing and to obtain the most favorable executions possible, and made inquiries to Dealer–Defendants regarding CDS price movement.")

Further, even if there were suggestions afoot that there might be a conspiracy, SL-x was entitled to rely on the explicit and implicit assurances that it was constantly receiving from Defendants that they were considering the platform on the merits. In *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 98 (2d Cir. 2018), plaintiffs claimed that defendants manipulated LIBOR, and the trial court dismissed the LIBOR claims as time-barred because press reports had raised questions about the accuracy of LIBOR. The defendants, however, had publicly stated that LIBOR was accurate, and this Court reversed the dismissal of the claims because "[i]t [wa]s plausible that Schwab reasonably relied on those assurances, thus delaying the start of the limitations period." *Id.* at 97. *Accord Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 530 (S.D.N.Y. 2018) (same); *In re Nine W. Shoes*, 80 F. Supp. 2d at 193 (Complaint successfully alleged price fixing conspiracy could not have been discovered earlier by alleging that defendants concealed the price-fixing and created false impression of price discounts.)

In any event, even if SL-x were on inquiry notice and it had failed to satisfactorily exercise due diligence, there would still be a fact question as to whether the action is timely. When a plaintiff has a duty to exercise due diligence but its diligence efforts fall short of its obligation, the statute of limitation is tolled until the plaintiff **should have** discovered the illegal conspiracy. *See Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995) ("[W]hen a "defendant fraudulently

conceals the wrong, the time [limit of the statute of limitations] does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action.")  The statute of limitations does not begin to run until the tolling ceases, from which point the plaintiff has four years to file its claim.  *Id.*  Accordingly, even absent diligence, the statute of limitations does not begin to run the precise moment that inquiry notice is triggered.  And determining when the statute of limitations begins to run requires determining how long a reasonable investigation would have taken to uncover the tort.

The trial court here held otherwise, concluding that statute of limitations began to run as soon as SL-x was placed on inquiry notice, in "late summer in 2014." SPA-14.  Realistically, Defendants' conspiracy would have required a reasonable person at least one year to uncover, meaning that SL-x's actions were timely when they were filed on November 1, 2018 and May 24, 2019.  It took two of the nation's top antitrust law firms nine months to uncover the conspiracy and they could only do so through efforts far above and beyond the reasonable diligence required for tolling.[6]  But in any event, adjudicating how long a reasonable investigation would have taken to uncover the conspiracy cannot be determined on a motion to dismiss.

---

[6] *IPERS*, Dkt. #233-6 at 11:25-12:11, *available at* https://pacer-documents.s3.amazonaws.com/119/479117/127125772747.pdf? (last accessed Feb. 7, 2022).

Even if some of SL-x's claims accrued more than four years before SL-x's actions were filed, the actions are timely because Defendants' fraudulent concealment of their illegal group boycott tolled the statute of limitations.

## III. THE DONNELLY ACT CLAIM IS TIMELY

The Donnelly Act's statute of limitations is substantially similar to that of the Sherman Act. *See* N.Y. Gen. Bus. Law § 340(5) (four-year statute of limitations); *TechReserves Inc. v. Delta Controls Inc.*, No. 13 CIV. 752 GBD, 2014 WL 1325914, at *10 (S.D.N.Y. Mar. 31, 2014) (Sherman and Donnelly Act statutes of limitations subject to same analysis). The Donnelly Act claim is timely for the very same reasons that the Sherman Act claim is timely.

## IV. ARTICLE III IS SATISFIED IN THE PARENT ACTION

It is undisputed that the SL-x Subsidiaries have standing to bring the instant antitrust claims and thus there is no dispute about whether the Subsidiaries Action satisfies Article III of the Constitution. Article III is also satisfied in the Parent Action both because (a) the SL-x Parent has independent standing to assert the instant antitrust claims; and (b) the SL-x Subsidiaries existed at the time the Parent Action was filed and sought to assign their claims to the Parent or to join or ratify the Parent Action.

### A. The SL-x Parent Has Standing

With respect to standing, the trial court first concluded that "it seems to me there are a lot of facts in dispute that, as of right now, I don't feel like I'm really in

a position to resolve that, one way or the other." A-520:6-9. It later ruled on the same record that the SL-x Parent did not have standing when it filed its Complaint because the SL-x Subsidiaries originally owned the claims and "[n]othing in the Parent or Subsidiary Complaint sheds any light on how or why [the SL-x Parent] is the legal successor in interest to its subsidiaries' claims." SPA-8.

This was error. In ruling under Fed. R. Civ. P. 12(b)(1), the trial court should have credited the allegations in the Complaint and considered the evidence that SL-x submitted. *See Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (On Rule 12(b)(1) motion, the court "must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction" and may "refer[ ] to evidence outside of the pleadings, such as affidavits.") Had it done so it would have concluded that the SL-x Parent had standing.

The SL-x Parent's Complaint makes clear that, beginning in 2010, it was in the business of providing new ways to conduct stock lending. A-77-78 ¶¶106-13. That the SL-x Parent created subsidiaries to hold certain assets and operate certain aspects of its business does not change that. Nor does it change the fact that Defendants' group boycott injured the SL-x Parent. A-91-93 ¶¶195-205. As a result, once the allegations in the Parent Complaint are properly credited, it is clear that the SL-x Parent has Article III standing.

Even if Plaintiff were seeking to recover solely as a corporate parent, where "there is such a unity of ownership of interest and ownership between a corporation and one or more of its investors that any injury to the corporation is in fact suffered by the investor, the investor may have standing to assert an antitrust claim against a direct competitor of the corporation." *In re Napster, Inc. Copyright Litig.*, 354 F. Supp. 2d 1113, 1120–21 (N.D. Cal. 2005). Here, the SL-x Parent had full operational control over the SL-x Subsidiaries from the time that the Subsidiaries were created until the day that the subsidiaries were dissolved. A-291 ¶2. Indeed, the Subsidiaries never had any owners besides the SL-x Parent. *Id.*

Finally, SL-x's director testified that after the SL-x's European Subsidiaries were dissolved in 2015 and 2016, the SL-x Parent continued their business. A-291-92 ¶3. When, as here, a parent corporation dissolves and then continues the business of its wholly owned subsidiaries, it has the right to bring claims held by the subsidiaries prior to the dissolution. *See eComSystems, Inc. v. Shared Mktg. Servs., Inc.*, No. 8:10-CV-1531-T-33MAP, 2012 WL 171083, at *1 (M.D. Fla. Jan. 20, 2012) (holding parent corporation had right to bring claims previously owned by subsidiaries where it continued the business of its dissolved subsidiaries); *Edward Hines Lumber Co. v. Vulcan Materials Co.*, No. 85 C 1142, 1985 WL 1189, at *1 (N.D. Ill. May 8, 1985) ("Even though the complaint does not specifically allege the succession of Hines to the rights and liabilities of its dissolved subsidiaries, other

allegations demonstrate that Hines does have standing to bring this suit."); *John Mohr & Sons v. Hanover Ins. Co.*, 322 F. Supp. 184, 187 (N.D. Ill. 1971) ("The situation is quite distinct from that where a corporation dissolves leaving no successor to carry on its work or assume its responsibilities, for here there was a successor corporation with a unity of interest and ownership in the dissolved corporation.")

### B. Article III Standing Is Satisfied by the Existence and Participation of the SL-x Subsidiaries

Even if the SL-x Parent lacks standing, its Action satisfies the standing requirement because the SL-x Subsidiaries (1) legally existed at the time the Parent Action was filed and (2) sought to participate in or approve the Parent Action shortly after it was filed. This Court recently set forth the standard for Article III standing:

> Article III is satisfied so long as a party with standing to prosecute the specific claim in question exists at the time the pleading is filed. If that party (the real party in interest) is not named in the complaint, then it must ratify, join, or be substituted into the action within a reasonable time. Only if the real party in interest either fails to materialize or lacks standing itself should the case be dismissed for want of subject-matter jurisdiction.

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 386 (2d Cir. 2021), *cert. denied* No. 21-505, 2022 WL 89304 (U.S. Jan. 10, 2022).

To "exist" for purposes of Article III standing, the real parties in interest must have "some vestige of legal existence at the action's inception, even if they lacked the capacity to sue." *Id.* at 383. Dissolved entities have a "vestige of legal existence"

where "state law granted the dissolved entities continued existence even after dissolutions so that they could wind up their affairs." *Id.* *See also In re Martin-Trigona*, 760 F.2d 1334, 1342–43 (2d Cir. 1985) (holding court had jurisdiction to hear action filed by dissolved corporation where corporation was authorized to wind up its affairs).

The SL-x Subsidiaries easily satisfy this requirement. SL-x Trading USA LLC and SL-x Technology USA LLC are Delaware LLCs that had been dissolved at the time the Parent Action was filed. A-342, A-576-77 ¶¶14-18. Under Delaware law, dissolved LLCs "may wind up the limited liability company's affairs." 6 Del. C. § 18-803(a). Thus, the existence requirement is satisfied.

And shortly after the Parent Action was filed, SL-x sought leave (1) to file a supplemental declaration containing proof of the Subsidiaries' assignment of these claims to the Parent (A-297) and (2) to join the SL-x Subsidiaries or to permit the SL-x Subsidiaries to ratify the Parent Action (A-341). Because *Fund Liquidation* had yet to be decided at that time, the trial court denied the motion to file a supplemental declaration (A-318-20) and denied the motion to amend or to ratify without prejudice (A-26 (5/17/19 Minute Entry)). However, under *Fund Liquidation*, the Parent Action satisfies the Article III standing requirement irrespective of whether the Parent had independent standing to bring the instant antitrust claims.

## V. THE STATE LAW CLAIMS SHOULD BE REINSTATED

The trial court's sole basis for dismissing SL-x's tortious interference, unjust enrichment, and Deceptive Trade Practice Act claims was that the court declined to exercise supplemental jurisdiction over such claims after dismissing SL-x's federal antitrust claim. SPA-19-20. Because SL-x's federal antitrust claims should be reinstated, the state claims should be reinstated as well. *See Fountain*, 838 F.3d at 138 ("Having revived the federal claims, at least for now, we also reinstate Fountain's state-law claims, as to which the district court declined to exercise supplemental jurisdiction because all federal claims had been dismissed.")

## VI. SL-X SHOULD BE GRANTED LEAVE TO AMEND THE COMPLAINTS

In its opposition to Defendants' motion to dismiss, SL-x requested leave to amend its Complaint to add additional parties or to provide additional allegations. A-290. In ruling on the motions to dismiss, the trial court did not grant this request and, as a result, it was denied. *See Fielding v. Tollaksen*, 510 F.3d 175, 178 (2d Cir. 2007) ("[A] district judge's entry of judgment without ruling on a motion or argument is tantamount to a[ ] denial or rejection of that motion or argument."); *Barani v. Dep't of Def.*, 518 F. App'x 48, 49 (2d Cir. 2013) (Summary Order) (implicit denial of motion to amend complaint).

This Court has repeatedly held that a plaintiff has a right under Fed. R. Civ. P. 15 to move to amend its complaint after the district court rules on the sufficiency

of the complaint.  *See Kopchik v. Town of E. Fishkill*, *New York*, 759 F. App'x 31, 38 (2d Cir. 2018) (Summary Order) ("There is no obligation on a plaintiff to expend time and resources to amend a complaint before knowing whether the court will find it insufficient, and if so, in what ways…. It is inappropriate to deny a plaintiff the opportunity to replead after a defendant's motion to dismiss is granted, simply because the plaintiff decided not to replead before learning whether the court would find the complaint insufficient."); *Cresci v. Mohawk Valley Cmty. Coll.*, 693 F. App'x 21, 25 (2d Cir. 2017) (plaintiff should be permitted to amend its complaint after court rules on motion to dismiss); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015) (same).

SL-x has been denied this right.  If this Court finds that any aspect of Defendants' motions to dismiss should be granted, SL-x should be permitted leave to amend its Complaints on remand.

## CONCLUSION

SL-x respectfully requests that the Court (i) reinstate all of SL-x's claims, (ii) permit the SL-x Subsidiaries to join, ratify, and/or approve the Parent Action, and (iii) remand the cases. In the alternative, SLI requests that the Court grant SL-x leave to amend and remand the cases.

**Dated:**    New York, NY
February 7, 2022

Respectfully submitted,

MANDEL BHANDARI LLP
80 Pine Street, 33rd Floor
New York, New York 10005
(212) 269-5600

By:  /s/ Rishi Bhandari

Rishi Bhandari
Evan Mandel
Robert Glunt
*Attorneys for SL-x IP S.à.r.l., SL-x Trading Europe Limited, SL-x Technology UK Limited, SL-x USA Trading LLC, and SL-x Technology USA LLC*

**CERTIFICATE OF COMPLIANCE**

    I hereby certify that pursuant to Local Rule 32.1(a)(4)(A), this brief contains fewer than 14,000 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), and complies with the format, typeface, and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6).

Dated:  New York, NY
         February 7, 2022

                    Respectfully submitted,

                    MANDEL BHANDARI LLP

                    By:   /s/ Rishi Bhandari
                          Rishi Bhandari
                          80 Pine Street, 33rd Floor
                          New York, NY 10005
                          T:  (212) 269-5600
                          dc@mandelbhandari.com

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Opinion and Order of the Honorable Richard J. Sullivan Appealed
    From, in *SL-X IP S.A.R.L. v. Bank Of America Corporation et al*,
    Case No. 1:18-cv-10179dated September 30, 2021................. SPA-1

Opinion and Order of the Honorable Richard J. Sullivan
    Appealed From, in *SL-X Trading Europe Limited, et al v. Bank
    Of America Corporation, et al*, Case No. 1:19-04885,
    dated September 30, 2021 ...................................... SPA-21

# SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SL-X IP S.Á.R.L., | |
| Plaintiff, | |
| -v- | No. 18-cv-10179 (RJS) |
| BANK OF AMERICA CORPORATION, *et al.*, | |
| Defendants. | |
| | OPINION & ORDER |
| SL-x Technology USA LLC., SL-x Technology UK Ltd., and SL-x Trading USA LLC, | |
| Plaintiffs, | |
| -v- | No. 19-cv-4885 (RJS) |
| BANK OF AMERICA CORPORATION, *et al.*, | |
| Defendants. | |

RICHARD J. SULLIVAN, Circuit Judge:

These consolidated actions arise from claims brought first by SL-x IP S.á.r.l. in Case No. 18-cv-10179 (the "Parent Action") and later by its subsidiaries, SL-x Technology USA LLC, SL-x Technology UK Ltd., and SL-x Trading USA LLC (together with SL-x IP S.á.r.l, "Plaintiffs" or "SL-x"), in a substantively identical complaint in Case No. 19-cv-4885 (the "Subsidiary Action"). Plaintiffs allege that a group of financial institutions (the "Broker Defendants") and their preferred provider for stock lending services, EquiLend, conspired to boycott a stock lending platform developed by SL-x in violation of applicable federal and state antitrust laws – specifically, the Sherman Act and New York's Donnelly Act.  (Doc. No. 5 ("Parent Complaint" or "Compl.") at

¶¶ 307–22; Case No. 19-cv-4885, Doc. No. 1 ("Subsidiary Complaint" or "Sub. Compl.") at ¶¶ 317–32.)[1]  Plaintiffs also bring claims under New York law for tortious interference with business relations, unjust enrichment, and a violation of the Deceptive Trade Practices Act ("DTPA").  (Compl. ¶¶ 323–36; Sub. Compl. ¶¶ 333–46.)

Now before the Court are Defendants' assorted motions to dismiss the Plaintiffs' claims.  For the reasons set forth below, the Court grants Defendants' motion to dismiss the Parent Complaint for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1); denies EquiLend Europe's motion to dismiss the Subsidiary Complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2); grants Defendants' collective motion to dismiss Plaintiffs' federal and state antitrust claims in the Subsidiary Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that they are time-barred; and declines to exercise supplemental jurisdiction over the remaining state-law claims in the Subsidiary Complaint.

## I. Background

### A. Facts

#### 1. The Stock Lending Market and SL-x

These actions involve alleged misconduct in the stock lending industry.  By way of background, a stock loan is a financial transaction in which a lender gives temporary ownership over shares of stock to a borrower (Compl. ¶ 68) – typically, a broker seeking to cover short positions – for a fee.  *See QS Holdco Inc. v. Bank of Am. Corp.*, No. 18-cv-824 (RJS), 2019 WL 3716443, at *1

---

[1] Unless otherwise noted, all citations to the docket refer to entries in Case No. 18-cv-10179 (the "Parent Action").  The remaining defendants in the consolidated actions (collectively called "Defendants") are:  Merrill Lynch Professional Clearing Corp;, Merrill Lynch L.P. Holdings, Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated (together, "Merrill Lynch"); Credit Suisse AG; Credit Suisse Securities (USA) LLC; Credit Suisse First Boston Next Fund, Inc. (together, "Credit Suisse"); Goldman, Sachs & Co. LLC ("Goldman"); JP Morgan Securities LLC; J.P. Morgan Prime, Inc.; J.P. Morgan Strategic Securities Lending Corp.; J.P. Morgan Chase Bank N.A. (together, "J.P. Morgan"); Morgan Stanley & Co. LLC; Prime Dealer Services Corp.; Strategic Investments I, Inc. (together, "Morgan Stanley"); UBS AG; UBS Americas Inc.; UBS Securities LLC; UBS Financial Services Inc. (together, "UBS," and collectively with the preceding defendants, the "Broker Defendants"); and EquiLend LLC; EquiLend Europe Limited ("EquiLend Europe"); and EquiLend Holdings LLC (together, "EquiLend").

(S.D.N.Y. Aug. 6, 2019).[2]  Over one trillion dollars in securities move through this stock loan market every year.  (Compl. ¶ 75.)  Nevertheless, because there is no public exchange to facilitate these stock lending transactions, would-be lenders and borrowers are often in the dark as to the appropriate fees to be charged for their loans.  (*Id.* ¶¶ 77, 82–92.)

Around 2010, some electronic trading veterans founded SL-x and developed a patented online software designed to counteract the market inefficiencies resulting from the lack of transparency in stock lending transactions.  (Compl. ¶¶ 93, 106.)[3]  SL-x's software provided an "online platform where Broker-Dealers and Agent Lenders could post bids and offers for potential stock loan transactions."  (*Id.* ¶ 94.)  Users could view price data "in real time" and access information that was previously unavailable to the general public.  (*Id.* ¶ 95.)  Other features included direct messaging with multiple parties and anonymous transacting (*id.* ¶¶ 96–97), and the ability to lend European stock at a reduced counterparty risk and lower capital cost (*id.* ¶¶ 100–04).

2.  Defendants' Boycott of SL-x

While developing their company's software, SL-x executives contacted market players to generate interest in their product.  (*Id.* ¶ 111.)  According to Plaintiffs, "more than one" of the Broker Defendants initially "contemplated investing in the company."  (*Id.* ¶ 112.)  With the help of its investor, Palamon Capital Partners ("Palamon"), SL-x also reached out to Defendant EquiLend, a company that is owned and controlled by the Broker Defendants (*Id.* ¶¶ 110, 287) and "operates an

---

[2] The following facts are taken from the Parent Complaint in Case No. 18-cv-10179 and the Subsidiary Complaint in Case No. 19-cv-4885 (together, the "Complaints") and are assumed true for purposes of these motions.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  In ruling on the motions, the Court has also considered Defendants' memorandum of law (Doc. No. 68 ("Mem.")), Defendant EquiLend Europe's memorandum of law (Doc. No. 65 ("EquiLend Mem.")), Plaintiffs' memorandum of law in opposition to Defendants' joint motion (Doc. No. 77 ("Opp'n")), Plaintiffs' memorandum of law in opposition to EquiLend Europe's memorandum (Doc. No. 75 ("Opp'n to EquiLend")), Defendants' reply (Doc. No. 88 ("Reply")), Defendant EquiLend Europe's reply (Doc. No. 83 ("EquiLend Reply")), and all exhibits attached thereto.

[3] Neither the Parent Complaint nor the Subsidiary Complaint specifies which SL-x entity initially created the software. Although the Subsidiary Complaint introduces the plaintiffs in that complaint as "all direct or indirect subsidiaries" of SL-x IP S.á.r.l. – "a holding company that operated the SL-x business through [the subsidiaries]" – Plaintiffs otherwise fail to differentiate among the SL-x entities.  (Sub. Compl. ¶ 14.)

electronic bulletin board where Agent Lenders can post their stock inventory with a fixed price to borrow each stock." (*Id.* ¶ 116.) Although SL-x offered to purchase EquiLend outright, EquiLend rejected that proposal out of hand and rebuffed "any further efforts at negotiation." (*Id.* ¶¶ 118, 120.) SL-x proceeded to contact the Broker Defendants directly and advertise itself as a competitor to EquiLend (*see, e.g., id.* ¶¶ 121–22), but the Broker Defendants ultimately rejected SL-x's overtures, notwithstanding their previous expressions of interest in the SL-x platform (*see, e.g., id.* ¶ 125).

At a meeting in February 2013, a Credit Suisse executive told Plaintiffs' representative that "EquiLend was like 'the mafia run by five crime families.'" (*Id.* ¶ 134.) That same executive later stated that Credit Suisse would "join" with SL-x only after "'the Big Boys' [ ] committed to the platform'" and warned that "without approval from EquiLend, SL-x was unlikely to be able to achieve a foothold in the industry." (*Id.* ¶¶ 135–36.) Indeed, according to the Complaints, at various times between 2011 and 2014 representatives of the Broker Defendants described EquiLend as the gatekeeper to any deal with Plaintiffs. (*See, e.g., id.* ¶ 168.)

Plaintiffs allege that Defendants entered into a secret agreement to boycott SL-x at EquiLend meetings where representatives from the Broker Defendants were present. (*Id.* ¶ 189.) Plaintiffs further allege that the Broker Defendants engaged in this boycott to perpetuate the lack of transparency in stock-lending transactions, which enabled them to "charg[e] exorbitant fees to connect borrowers and lenders and prevent[] either side from knowing the true 'cut' that Defendants charge as middlemen." (*Id.* ¶ 3; *see also id.* ¶ 81–82.) Plaintiffs also allege that as a result of the boycott, SL-x lost access to funding and new investors (*id.* ¶¶ 195–201), and was forced, in early 2015, to sell its patents to EquiLend "for a fraction of the true value of the company" (*id.* ¶¶ 201, 216).

### B. Procedural History

SL-x IP S.á.r.l. filed the Parent Complaint on November 1, 2018. (Doc. No. 5.) On December

21, 2018, Defendants filed a joint motion to dismiss all claims in the Parent Complaint.  (Doc. Nos. 67, 68.)  That same day, Defendant EquiLend filed a separate motion to dismiss the Parent Complaint for lack of personal jurisdiction.  (Doc. Nos. 64, 65.)

In light of Defendants' argument that SL-x IP S.á.r.l lacked standing to pursue the claims of its since-dissolved subsidiaries, on February 5, 2019, SL-x IP S.á.r.l requested leave to file a supplemental declaration once it had revived its subsidiaries and assigned the subsidiaries' claims to SL-x IP S.á.r.l.  (Doc. Nos. 79, 80.)  The Court denied SL-x IP S.á.r.l.'s request.  (Doc. No. 87 at 2.) Nevertheless, on April 18, 2019, after the subsidiaries had been revived, SL-x IP S.á.r.l. filed a letter seeking a pre-motion conference regarding its contemplated motion to join the subsidiaries as plaintiffs pursuant to Federal Rules of Civil Procedure 15(a)(2), 17(a), and 25(c).  (Doc. No. 90.)  At a pre-motion conference on May 17, 2019, the Court suggested that the parties engage in jurisdictional discovery to first resolve the standing issue presented in the motion to dismiss.  (Doc. No. 98 ("Conf. Tr.") at 7:9–13.)  The parties, however, rejected that proposal, whereupon the Court denied SL-x IP S.á.r.l's motion to amend its complaint without prejudice to renewal after a decision on the fully briefed motion to dismiss.  (*See id.* at 26–27.)

Subsequently, on May 24, 2019, the revived subsidiaries – SL-x Technology USA LLC, SL-x Technology UK Ltd., SL-x Trading USA LLC, and SL-x Trading Europe Ltd. – brought an identical suit of their own, the Subsidiary Action, which was assigned to my docket as related to the Parent Action.  Despite Defendants' previous opposition to a motion to join the subsidiaries in the initial action, Defendants consented to the consolidation of the two cases under Rule 42(a)(2) of the Federal Rules of Civil Procedure.  (Case No. 19-cv-4885, Doc. No. 12.)  In light of the parties' agreement to consolidate the Parent and Subsidiary Actions, the Court ordered that the actions be consolidated, and – per the parties' agreement – ordered that Defendants' motion to dismiss the Parent Complaint and Plaintiffs' opposition to that motion be deemed responsive to the Subsidiary Complaint.  (Case

No. 19-cv-4885, Doc. No. 25 at 2.)  Defendants declined the opportunity to submit supplemental briefing.  (Case No. 19-cv-4885, Doc. No. 41.)  With that background, the Court now turns to those motions in this consolidated action.[4]

## III.  DISCUSSION

The Court will address, in turn, (1) Defendants' joint motion to dismiss the Parent Complaint for lack of standing pursuant to Rule 12(b)(1); (2) EquiLend Europe's motion to dismiss the claims against it for lack of personal jurisdiction under Rule 12(b)(2); and (3) Defendants' joint motion to dismiss the Subsidiary Complaint for failure to state a claim under Rule 12(b)(6).

### A.  Standing

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), the party seeking to invoke the Court's jurisdiction bears the burden of proving that subject matter jurisdiction exists. *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  Standing is a "core component . . . of the case-or-controversy requirement of Article III," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), and whether a plaintiff has standing "is the threshold question in every federal case, determining the power of the court to entertain the suit," *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) (internal quotation marks and citations omitted).

Because "federal court[s] may resolve only [] real controvers[ies] with real impact[s] on real persons," we cannot hear claims that plaintiffs do not have standing to bring.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (internal quotation marks omitted).  To establish Article III

---

[4] In 2018, a separate group of plaintiffs brought a class action against Defendants in the Southern District of New York, alleging many of the same facts now alleged here.  That case, which is discussed in part below, is currently proceeding before Judge Failla.  *See Iowa Pub. Emps.' Ret. Sys. v. Bank of Am. Corp.*, No. 17-cv-6221 (KPF).

standing, a plaintiff must show that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant[s]; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). More than one party can have Article III standing to assert a claim as long as each can individually establish the elements of standing.

The Second Circuit recently held that "Article III is satisfied so long as a party with standing to prosecute the specific claim in question exists at the time the pleading is filed." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 386 (2d Cir. 2021). But even if a real party in interest is not named in the complaint, a case will not be dismissed for lack of standing if that party "ratif[ies], join[s], or [is] substituted into the action within a reasonable time. Only if the real party in interest either fails to materialize or lacks standing itself should the case be dismissed for want of subject-matter jurisdiction." *Id.* A real party in interest lacks standing to sue if it lacks legal existence. *Id.* at 384. To determine the legal existence of party, we look to state law. *Id.* at 386.

Defendants argue that SL-x IP S.á.r.l. lacks Article III standing to bring the Parent Action because it does not own the claims it asserts. (Mem. at 6.) According to Defendants, the subsidiaries – now the plaintiffs in the Subsidiary Action – owned the claims and suffered the injury at issue in this case. (*Id.* at 6–8.) SL-x IP S.á.r.l. concedes that it did not own the claims at issue; nevertheless, it asserts that, as the "sole surviving SL-x entity" at the time the Parent Complaint was filed, it was the "legal successor in interest to all of its shuttered subsidiaries." (Opp'n at 5.) Although the subsidiaries have since been revived, "standing is to be determined as of the *commencement* of suit." *Lujan*, 504 U.S. at 570 n.5 (emphasis added). Thus, to meet the requirements of Article III standing here, either (1) SL-x IP S.á.r.l. must have suffered an injury at the time it filed the Parent

Complaint by virtue of its status either as a successor in interest or parent to the subsidiaries that owned the SL-x platform, or at least (2) the real parties in interest – the subsidiaries – must have existed at the time SL-x IP S.á.r.l. filed the Parent Complaint.

Nothing in the Parent or Subsidiary Complaint sheds any light on how or why SL-x IP S.á.r.l. is the legal successor in interest to its subsidiaries' claims.  In fact, contrary to the assertions in the Plaintiffs' briefing, the Parent Complaint does not even allege that SL-x IP S.á.r.l. *is* the successor in interest to its subsidiaries; it neglects any mention of the subsidiaries whatsoever.  *Cf. Wallert v. Atlan*, 141 F. Supp. 3d 258, 277–78 (S.D.N.Y. 2015) (concluding that plaintiff lacked standing to bring copyright claims because his complaint only alleged that he was the "successor in interest" to copyright rights, and not that he was assigned or transferred the rights pursuant to the governing copyright statute).  The mere fact that SL-x IP S.á.r.l. was the parent of the injured subsidiaries is insufficient alone to establish injury here.  *See In re Beck Indus., Inc.*, 479 F.2d 410, 418 (2d Cir. 1973) ("Where a parent corporation desires the legal benefits to be derived from organization of a subsidiary that will function separately and autonomously in the conduct of its own distinct business, the parent must accept the legal consequences, including its inability later to treat the subsidiary as its alter ego because of certain advantages that might thereby be gained."); *see also BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 420 (S.D.N.Y. 2011) (concluding that parent lacked standing to assert claims of subsidiary); *Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12-cv-0722 (PAE), 2012 WL 4849146, at *6 (S.D.N.Y. Oct. 12, 2012) (collecting cases).  SL-x IP S.á.r.l. has therefore failed to establish that it had standing to pursue its claims as a successor in interest or as a parent corporation.[5]

That leaves only the question of whether "a party with standing to prosecute the specific claim

---

[5] Since the Court concludes that SL-x IP S.á.r.l. does not have standing to bring the Parent Action, it need not address Defendants' alternative argument – which Defendants asserted only in connection with the Parent Complaint – that SL-x

in question exist[ed] at the time the pleading [was] filed." *Fund Liquidation Holdings*, 991 F.3d at 386. It is clear from the record that no real party in interest existed at the time the Parent Complaint was filed. Indeed, Plaintiffs have conceded that the subsidiaries did not exist when SL-x IP S.á.r.l. filed the Parent Complaint. (*See* Opp'n at 1–2 (explaining that "[SL-x IP S.á.r.l.] continued the SL-x business after winding down its former wholly-owned subsidiaries" and began reviving those subsidiaries only after Defendants asserted – in a response to the Parent Complaint – that only the subsidiaries had standing to bring this suit).) So, at the commencement of the Parent Action, there was no real party in interest in existence, and thus the requirements of standing under Article III were not met. *See Lujan*, 504 U.S. at 570 n.5; *Fund Liquidation Holdings*, 991 F.3d at 386–91. For these reasons, the Parent Complaint is dismissed.

That leaves only the Subsidiary Complaint, which EquiLend Europe seeks to dismiss for lack of personal jurisdiction and which all Defendants seek to dismiss for failure to state a claim.

## B. Personal Jurisdiction Over EquiLend Europe

Because "a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)," the Court turns next to EquiLend Europe's personal jurisdiction argument. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007).

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), "[t]he plaintiff bears the burden of establishing that the court has jurisdiction over the defendant . . . ." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)). "[W]here a court rules on a 12(b)(2) motion based on pleadings and affidavits, the plaintiff is only required to make a prima facie showing of jurisdiction over the defendant." *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 440 (S.D.N.Y.

---

IP S.á.r.l. does not have antitrust standing. (*See* Mem. at 9 ("Even if Plaintiff possessed Article III standing, it would nonetheless lack antitrust standing because SL-x IP S.á.r.l. cannot sue under the antitrust laws to recover for injuries directly suffered by SL-x Trading Europe Limited and SL-x Technology UK Limited.").)

2008); *see Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).  Personal jurisdiction may be either general or specific.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).  General jurisdiction requires that a defendant's "affiliations with the State [be] so continuous and systematic as to render it essentially at home in the forum State."  *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (internal quotation marks and alterations omitted).  Specific jurisdiction requires that a defendant have minimum contacts with the forum jurisdiction, such as when a defendant has "'purposefully directed' his activities at the forum and the litigation 'arises out of or relates to' those activities."  *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 136 (2d Cir. 2014) (alterations omitted) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  If such "minimum contacts" with the forum are established, the Court must still be satisfied that "the assertion of personal jurisdiction would comport with fair play and substantial justice" under the Due Process Clause of the Constitution.  *Id.*

Defendant EquiLend Europe claims that personal jurisdiction is lacking for two reasons.  First, it notes that it is incorporated in the United Kingdom with its headquarters in London, preventing the exercise of general jurisdiction over it.  (EquiLend Mem. at 1; Sub. Compl. ¶ 62.)  Second, it asserts that the Court cannot exercise specific jurisdiction because Plaintiffs have failed to sufficiently establish that EquiLend Europe itself engaged in conduct directed towards the United States, let alone New York.  (EquiLend Mem. at 1.)  While the Court agrees that EquiLend Europe is not subject to general jurisdiction in New York, the same cannot be said for specific jurisdiction.

To be sure, Plaintiffs' Subsidiary Complaint makes few explicit references to EquiLend Europe, save for noting that "EquiLend Europe Limited has multiple officers and directors based in New York" (Sub. Compl. ¶ 64) and that certain members of EquiLend Europe's Board of Directors were also employees of the Broker Defendants (Sub. Compl. ¶ 294).  Otherwise, the allegations contained in the Subsidiary Complaint make no distinction between the different "EquiLend" entities.

(*See, e.g.*, Sub. Compl. ¶ 67 ("[Defendants] also met and conspired at EquiLend Board of Directors meetings in New York City and elsewhere, including at private dinners in New York City.").) Ordinarily, where a complaint conflates several entities and "make[s no] effort to allege that the conduct of one affiliate is attributable to the other[,]" group pleading will fail to establish personal jurisdiction for each defendant. *Tera Grp., Inc. v. Citigroup, Inc.*, No. 17-cv-4302 (RJS), 2018 WL 4732426, at *2 (S.D.N.Y. Sept. 28, 2018).

But the Second Circuit has recognized that specific jurisdiction may be established under a conspiracy-based theory, which provides that an alleged conspirator-defendant will be deemed to have "purposefully availed itself" of the laws of a forum – thus establishing minimum contacts – when that defendant or its co-conspirator undertakes an overt act in furtherance of the conspiracy in the forum. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82, 87 (2d Cir. 2018). Notably, Judge Failla considered a similar motion from EquiLend Europe in *Iowa Public Employees' Retirement System v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285 (S.D.N.Y. 2018), and– drawing all inferences in the plaintiffs' favor – concluded that specific jurisdiction was proper under the conspiracy theory articulated in *Schwab*. *Id.* at 340. Judge Failla reasoned that because EquiLend Europe was alleged to be part of the conspiracy, "its co-conspirators' 'overt acts in furtherance of the conspiracy' may be imputed to it for purposes of exercising jurisdiction." *Id.* (quoting *Charles Schwab Corp.*, 883 F.3d at 87).

As in the case before Judge Failla, Plaintiffs here have alleged facts that support the exercise of specific jurisdiction by virtue of EquiLend Europe's alleged participation in a conspiracy to violate the antitrust laws. The Subsidiary Complaint alleges that the Defendants conspired in part through their board positions (Sub. Compl. ¶ 286) and identifies which of the Broker Defendants' employees served on the board of EquiLend Holdings LLC (the U.S.-based entity) and which served on the board of EquiLend Europe (*id.* ¶¶ 293–94). Moreover, the Subsidiary Complaint alleges that a UBS

representative told SL-x that "any agreement would need to be approved by James Buckland, the Global Head of Securities Lending for UBS and a member of the EquiLend Board." (*Id.* ¶ 172.) The Subsidiary Complaint also identifies Buckland as a director of EquiLend Europe; together, these allegations support an inference that EquiLend Europe – through its agent, Buckland – was a member of the alleged conspiracy. (*Id.* ¶ 294; *see also* ¶ 286, ¶ 158 (alleging that a JP Morgan employee, identified later in the complaint as a director of EquiLend Europe, "admit[ted] that 'there is general agreement among [EquiLend] Directors that industry advances should be achieved from within EquiLend" (second alteration in original)); ¶ 63 (alleging that the "EquiLend entities operate under common corporate control and coordinate their business activities").)

Accordingly, the Court finds that the Subsidiary Complaint alleges sufficient facts to warrant the exercise of personal jurisdiction over Defendant EquiLend Europe. The Court therefore denies EquiLend Europe's motion to dismiss for lack of personal jurisdiction.

### C. Failure to State a Claim

Defendants contend that Plaintiffs' remaining claims must be dismissed because they are time-barred, and therefore fail to state a claim upon which relief can be granted. To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). To meet this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. That tenet, however, "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678; therefore, a

pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do," *Twombly*, 550 U.S. at 555. If the plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* at 570.

### 1. Antitrust Claims

Claims brought under the Sherman Act are subject to a four-year statute of limitations. *See* 15 U.S.C. § 15b. The same is true for claims brought under New York's Donnelly Act, a state antitrust statute modeled after the Sherman Act. *See* N.Y. Gen. Bus. Law § 340(5). Thus, Plaintiffs may recover on their antitrust claims only if they commenced this action within four years of "an act that injure[d] [their] business." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). Defendants assert that the statute of limitations has run on all of Plaintiffs' antitrust claims because the Parent Complaint was filed on November 1, 2018 (Doc. No. 1; *see also* Doc. No. 5), and because all injurious conduct alleged in the Complaints – with the potential exception of the sale of SL-x's patents in "early 2015" to EquiLend – occurred prior to November 1, 2014 (*See* Mem. at 12).[6] Plaintiffs counter that Defendants fraudulently concealed their conduct, thereby tolling those claims; they further argue that the 2015 sale constituted an antitrust injury that is actionable and timely.

"[A] motion to dismiss on statute of limitations grounds 'may be granted only if it is clear on the face of the complaint that the statute of limitations has run.'" *Patterson v. Morgan Stanley*, No. 16-cv-6568 (RJS), 2019 WL 4934834, at *15 (S.D.N.Y. Oct. 7, 2019) (quoting *Fargas v. Cincinnati Mack, LLC*, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013)). "In the context of a continuing conspiracy

---

[6] Whether the Court should view the four-year statute of limitations period as running from the filing date of the Parent Complaint (November 1, 2018) or that of the Subsidiary Complaint (May 24, 2019) was not addressed by either party following Plaintiffs' filing of the Subsidiary Complaint. Because Defendants previously identified November 1, 2018, as the relevant filing date for purposes of their statute of limitations defense and do not now argue for the Court to treat May 24, 2019, as the relevant date – and because the outcome would be the same in any event – the Court will proceed to treat November 1, 2018 as the relevant filing date without further analysis. (Mem. at 12; Opp'n at 19.)  [7] Plaintiffs have not established diversity jurisdiction under 28 U.S.C. § 1332(a) because two SL-x subsidiaries named as plaintiffs in the Subsidiary Complaint are incorporated in Delaware (Sub. Compl. ¶¶ 17–18), and many of the Defendants named in the Subsidiary Complaint are also incorporated in Delaware (*see, e.g.*, *id.* ¶¶ 20–23, 27–29, 32–33). *See* 28 U.S.C. § 1332(a), (c).

to violate the antitrust laws . . . each time a plaintiff is injured by an act of the defendants[,] a cause of action accrues to him . . . [and] the statute of limitations runs from the commission of the act." *Zenith Radio Corp.*, 401 U.S. at 338. This does not, however, "permit the plaintiff to recover for injuries caused by acts that occurred before that limitations period." *Iowa Pub. Emps.' Ret. Sys.*, 340 F. Supp. 3d at 333 (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)).

Based on the Plaintiffs' allegations in their Subsidiary Complaint, the Broker Defendants initially expressed "enormous amounts" of interest in SL-x and its product (Sub. Compl. ¶ 117), but by late summer in 2014, the Broker Defendants had conveyed to SL-x that they were not prepared to invest in or become customers of SL-x (*see, e.g., id.* ¶¶ 143–44, 148, 157, 166, 174). The statute of limitations thus started running at the time of this alleged anticompetitive conduct. *See Vitale v. Marlborough Gallery*, No. 93-cv-6276 (PKL), 1994 WL 654494, at *5 (S.D.N.Y. July 5, 1994); *see also Creative Copier Servs. v. Xerox Corp.*, No. 301-cv-155 (SRU), 2005 WL 2175138, at *2 (D. Conn. Sept. 2, 2005) (explaining that in some circumstances, "refusal[s] to deal" with a market actor may constitute anticompetitive conduct, and in the "refusal to deal" context the statute of limitations starts running when the refusal becomes final).

Of course, a statute of limitations may be tolled with a showing of fraudulent concealment. *See New York v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

> To show fraudulent concealment, a plaintiff must prove: (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to a lack of diligence on his part.

*See In re Int. Rate Swaps Antitrust Litig.* (*In re IRS*), 261 F. Supp. 3d 430, 487 (S.D.N.Y. 2017) (internal quotation marks omitted). A "plaintiff may prove the concealment element by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *Hendrickson Bros.*, 840

F.2d at 1083.  Fraudulent concealment must be pleaded with particularity "in accordance with the heightened pleading standards of Rule 9(b)." *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 675, 688 (S.D.N.Y. 2016) ("In alleging fraud . . . under Rule 9(b), 'a party must state with particularity the circumstances constituting fraud . . . .'" (quoting Fed. R. Civ. P. 9(b))).

Plaintiffs assert that Defendants' pre-2015 conduct was inherently self-concealing *and* involved affirmative acts of concealment.  (Sub. Compl. ¶ 305.)  In support of these arguments, Plaintiffs point to Judge Failla's conclusion in *Iowa Public Employees* that Defendants' alleged conspiracy was inherently self-concealing "because the alleged conspiracy required numerous participants, was designed to endure, and depended on concealment for its success."  340 F. Supp. 3d at 334 (citing *Hendrickson Bros.*, 840 F.2d at 1083–84).  In contrast to the present case, however, the plaintiffs in *Iowa Public Employees* were *not* owners of the stock lending platforms that Defendants allegedly boycotted.  In Judge Failla's case, the plaintiffs are a class of individuals and entities who entered into stock lending transactions with the Defendants.  *Id.* at 298.  Those plaintiffs allege that the Defendants threatened the Broker Defendants' own hedge fund clients to ensure that no one did business with other stock lending platforms.  *Id.* at 334.  Because the communications between the Defendants and their clients were not publicly available or disclosed, the plaintiffs in the *Iowa Public Employees* case had no way of knowing about the alleged threats.  *See id.*

This case is quite different.  Plaintiffs here were the owners of SL-x's intellectual property and have alleged that they were at meetings in which individual executives from the Broker Defendants clearly alluded to a conspiracy to freeze SL-x out of the market by boycotting it.  For instance – and most starkly – Plaintiffs allege that: (1) in a February 2013 meeting, a Credit Suisse executive warned Plaintiffs that EquiLend was like "the mafia run by five crime families" (Sub. Compl. ¶ 139); (2) in July 2013, that same executive, when withdrawing his company's interest in the platform, cautioned that Credit Suisse would only be interested if "the Big Boys" were committed

to SL-x (*id.* ¶ 140) and that without EquiLend's approval, SL-x would not get a "foothold" in the industry (*id.* ¶ 141); (3) in August 2013, a J.P. Morgan executive "admit[ted] that there is general agreement among EquiLend Directors that industry advances should be achieved from within EquiLend and that JP Morgan participated in discussions with other banks about industry direction at EquiLend meetings" (*id.* ¶ 158 (internal quotation marks omitted)); and (4) in September 2013, a UBS executive extolled the "benefit of being 'inside the club' of EquiLend member banks to effectuate market changes" and implied that "any market transition" in the area of stock lending platforms "would need to come from inside EquiLend" (*id.* ¶ 173).  The fact that executives of the Broker Defendants made these statements directly to SL-x representatives demonstrates that the alleged conspiracy did not "depend[] on concealment for its success."  *Iowa Pub. Emps.' Ret. Sys.*, 340 F. Supp. 3d at 334 (citing *Hendrickson Bros.*, 840 F.2d at 1083–84); *see In re IRS*, 261 F. Supp. 3d at 488 (observing that a conspiracy's object that "occur[s] in plain sight and in contrast to the market's expectations" would "if anything . . . have invited, rather than lulled, skeptical attention").

Even if Plaintiffs had alleged a self-concealing conspiracy – or, in the alternative, affirmative acts to conceal – their claim of fraudulent concealment would still fail because Plaintiffs were at least on inquiry notice of the conspiracy.  In *Iowa Public Employees*, Judge Failla concluded that the plaintiffs had properly alleged both ignorance of the scheme and due diligence because the only notice the plaintiffs might have seen came from a "single instance of unverified media speculation" from which a reasonable person would not have made inquiries.  340 F. Supp. 3d at 336–37.  The same cannot be said here.  Although Plaintiffs insist that they did not discover the conspiracy until the *Iowa Public Employees* lawsuit was filed in August 2017 (Sub. Compl. ¶ 8), this allegation is belied by the statements contained in the Subsidiary Complaint, which Plaintiffs concede were made by Defendants' executives to representatives of SL-x in 2013.  The warnings in these statements (i.e., that EquiLend was like "the mafia run by five crime families" (Sub. Compl. ¶ 139)) would make a

reasonable person suspicious enough to inquire further into the reasons why Defendants were rejecting the platform. And Plaintiffs' conclusory assertion that they "could [not] have discovered through the exercise of reasonable due diligence facts comprising its claims" (Sub. Compl. ¶ 305) is undermined by the apparent openness of Defendants' executives as to their plans to freeze SL-x out of the stock lending market. *Cf. Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 703–04 (S.D.N.Y. 2019) (concluding that a failure to plead with particularity when the plaintiff became aware of the antitrust violation, or that the plaintiff had performed due diligence, precluded a finding of fraudulent concealment).

In addition to explicit statements made directly to Plaintiffs' representatives that should have raised red flags, the Subsidiary Complaint also makes general allegations about Defendants' conduct that suggest such conduct was "unnatural and contrary to expectations." *In re IRS*, 261 F. Supp. 3d at 489. For instance, Plaintiffs characterize certain entities' decisions to reject SL-x after showing initial interest as "unexpected[,]" "strange[,] and sudden[.]" (Sub. Compl. ¶¶ 204, 180.) Because such conduct, together with the statements allegedly made by executives of the Broker Defendants, was sufficient to put Plaintiffs on inquiry notice of the scheme, Plaintiffs cannot plead ignorance and due diligence. *See In re IRS*, 261 F. Supp. 3d at 489 (concluding that the plaintiffs were "[a]t a minimum . . . on inquiry notice" where the plaintiffs "had every basis, in real time, to smell a rat"). Accordingly, Plaintiffs' claims for relief based on the pre-2015 conduct are barred by the statute of limitations.

Having concluded that Plaintiffs failed to state a claim for any of the pre-2015 conduct alleged in the Subsidiary Complaint, the Court next turns to whether the 2015 sale of SL-x's patents to EquiLend constituted a separate antitrust injury. Plaintiffs allege that they sought investors for SL-x throughout 2013 and 2014, but that Defendants pressured potential buyers not to invest. (Sub. Compl. ¶¶ 200–06.) In 2015, "Defendants negotiated with SL-x's principal shareholder, Palamon, to

purchase the patents held by SL-x." (*Id.* ¶ 207.) Plaintiffs assert that "[w]hile SL-x was gone" at this point, Defendants still worried that a third party would purchase SL-x's technology and "engineer a potential competitor to EquiLend" (*id.* ¶ 208); to eliminate this threat, EquiLend purchased SL-x's intellectual property in "early 2015" for £500,000 (*id.* ¶ 209). Plaintiffs contend that EquiLend made this purchase with no intention of ever using SL-x's intellectual property, as evidenced by the fact that EquiLend performed little due diligence regarding the transaction in May 2015 and never attempted to use the technology in any of its products thereafter. (*Id.* ¶ 210.)

But even accepting Plaintiffs' allegations as true, as the Court must at this stage of the proceedings, it remains clear from the face of the Subsidiary Complaint that Plaintiffs have failed to establish an independent antitrust injury as a result of the 2015 sale. As noted above, "a separate cause of action accrues," and the statute of limitations restarts, for each distinct violation that injures the Plaintiffs. *Creative Copier Servs.*, 2005 WL 2175138, at *1. But "not every act by an antitrust defendant is sufficient to restart the statute of limitations." *Id.* (internal quotation marks and citation omitted). Rather, Plaintiffs "must allege an overt act which (1) is a 'new and independent act that is not merely a reaffirmation of a previous act," and (2) 'inflict[s] new and accumulating injury on the plaintiff.'" *Vitale*, 1994 WL 654494, at *5.

Plaintiffs claim they were injured because "Defendants' conduct . . . forced [SL-x] to close its doors and sell off its intellectual property for a fraction of the true value of the company." (Sub. Compl. ¶ 221.) But while EquiLend's purchase and subsequent shelving of SL-x's technology may have further reduced competition and protected Defendants' positions in the relevant market, that was an injury inflicted on would-be stock-lenders and borrowers – like the plaintiffs in *Iowa Public Employees* – not the Plaintiffs here. For Plaintiffs, the injury realized in the 2015 sale – lost profits on the sale of their patents and business model – was the direct result of Defendants' refusal to deal with Plaintiffs in the years prior to the sale. Had Plaintiffs sold their patents at fire sale prices to a

party other than EquiLend, or not sold them at all, they still would have realized the same injury resulting from Defendants' earlier anticompetitive conduct.   In the words of Judge Underhill in *Creative Copier Services,* Plaintiffs' injury here was merely the "abatable but unabated inertial consequence" of Defendants' pre-limitations period boycott of SL-x.   2005 WL 2175138, at *1 (quotation marks omitted); *see also Vitale*, 1994 WL 654494, at *5.   Because Plaintiffs have not alleged facts to show that the 2015 sale was an overt act causing a new and accumulating injury, they have failed to assert a cause of action within the four-year statute of limitations.   Accordingly, the Court grants Defendants' joint motion to dismiss Plaintiffs' federal antitrust claim in the Subsidiary Complaint.

The same is true for Plaintiffs' Donnelly Act claim.   The Court retains supplemental jurisdiction over Plaintiffs' claim under New York's Donnelly Act, as that state antitrust claim "overlaps completely with" Plaintiffs' federal claim.   *Arista Recs. LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 582 (S.D.N.Y. 2007); *see* 28 U.S.C. § 1367(a).   Because "the Donnelly Act was modeled on the Sherman Act and is generally to be construed in accordance with federal antitrust precedents," and because Plaintiffs do not argue that any policy or provision of state law requires a different result, Plaintiffs' "fail[ure] to allege sufficient facts in support of [their] Sherman Act claim[]" compels the conclusion that their "state law Donnelly Act claim based on the same conduct must also fail." *TechReserves Inc. v. Delta Controls Inc.*, No. 13-cv-752 (GBD), 2014 WL 1325914, at *10 (S.D.N.Y. Mar. 31, 2014); *see also Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 192–93 (S.D.N.Y. 2006).   Accordingly, the Plaintiffs' Donnelly Act claim is also time-barred, and the Court grants Defendants' joint motion to dismiss Plaintiffs' state antitrust claim.

## 2. Remaining State-Law Claims

With the dismissal of Plaintiffs' state and federal antitrust claims, all that remain are Plaintiffs' state law claims for tortious interference, unjust enrichment, and violation of the Deceptive Trade

Practices Act ("DTPA").  The Court declines to exercise supplemental jurisdiction over these remaining state law claims, and therefore "need not determine at this time whether those claims withstand Defendants' motion to dismiss." *Doron Precision Sys.*, 423 F. Supp. 2d at 193; *see* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction.").[7]  Accordingly, the Court dismisses Plaintiffs' tortious interference, unjust enrichment, and DTPA claims "without prejudice to renewal in the proper state court." *Id.*

## IV.  CONCLUSION

For the reasons described above, IT IS HEREBY ORDERED THAT Defendants' joint motion to dismiss is GRANTED as to both the Parent and Subsidiary Complaints.  The Clerk of Court is respectfully directed to terminate the motions pending at document numbers 64 and 67 of Case No. 18-cv-10179 and to close both Case No. 18-cv-10179 and Case No. 19-cv-4885.

SO ORDERED.

Dated:      September 30, 2021
            New York, New York

RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation

---

[7] Plaintiffs have not established diversity jurisdiction under 28 U.S.C. § 1332(a) because two SL-x subsidiaries named as plaintiffs in the Subsidiary Complaint are incorporated in Delaware (Sub. Compl. ¶¶ 17–18), and many of the Defendants named in the Subsidiary Complaint are also incorporated in Delaware (*see, e.g.*, *id.* ¶¶ 20–23, 27–29, 32–33).  *See* 28 U.S.C. § 1332(a), (c).

# SPA-21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SL-X IP S.Á.R.L.,

                               Plaintiff,

     -v-                                  No. 18-cv-10179 (RJS)

BANK OF AMERICA CORPORATION, *et al.*,

                          Defendants.

                                          OPINION & ORDER

SL-x Technology USA LLC., SL-x Technology UK Ltd., and SL-x Trading USA LLC,

                              Plaintiffs,

     -v-                                  No. 19-cv-4885 (RJS)

BANK OF AMERICA CORPORATION, *et al.*,

                          Defendants.

---

<u>RICHARD J. SULLIVAN</u>, Circuit Judge:

These consolidated actions arise from claims brought first by SL-x IP S.á.r.l. in Case No. 18-cv-10179 (the "Parent Action") and later by its subsidiaries, SL-x Technology USA LLC, SL-x Technology UK Ltd., and SL-x Trading USA LLC (together with SL-x IP S.á.r.l, "Plaintiffs" or "SL-x"), in a substantively identical complaint in Case No. 19-cv-4885 (the "Subsidiary Action"). Plaintiffs allege that a group of financial institutions (the "Broker Defendants") and their preferred provider for stock lending services, EquiLend, conspired to boycott a stock lending platform developed by SL-x in violation of applicable federal and state antitrust laws – specifically, the Sherman Act and New York's Donnelly Act. (Doc. No. 5 ("Parent Complaint" or "Compl.") at

¶¶ 307–22; Case No. 19-cv-4885, Doc. No. 1 ("Subsidiary Complaint" or "Sub. Compl.") at ¶¶ 317–32.)[1]   Plaintiffs also bring claims under New York law for tortious interference with business relations, unjust enrichment, and a violation of the Deceptive Trade Practices Act ("DTPA").  (Compl. ¶¶ 323–36; Sub. Compl. ¶¶ 333–46.)

Now before the Court are Defendants' assorted motions to dismiss the Plaintiffs' claims.  For the reasons set forth below, the Court grants Defendants' motion to dismiss the Parent Complaint for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1); denies EquiLend Europe's motion to dismiss the Subsidiary Complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2); grants Defendants' collective motion to dismiss Plaintiffs' federal and state antitrust claims in the Subsidiary Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that they are time-barred; and declines to exercise supplemental jurisdiction over the remaining state-law claims in the Subsidiary Complaint.

I. BACKGROUND

A.  Facts

1.  The Stock Lending Market and SL-x

These actions involve alleged misconduct in the stock lending industry.  By way of background, a stock loan is a financial transaction in which a lender gives temporary ownership over shares of stock to a borrower (Compl. ¶ 68) – typically, a broker seeking to cover short positions – for a fee.  *See QS Holdco Inc. v. Bank of Am. Corp.*, No. 18-cv-824 (RJS), 2019 WL 3716443, at *1

---

[1] Unless otherwise noted, all citations to the docket refer to entries in Case No. 18-cv-10179 (the "Parent Action").  The remaining defendants in the consolidated actions (collectively called "Defendants") are:  Merrill Lynch Professional Clearing Corp;, Merrill Lynch L.P. Holdings, Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated (together, "Merrill Lynch"); Credit Suisse AG; Credit Suisse Securities (USA) LLC; Credit Suisse First Boston Next Fund, Inc. (together, "Credit Suisse"); Goldman, Sachs & Co. LLC ("Goldman"); JP Morgan Securities LLC; J.P. Morgan Prime, Inc.; J.P. Morgan Strategic Securities Lending Corp.; J.P. Morgan Chase Bank N.A. (together, "J.P. Morgan"); Morgan Stanley & Co. LLC; Prime Dealer Services Corp.; Strategic Investments I, Inc. (together, "Morgan Stanley"); UBS AG; UBS Americas Inc.; UBS Securities LLC; UBS Financial Services Inc. (together, "UBS," and collectively with the preceding defendants, the "Broker Defendants"); and EquiLend LLC; EquiLend Europe Limited ("EquiLend Europe"); and EquiLend Holdings LLC (together, "EquiLend").

(S.D.N.Y. Aug. 6, 2019).[2]  Over one trillion dollars in securities move through this stock loan market every year.  (Compl. ¶ 75.)  Nevertheless, because there is no public exchange to facilitate these stock lending transactions, would-be lenders and borrowers are often in the dark as to the appropriate fees to be charged for their loans.  (*Id.* ¶¶ 77, 82–92.)

Around 2010, some electronic trading veterans founded SL-x and developed a patented online software designed to counteract the market inefficiencies resulting from the lack of transparency in stock lending transactions.  (Compl. ¶¶ 93, 106.)[3]  SL-x's software provided an "online platform where Broker-Dealers and Agent Lenders could post bids and offers for potential stock loan transactions."  (*Id.* ¶ 94.)  Users could view price data "in real time" and access information that was previously unavailable to the general public.  (*Id.* ¶ 95.)  Other features included direct messaging with multiple parties and anonymous transacting (*id.* ¶¶ 96–97), and the ability to lend European stock at a reduced counterparty risk and lower capital cost (*id.* ¶¶ 100–04).

### 2.  Defendants' Boycott of SL-x

While developing their company's software, SL-x executives contacted market players to generate interest in their product.  (*Id.* ¶ 111.)  According to Plaintiffs, "more than one" of the Broker Defendants initially "contemplated investing in the company."  (*Id.* ¶ 112.)  With the help of its investor, Palamon Capital Partners ("Palamon"), SL-x also reached out to Defendant EquiLend, a company that is owned and controlled by the Broker Defendants (*Id.* ¶¶ 110, 287) and "operates an

---

[2] The following facts are taken from the Parent Complaint in Case No. 18-cv-10179 and the Subsidiary Complaint in Case No. 19-cv-4885 (together, the "Complaints") and are assumed true for purposes of these motions.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  In ruling on the motions, the Court has also considered Defendants' memorandum of law (Doc. No. 68 ("Mem.")), Defendant EquiLend Europe's memorandum of law (Doc. No. 65 ("EquiLend Mem.")), Plaintiffs' memorandum of law in opposition to Defendants' joint motion (Doc. No. 77 ("Opp'n")), Plaintiffs' memorandum of law in opposition to EquiLend Europe's memorandum (Doc. No. 75 ("Opp'n to EquiLend")), Defendants' reply (Doc. No. 88 ("Reply")), Defendant EquiLend Europe's reply (Doc. No. 83 ("EquiLend Reply")), and all exhibits attached thereto.

[3] Neither the Parent Complaint nor the Subsidiary Complaint specifies which SL-x entity initially created the software.  Although the Subsidiary Complaint introduces the plaintiffs in that complaint as "all direct or indirect subsidiaries" of SL-x IP S.á.r.l. – "a holding company that operated the SL-x business through [the subsidiaries]" – Plaintiffs otherwise fail to differentiate among the SL-x entities.  (Sub. Compl. ¶ 14.)

electronic bulletin board where Agent Lenders can post their stock inventory with a fixed price to borrow each stock." (*Id.* ¶ 116.) Although SL-x offered to purchase EquiLend outright, EquiLend rejected that proposal out of hand and rebuffed "any further efforts at negotiation." (*Id.* ¶¶ 118, 120.) SL-x proceeded to contact the Broker Defendants directly and advertise itself as a competitor to EquiLend (*see, e.g.*, *id.* ¶¶ 121–22), but the Broker Defendants ultimately rejected SL-x's overtures, notwithstanding their previous expressions of interest in the SL-x platform (*see, e.g.*, *id.* ¶ 125).

At a meeting in February 2013, a Credit Suisse executive told Plaintiffs' representative that "EquiLend was like 'the mafia run by five crime families.'" (*Id.* ¶ 134.) That same executive later stated that Credit Suisse would "join" with SL-x only after "'the Big Boys' [ ] committed to the platform'" and warned that "without approval from EquiLend, SL-x was unlikely to be able to achieve a foothold in the industry." (*Id.* ¶¶ 135–36.) Indeed, according to the Complaints, at various times between 2011 and 2014 representatives of the Broker Defendants described EquiLend as the gatekeeper to any deal with Plaintiffs. (*See, e.g.*, *id.* ¶ 168.)

Plaintiffs allege that Defendants entered into a secret agreement to boycott SL-x at EquiLend meetings where representatives from the Broker Defendants were present. (*Id.* ¶ 189.) Plaintiffs further allege that the Broker Defendants engaged in this boycott to perpetuate the lack of transparency in stock-lending transactions, which enabled them to "charg[e] exorbitant fees to connect borrowers and lenders and prevent[] either side from knowing the true 'cut' that Defendants charge as middlemen." (*Id.* ¶ 3; *see also id.* ¶ 81–82.) Plaintiffs also allege that as a result of the boycott, SL-x lost access to funding and new investors (*id.* ¶¶ 195–201), and was forced, in early 2015, to sell its patents to EquiLend "for a fraction of the true value of the company" (*id.* ¶¶ 201, 216).

### B. Procedural History

SL-x IP S.á.r.l. filed the Parent Complaint on November 1, 2018. (Doc. No. 5.) On December

21, 2018, Defendants filed a joint motion to dismiss all claims in the Parent Complaint.  (Doc. Nos. 67, 68.)  That same day, Defendant EquiLend filed a separate motion to dismiss the Parent Complaint for lack of personal jurisdiction.  (Doc. Nos. 64, 65.)

In light of Defendants' argument that SL-x IP S.á.r.l lacked standing to pursue the claims of its since-dissolved subsidiaries, on February 5, 2019, SL-x IP S.á.r.l requested leave to file a supplemental declaration once it had revived its subsidiaries and assigned the subsidiaries' claims to SL-x IP S.á.r.l.  (Doc. Nos. 79, 80.)  The Court denied SL-x IP S.á.r.l.'s request.  (Doc. No. 87 at 2.)  Nevertheless, on April 18, 2019, after the subsidiaries had been revived, SL-x IP S.á.r.l. filed a letter seeking a pre-motion conference regarding its contemplated motion to join the subsidiaries as plaintiffs pursuant to Federal Rules of Civil Procedure 15(a)(2), 17(a), and 25(c).  (Doc. No. 90.)  At a pre-motion conference on May 17, 2019, the Court suggested that the parties engage in jurisdictional discovery to first resolve the standing issue presented in the motion to dismiss.  (Doc. No. 98 ("Conf. Tr.") at 7:9–13.)  The parties, however, rejected that proposal, whereupon the Court denied SL-x IP S.á.r.l's motion to amend its complaint without prejudice to renewal after a decision on the fully briefed motion to dismiss.  (*See id.* at 26–27.)

Subsequently, on May 24, 2019, the revived subsidiaries – SL-x Technology USA LLC, SL-x Technology UK Ltd., SL-x Trading USA LLC, and SL-x Trading Europe Ltd. – brought an identical suit of their own, the Subsidiary Action, which was assigned to my docket as related to the Parent Action.  Despite Defendants' previous opposition to a motion to join the subsidiaries in the initial action, Defendants consented to the consolidation of the two cases under Rule 42(a)(2) of the Federal Rules of Civil Procedure.  (Case No. 19-cv-4885, Doc. No. 12.)  In light of the parties' agreement to consolidate the Parent and Subsidiary Actions, the Court ordered that the actions be consolidated, and – per the parties' agreement – ordered that Defendants' motion to dismiss the Parent Complaint and Plaintiffs' opposition to that motion be deemed responsive to the Subsidiary Complaint.  (Case

No. 19-cv-4885, Doc. No. 25 at 2.)  Defendants declined the opportunity to submit supplemental briefing.  (Case No. 19-cv-4885, Doc. No. 41.)  With that background, the Court now turns to those motions in this consolidated action.[4]

## III.  DISCUSSION

The Court will address, in turn, (1) Defendants' joint motion to dismiss the Parent Complaint for lack of standing pursuant to Rule 12(b)(1); (2) EquiLend Europe's motion to dismiss the claims against it for lack of personal jurisdiction under Rule 12(b)(2); and (3) Defendants' joint motion to dismiss the Subsidiary Complaint for failure to state a claim under Rule 12(b)(6).

### A.  Standing

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), the party seeking to invoke the Court's jurisdiction bears the burden of proving that subject matter jurisdiction exists. *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  Standing is a "core component . . . of the case-or-controversy requirement of Article III," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), and whether a plaintiff has standing "is the threshold question in every federal case, determining the power of the court to entertain the suit," *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) (internal quotation marks and citations omitted).

Because "federal court[s] may resolve only [] real controvers[ies] with real impact[s] on real persons," we cannot hear claims that plaintiffs do not have standing to bring.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (internal quotation marks omitted).  To establish Article III

---

[4] In 2018, a separate group of plaintiffs brought a class action against Defendants in the Southern District of New York, alleging many of the same facts now alleged here.  That case, which is discussed in part below, is currently proceeding before Judge Failla.  *See Iowa Pub. Emps.' Ret. Sys. v. Bank of Am. Corp.*, No. 17-cv-6221 (KPF).

standing, a plaintiff must show that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant[s]; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).  More than one party can have Article III standing to assert a claim as long as each can individually establish the elements of standing.

The Second Circuit recently held that "Article III is satisfied so long as a party with standing to prosecute the specific claim in question exists at the time the pleading is filed."  *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 386 (2d Cir. 2021).  But even if a real party in interest is not named in the complaint, a case will not be dismissed for lack of standing if that party "ratif[ies], join[s], or [is] substituted into the action within a reasonable time.  Only if the real party in interest either fails to materialize or lacks standing itself should the case be dismissed for want of subject-matter jurisdiction."  *Id.*  A real party in interest lacks standing to sue if it lacks legal existence.  *Id.* at 384.  To determine the legal existence of party, we look to state law.  *Id.* at 386.

Defendants argue that SL-x IP S.á.r.l. lacks Article III standing to bring the Parent Action because it does not own the claims it asserts.  (Mem. at 6.)  According to Defendants, the subsidiaries – now the plaintiffs in the Subsidiary Action – owned the claims and suffered the injury at issue in this case.  (*Id.* at 6–8.)  SL-x IP S.á.r.l. concedes that it did not own the claims at issue; nevertheless, it asserts that, as the "sole surviving SL-x entity" at the time the Parent Complaint was filed, it was the "legal successor in interest to all of its shuttered subsidiaries." (Opp'n at 5.) Although the subsidiaries have since been revived, "standing is to be determined as of the *commencement* of suit."  *Lujan*, 504 U.S. at 570 n.5 (emphasis added).  Thus, to meet the requirements of Article III standing here, either (1) SL-x IP S.á.r.l. must have suffered an injury at the time it filed the Parent

Complaint by virtue of its status either as a successor in interest or parent to the subsidiaries that owned the SL-x platform, or at least (2) the real parties in interest – the subsidiaries – must have existed at the time SL-x IP S.á.r.l. filed the Parent Complaint.

Nothing in the Parent or Subsidiary Complaint sheds any light on how or why SL-x IP S.á.r.l. is the legal successor in interest to its subsidiaries' claims.  In fact, contrary to the assertions in the Plaintiffs' briefing, the Parent Complaint does not even allege that SL-x IP S.á.r.l. *is* the successor in interest to its subsidiaries; it neglects any mention of the subsidiaries whatsoever.  *Cf. Wallert v. Atlan*, 141 F. Supp. 3d 258, 277–78 (S.D.N.Y. 2015) (concluding that plaintiff lacked standing to bring copyright claims because his complaint only alleged that he was the "successor in interest" to copyright rights, and not that he was assigned or transferred the rights pursuant to the governing copyright statute).  The mere fact that SL-x IP S.á.r.l. was the parent of the injured subsidiaries is insufficient alone to establish injury here.  *See In re Beck Indus., Inc.*, 479 F.2d 410, 418 (2d Cir. 1973) ("Where a parent corporation desires the legal benefits to be derived from organization of a subsidiary that will function separately and autonomously in the conduct of its own distinct business, the parent must accept the legal consequences, including its inability later to treat the subsidiary as its alter ego because of certain advantages that might thereby be gained."); *see also BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 420 (S.D.N.Y. 2011) (concluding that parent lacked standing to assert claims of subsidiary); *Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12-cv-0722 (PAE), 2012 WL 4849146, at *6 (S.D.N.Y. Oct. 12, 2012) (collecting cases).  SL-x IP S.á.r.l. has therefore failed to establish that it had standing to pursue its claims as a successor in interest or as a parent corporation.[5]

That leaves only the question of whether "a party with standing to prosecute the specific claim

---

[5] Since the Court concludes that SL-x IP S.á.r.l. does not have standing to bring the Parent Action, it need not address Defendants' alternative argument – which Defendants asserted only in connection with the Parent Complaint – that SL-x

in question exist[ed] at the time the pleading [was] filed." *Fund Liquidation Holdings*, 991 F.3d at

386.  It is clear from the record that no real party in interest existed at the time the Parent Complaint

was filed.  Indeed, Plaintiffs have conceded that the subsidiaries did not exist when SL-x IP S.á.r.l.

filed the Parent Complaint.  (*See* Opp'n at 1–2 (explaining that "[SL-x IP S.á.r.l.] continued the SL-

x business after winding down its former wholly-owned subsidiaries" and began reviving those

subsidiaries only after Defendants asserted – in a response to the Parent Complaint – that only the

subsidiaries had standing to bring this suit).)  So, at the commencement of the Parent Action, there

was no real party in interest in existence, and thus the requirements of standing under Article III were

not met.  *See Lujan*, 504 U.S. at 570 n.5; *Fund Liquidation Holdings*, 991 F.3d at 386–91.  For these

reasons, the Parent Complaint is dismissed.

That leaves only the Subsidiary Complaint, which EquiLend Europe seeks to dismiss for lack

of personal jurisdiction and which all Defendants seek to dismiss for failure to state a claim.

### B.  Personal Jurisdiction Over EquiLend Europe

Because "a federal court generally may not rule on the merits of a case without first

determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and

the parties (personal jurisdiction)," the Court turns next to EquiLend Europe's personal jurisdiction

argument.  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007).

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), "[t]he plaintiff

bears the burden of establishing that the court has jurisdiction over the defendant . . . ."  *Whitaker v.

Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)).  "[W]here a court rules on a 12(b)(2) motion

based on pleadings and affidavits, the plaintiff is only required to make a prima facie showing of

jurisdiction over the defendant."  *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 440 (S.D.N.Y.

---

IP S.á.r.l. does not have antitrust standing.  (*See* Mem. at 9 ("Even if Plaintiff possessed Article III standing, it would nonetheless lack antitrust standing because SL-x IP S.á.r.l. cannot sue under the antitrust laws to recover for injuries directly suffered by SL-x Trading Europe Limited and SL-x Technology UK Limited.").)

2008); *see Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). Personal

jurisdiction may be either general or specific. *Goodyear Dunlop Tires Operations, S.A. v. Brown*,

564 U.S. 915, 924 (2011). General jurisdiction requires that a defendant's "affiliations with the State

[be] so continuous and systematic as to render it essentially at home in the forum State." *Daimler AG*

*v. Bauman*, 571 U.S. 117, 139 (2014) (internal quotation marks and alterations omitted). Specific

jurisdiction requires that a defendant have minimum contacts with the forum jurisdiction, such as

when a defendant has "'purposefully directed' his activities at the forum and the litigation 'arises out

of or relates to' those activities." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 136 (2d Cir. 2014)

(alterations omitted) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). If such

"minimum contacts" with the forum are established, the Court must still be satisfied that "the assertion

of personal jurisdiction would comport with fair play and substantial justice" under the Due Process

Clause of the Constitution. *Id.*

Defendant EquiLend Europe claims that personal jurisdiction is lacking for two reasons. First,

it notes that it is incorporated in the United Kingdom with its headquarters in London, preventing the

exercise of general jurisdiction over it. (EquiLend Mem. at 1; Sub. Compl. ¶ 62.) Second, it asserts

that the Court cannot exercise specific jurisdiction because Plaintiffs have failed to sufficiently

establish that EquiLend Europe itself engaged in conduct directed towards the United States, let alone

New York. (EquiLend Mem. at 1.) While the Court agrees that EquiLend Europe is not subject to

general jurisdiction in New York, the same cannot be said for specific jurisdiction.

To be sure, Plaintiffs' Subsidiary Complaint makes few explicit references to EquiLend

Europe, save for noting that "EquiLend Europe Limited has multiple officers and directors based in

New York" (Sub. Compl. ¶ 64) and that certain members of EquiLend Europe's Board of Directors

were also employees of the Broker Defendants (Sub. Compl. ¶ 294). Otherwise, the allegations

contained in the Subsidiary Complaint make no distinction between the different "EquiLend" entities.

(*See, e.g.*, Sub. Compl. ¶ 67 ("[Defendants] also met and conspired at EquiLend Board of Directors meetings in New York City and elsewhere, including at private dinners in New York City.").) Ordinarily, where a complaint conflates several entities and "make[s no] effort to allege that the conduct of one affiliate is attributable to the other[,]" group pleading will fail to establish personal jurisdiction for each defendant. *Tera Grp., Inc. v. Citigroup, Inc.*, No. 17-cv-4302 (RJS), 2018 WL 4732426, at *2 (S.D.N.Y. Sept. 28, 2018).

But the Second Circuit has recognized that specific jurisdiction may be established under a conspiracy-based theory, which provides that an alleged conspirator-defendant will be deemed to have "purposefully availed itself" of the laws of a forum – thus establishing minimum contacts – when that defendant or its co-conspirator undertakes an overt act in furtherance of the conspiracy in the forum. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82, 87 (2d Cir. 2018). Notably, Judge Failla considered a similar motion from EquiLend Europe in *Iowa Public Employees' Retirement System v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285 (S.D.N.Y. 2018), and– drawing all inferences in the plaintiffs' favor – concluded that specific jurisdiction was proper under the conspiracy theory articulated in *Schwab*. *Id.* at 340. Judge Failla reasoned that because EquiLend Europe was alleged to be part of the conspiracy, "its co-conspirators' 'overt acts in furtherance of the conspiracy' may be imputed to it for purposes of exercising jurisdiction." *Id.* (quoting *Charles Schwab Corp.*, 883 F.3d at 87).

As in the case before Judge Failla, Plaintiffs here have alleged facts that support the exercise of specific jurisdiction by virtue of EquiLend Europe's alleged participation in a conspiracy to violate the antitrust laws. The Subsidiary Complaint alleges that the Defendants conspired in part through their board positions (Sub. Compl. ¶ 286) and identifies which of the Broker Defendants' employees served on the board of EquiLend Holdings LLC (the U.S.-based entity) and which served on the board of EquiLend Europe (*id.* ¶¶ 293–94). Moreover, the Subsidiary Complaint alleges that a UBS

representative told SL-x that "any agreement would need to be approved by James Buckland, the Global Head of Securities Lending for UBS and a member of the EquiLend Board." (*Id.* ¶ 172.)  The Subsidiary Complaint also identifies Buckland as a director of EquiLend Europe; together, these allegations support an inference that EquiLend Europe – through its agent, Buckland – was a member of the alleged conspiracy.  (*Id.* ¶ 294; *see also* ¶ 286, ¶ 158 (alleging that a JP Morgan employee, identified later in the complaint as a director of EquiLend Europe, "admit[ted] that 'there is general agreement among [EquiLend] Directors that industry advances should be achieved from within EquiLend" (second alteration in original)); ¶ 63 (alleging that the "EquiLend entities operate under common corporate control and coordinate their business activities").)

Accordingly, the Court finds that the Subsidiary Complaint alleges sufficient facts to warrant the exercise of personal jurisdiction over Defendant EquiLend Europe.  The Court therefore denies EquiLend Europe's motion to dismiss for lack of personal jurisdiction.

### C.  Failure to State a Claim

Defendants contend that Plaintiffs' remaining claims must be dismissed because they are time-barred, and therefore fail to state a claim upon which relief can be granted.  To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."  Fed. R. Civ. P. 8(a)(2). To meet this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98.  That tenet, however, "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678; therefore, a

pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do," *Twombly*, 550 U.S. at 555.  If the plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* at 570.

### 1.   Antitrust Claims

Claims brought under the Sherman Act are subject to a four-year statute of limitations. *See* 15 U.S.C. § 15b.  The same is true for claims brought under New York's Donnelly Act, a state antitrust statute modeled after the Sherman Act. *See* N.Y. Gen. Bus. Law § 340(5).  Thus, Plaintiffs may recover on their antitrust claims only if they commenced this action within four years of "an act that injure[d] [their] business." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971).  Defendants assert that the statute of limitations has run on all of Plaintiffs' antitrust claims because the Parent Complaint was filed on November 1, 2018 (Doc. No. 1; *see also* Doc. No. 5), and because all injurious conduct alleged in the Complaints – with the potential exception of the sale of SL-x's patents in "early 2015" to EquiLend – occurred prior to November 1, 2014 (*See* Mem. at 12).[6] Plaintiffs counter that Defendants fraudulently concealed their conduct, thereby tolling those claims; they further argue that the 2015 sale constituted an antitrust injury that is actionable and timely.

"[A] motion to dismiss on statute of limitations grounds 'may be granted only if it is clear on the face of the complaint that the statute of limitations has run.'" *Patterson v. Morgan Stanley*, No. 16-cv-6568 (RJS), 2019 WL 4934834, at *15 (S.D.N.Y. Oct. 7, 2019) (quoting *Fargas v. Cincinnati Mack, LLC*, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013)).  "In the context of a continuing conspiracy

---

[6] Whether the Court should view the four-year statute of limitations period as running from the filing date of the Parent Complaint (November 1, 2018) or that of the Subsidiary Complaint (May 24, 2019) was not addressed by either party following Plaintiffs' filing of the Subsidiary Complaint.  Because Defendants previously identified November 1, 2018, as the relevant filing date for purposes of their statute of limitations defense and do not now argue for the Court to treat May 24, 2019, as the relevant date – and because the outcome would be the same in any event – the Court will proceed to treat November 1, 2018 as the relevant filing date without further analysis.  (Mem. at 12; Opp'n at 19.)  [7] Plaintiffs have not established diversity jurisdiction under 28 U.S.C. § 1332(a) because two SL-x subsidiaries named as plaintiffs in the Subsidiary Complaint are incorporated in Delaware (Sub. Compl. ¶¶ 17–18), and many of the Defendants named in the Subsidiary Complaint are also incorporated in Delaware (*see, e.g.*, *id.* ¶¶ 20–23, 27–29, 32–33). *See* 28 U.S.C. § 1332(a), (c).

to violate the antitrust laws . . . each time a plaintiff is injured by an act of the defendants[,] a cause of action accrues to him . . . [and] the statute of limitations runs from the commission of the act." *Zenith Radio Corp.*, 401 U.S. at 338.  This does not, however, "permit the plaintiff to recover for injuries caused by acts that occurred before that limitations period." *Iowa Pub. Emps.' Ret. Sys.*, 340 F. Supp. 3d at 333 (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)).

Based on the Plaintiffs' allegations in their Subsidiary Complaint, the Broker Defendants initially expressed "enormous amounts" of interest in SL-x and its product (Sub. Compl. ¶ 117), but by late summer in 2014, the Broker Defendants had conveyed to SL-x that they were not prepared to invest in or become customers of SL-x (*see, e.g., id.* ¶¶ 143–44, 148, 157, 166, 174).  The statute of limitations thus started running at the time of this alleged anticompetitive conduct.  *See Vitale v. Marlborough Gallery*, No. 93-cv-6276 (PKL), 1994 WL 654494, at *5 (S.D.N.Y. July 5, 1994); *see also Creative Copier Servs. v. Xerox Corp.*, No. 301-cv-155 (SRU), 2005 WL 2175138, at *2 (D. Conn. Sept. 2, 2005) (explaining that in some circumstances, "refusal[s] to deal" with a market actor may constitute anticompetitive conduct, and in the "refusal to deal" context the statute of limitations starts running when the refusal becomes final).

Of course, a statute of limitations may be tolled with a showing of fraudulent concealment.  *See New York v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

> To show fraudulent concealment, a plaintiff must prove: (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to a lack of diligence on his part.

*See In re Int. Rate Swaps Antitrust Litig.* (*In re IRS*), 261 F. Supp. 3d 430, 487 (S.D.N.Y. 2017) (internal quotation marks omitted).  A "plaintiff may prove the concealment element by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *Hendrickson Bros.*, 840

F.2d at 1083.  Fraudulent concealment must be pleaded with particularity "in accordance with the heightened pleading standards of Rule 9(b)." *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 675, 688 (S.D.N.Y. 2016) ("In alleging fraud . . . under Rule 9(b), 'a party must state with particularity the circumstances constituting fraud . . . .'" (quoting Fed. R. Civ. P. 9(b))).

Plaintiffs assert that Defendants' pre-2015 conduct was inherently self-concealing *and* involved affirmative acts of concealment.  (Sub. Compl. ¶ 305.)  In support of these arguments, Plaintiffs point to Judge Failla's conclusion in *Iowa Public Employees* that Defendants' alleged conspiracy was inherently self-concealing "because the alleged conspiracy required numerous participants, was designed to endure, and depended on concealment for its success."  340 F. Supp. 3d at 334 (citing *Hendrickson Bros.*, 840 F.2d at 1083–84).  In contrast to the present case, however, the plaintiffs in *Iowa Public Employees* were *not* owners of the stock lending platforms that Defendants allegedly boycotted.  In Judge Failla's case, the plaintiffs are a class of individuals and entities who entered into stock lending transactions with the Defendants.  *Id.* at 298.  Those plaintiffs allege that the Defendants threatened the Broker Defendants' own hedge fund clients to ensure that no one did business with other stock lending platforms.  *Id.* at 334.  Because the communications between the Defendants and their clients were not publicly available or disclosed, the plaintiffs in the *Iowa Public Employees* case had no way of knowing about the alleged threats.  *See id.*

This case is quite different.  Plaintiffs here were the owners of SL-x's intellectual property and have alleged that they were at meetings in which individual executives from the Broker Defendants clearly alluded to a conspiracy to freeze SL-x out of the market by boycotting it.  For instance – and most starkly – Plaintiffs allege that: (1) in a February 2013 meeting, a Credit Suisse executive warned Plaintiffs that EquiLend was like "the mafia run by five crime families" (Sub. Compl. ¶ 139); (2) in July 2013, that same executive, when withdrawing his company's interest in the platform, cautioned that Credit Suisse would only be interested if "the Big Boys" were committed

to SL-x (*id.* ¶ 140) and that without EquiLend's approval, SL-x would not get a "foothold" in the industry (*id.* ¶ 141); (3) in August 2013, a J.P. Morgan executive "admit[ted] that there is general agreement among EquiLend Directors that industry advances should be achieved from within EquiLend and that JP Morgan participated in discussions with other banks about industry direction at EquiLend meetings" (*id.* ¶ 158 (internal quotation marks omitted)); and (4) in September 2013, a UBS executive extolled the "benefit of being 'inside the club' of EquiLend member banks to effectuate market changes" and implied that "any market transition" in the area of stock lending platforms "would need to come from inside EquiLend" (*id.* ¶ 173). The fact that executives of the Broker Defendants made these statements directly to SL-x representatives demonstrates that the alleged conspiracy did not "depend[] on concealment for its success." *Iowa Pub. Emps.' Ret. Sys.*, 340 F. Supp. 3d at 334 (citing *Hendrickson Bros.*, 840 F.2d at 1083–84; *see In re IRS*, 261 F. Supp. 3d at 488 (observing that a conspiracy's object that "occur[s] in plain sight and in contrast to the market's expectations" would "if anything . . . have invited, rather than lulled, skeptical attention").

Even if Plaintiffs had alleged a self-concealing conspiracy – or, in the alternative, affirmative acts to conceal – their claim of fraudulent concealment would still fail because Plaintiffs were at least on inquiry notice of the conspiracy. In *Iowa Public Employees*, Judge Failla concluded that the plaintiffs had properly alleged both ignorance of the scheme and due diligence because the only notice the plaintiffs might have seen came from a "single instance of unverified media speculation" from which a reasonable person would not have made inquiries. 340 F. Supp. 3d at 336–37. The same cannot be said here. Although Plaintiffs insist that they did not discover the conspiracy until the *Iowa Public Employees* lawsuit was filed in August 2017 (Sub. Compl. ¶ 8), this allegation is belied by the statements contained in the Subsidiary Complaint, which Plaintiffs concede were made by Defendants' executives to representatives of SL-x in 2013. The warnings in these statements (i.e., that EquiLend was like "the mafia run by five crime families" (Sub. Compl. ¶ 139)) would make a

reasonable person suspicious enough to inquire further into the reasons why Defendants were rejecting the platform. And Plaintiffs' conclusory assertion that they "could [not] have discovered through the exercise of reasonable due diligence facts comprising its claims" (Sub. Compl. ¶ 305) is undermined by the apparent openness of Defendants' executives as to their plans to freeze SL-x out of the stock lending market. *Cf. Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 703–04 (S.D.N.Y. 2019) (concluding that a failure to plead with particularity when the plaintiff became aware of the antitrust violation, or that the plaintiff had performed due diligence, precluded a finding of fraudulent concealment).

In addition to explicit statements made directly to Plaintiffs' representatives that should have raised red flags, the Subsidiary Complaint also makes general allegations about Defendants' conduct that suggest such conduct was "unnatural and contrary to expectations." *In re IRS*, 261 F. Supp. 3d at 489. For instance, Plaintiffs characterize certain entities' decisions to reject SL-x after showing initial interest as "unexpected[,]" "strange[,] and sudden[.]" (Sub. Compl. ¶¶ 204, 180.) Because such conduct, together with the statements allegedly made by executives of the Broker Defendants, was sufficient to put Plaintiffs on inquiry notice of the scheme, Plaintiffs cannot plead ignorance and due diligence. *See In re IRS*, 261 F. Supp. 3d at 489 (concluding that the plaintiffs were "[a]t a minimum . . . on inquiry notice" where the plaintiffs "had every basis, in real time, to smell a rat"). Accordingly, Plaintiffs' claims for relief based on the pre-2015 conduct are barred by the statute of limitations.

Having concluded that Plaintiffs failed to state a claim for any of the pre-2015 conduct alleged in the Subsidiary Complaint, the Court next turns to whether the 2015 sale of SL-x's patents to EquiLend constituted a separate antitrust injury. Plaintiffs allege that they sought investors for SL-x throughout 2013 and 2014, but that Defendants pressured potential buyers not to invest. (Sub. Compl. ¶¶ 200–06.) In 2015, "Defendants negotiated with SL-x's principal shareholder, Palamon, to

17

purchase the patents held by SL-x." (*Id.* ¶ 207.)  Plaintiffs assert that "[w]hile SL-x was gone" at this point, Defendants still worried that a third party would purchase SL-x's technology and "engineer a potential competitor to EquiLend" (*id.* ¶ 208); to eliminate this threat, EquiLend purchased SL-x's intellectual property in "early 2015" for £500,000 (*id.* ¶ 209).  Plaintiffs contend that EquiLend made this purchase with no intention of ever using SL-x's intellectual property, as evidenced by the fact that EquiLend performed little due diligence regarding the transaction in May 2015 and never attempted to use the technology in any of its products thereafter.  (*Id.* ¶ 210.)

But even accepting Plaintiffs' allegations as true, as the Court must at this stage of the proceedings, it remains clear from the face of the Subsidiary Complaint that Plaintiffs have failed to establish an independent antitrust injury as a result of the 2015 sale.  As noted above, "a separate cause of action accrues," and the statute of limitations restarts, for each distinct violation that injures the Plaintiffs.  *Creative Copier Servs.*, 2005 WL 2175138, at *1.  But "not every act by an antitrust defendant is sufficient to restart the statute of limitations."  *Id.* (internal quotation marks and citation omitted).  Rather, Plaintiffs "must allege an overt act which (1) is a 'new and independent act that is not merely a reaffirmation of a previous act,'" and (2) 'inflict[s] new and accumulating injury on the plaintiff.'"  *Vitale*, 1994 WL 654494, at *5.

Plaintiffs claim they were injured because "Defendants' conduct . . . forced [SL-x] to close its doors and sell off its intellectual property for a fraction of the true value of the company."  (Sub. Compl. ¶ 221.)  But while EquiLend's purchase and subsequent shelving of SL-x's technology may have further reduced competition and protected Defendants' positions in the relevant market, that was an injury inflicted on would-be stock-lenders and borrowers – like the plaintiffs in *Iowa Public Employees* – not the Plaintiffs here.  For Plaintiffs, the injury realized in the 2015 sale – lost profits on the sale of their patents and business model – was the direct result of Defendants' refusal to deal with Plaintiffs in the years prior to the sale.  Had Plaintiffs sold their patents at fire sale prices to a

party other than EquiLend, or not sold them at all, they still would have realized the same injury resulting from Defendants' earlier anticompetitive conduct. In the words of Judge Underhill in *Creative Copier Services,* Plaintiffs' injury here was merely the "abatable but unabated inertial consequence" of Defendants' pre-limitations period boycott of SL-x. 2005 WL 2175138, at *1 (quotation marks omitted); *see also Vitale*, 1994 WL 654494, at *5. Because Plaintiffs have not alleged facts to show that the 2015 sale was an overt act causing a new and accumulating injury, they have failed to assert a cause of action within the four-year statute of limitations. Accordingly, the Court grants Defendants' joint motion to dismiss Plaintiffs' federal antitrust claim in the Subsidiary Complaint.

The same is true for Plaintiffs' Donnelly Act claim. The Court retains supplemental jurisdiction over Plaintiffs' claim under New York's Donnelly Act, as that state antitrust claim "overlaps completely with" Plaintiffs' federal claim. *Arista Recs. LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 582 (S.D.N.Y. 2007); *see* 28 U.S.C. § 1367(a). Because "the Donnelly Act was modeled on the Sherman Act and is generally to be construed in accordance with federal antitrust precedents," and because Plaintiffs do not argue that any policy or provision of state law requires a different result, Plaintiffs' "fail[ure] to allege sufficient facts in support of [their] Sherman Act claim[]" compels the conclusion that their "state law Donnelly Act claim based on the same conduct must also fail." *TechReserves Inc. v. Delta Controls Inc.*, No. 13-cv-752 (GBD), 2014 WL 1325914, at *10 (S.D.N.Y. Mar. 31, 2014); *see also Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 192–93 (S.D.N.Y. 2006). Accordingly, the Plaintiffs' Donnelly Act claim is also time-barred, and the Court grants Defendants' joint motion to dismiss Plaintiffs' state antitrust claim.

### 2. Remaining State-Law Claims

With the dismissal of Plaintiffs' state and federal antitrust claims, all that remain are Plaintiffs' state law claims for tortious interference, unjust enrichment, and violation of the Deceptive Trade

Practices Act ("DTPA"). The Court declines to exercise supplemental jurisdiction over these remaining state law claims, and therefore "need not determine at this time whether those claims withstand Defendants' motion to dismiss." *Doron Precision Sys.*, 423 F. Supp. 2d at 193; *see* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction.").[7] Accordingly, the Court dismisses Plaintiffs' tortious interference, unjust enrichment, and DTPA claims "without prejudice to renewal in the proper state court." *Id.*

## IV. CONCLUSION

For the reasons described above, IT IS HEREBY ORDERED THAT Defendants' joint motion to dismiss is GRANTED as to both the Parent and Subsidiary Complaints. The Clerk of Court is respectfully directed to terminate the motions pending at document numbers 64 and 67 of Case No. 18-cv-10179 and to close both Case No. 18-cv-10179 and Case No. 19-cv-4885.

SO ORDERED.

Dated:    September 30, 2021
          New York, New York

RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation

---

[7] Plaintiffs have not established diversity jurisdiction under 28 U.S.C. § 1332(a) because two SL-x subsidiaries named as plaintiffs in the Subsidiary Complaint are incorporated in Delaware (Sub. Compl. ¶¶ 17–18), and many of the Defendants named in the Subsidiary Complaint are also incorporated in Delaware (*see, e.g.*, *id.* ¶¶ 20–23, 27–29, 32–33). *See* 28 U.S.C. § 1332(a), (c).