# 21-2697(L)

## 21-2699 (Con)

In The

### United States Court of Appeals

For The Second Circuit

———————————

SL-X IP S.A.R.L., SL-x Technology UK Ltd., SL-x Technology USA LLC, SL-x Trading Europe Ltd. and SL-x Trading USA LLC,

*Plaintiffs - Appellants,*

– against –

Merrill Lynch, Pierce, Fenner & Smith Incorporated, Merrill Lynch L.P.

*(Caption continued on inside cover)*

———————————

On Appeal From The United States District Court
For The Southern District Of New York

## JOINT BRIEF OF DEFENDANTS-APPELLEES

Michael A. Paskin
Lauren M. Rosenberg
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Tel: (212) 474-1000
*Attorneys for Defendants Morgan Stanley, Morgan Stanley Capital Management LLC, Morgan Stanley & Co. LLC, Morgan Stanley Distribution, Inc., Prime Dealer Services Corp., and Strategic Investments I, Inc.*

*(Additional Parties and Counsel Listed on Signature Page)*

May 9, 2022

HOLDINGS, INC., MERRILL LYNCH PROFESSIONAL CLEARING CORP., CREDIT SUISSE AG, CREDIT SUISSE SECURITIES (USA) LLC, CREDIT SUISSE FIRST BOSTON NEXT FUND, INC., CREDIT SUISSE PRIME SECURITIES SERVICES (USA) LLC, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, J.P. MORGAN PRIME, INC., J.P. MORGAN STRATEGIC SECURITIES LENDING CORP., J.P. MORGAN CHASE BANK, N.A., MORGAN STANLEY & CO. LLC, PRIME DEALER SERVICES CORP., STRATEGIC INVESTMENTS I, INC., UBS AG, UBS AMERICAS INC., UBS SECURITIES LLC, UBS FINANCIAL SERVICES INC., EQUILEND LLC, EQUILEND EUROPE LIMITED, EQUILEND HOLDINGS LLC, MORGAN STANLEY, MORGAN STANLEY CAPITAL MANAGEMENT, LLC, CREDIT SUISSE GROUP AG, MORGAN STANLEY DISTRIBUTION, INC.,

*Defendants - Appellees,*

BANK OF AMERICA CORPORATION, THE GOLDMAN SACHS GROUP, INC., GOLDMAN SACHS EXECUTION & CLEARING, L.P., J.P. MORGAN CHASE & CO., J.P. MORGAN INSTITUTIONAL INVESTMENTS INC., UBS GROUP AG, UBS INVESTMENT BANK, UBS ASSET MANAGEMENT (US) INC., UBS FUND SERVICES (USA) LLC,

*Defendants.*

## **RULE 26.1 CORPORATE DISCLOSURE STATEMENTS**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellees in the above-captioned matter, make the following disclosures through their undersigned counsel.

## **Credit Suisse**

Credit Suisse Group AG has no parent company, and no publicly held corporation owns 10 percent or more of its stock. Credit Suisse AG is a wholly-owned subsidiary of Credit Suisse Group AG.

Credit Suisse Securities (USA) LLC is a wholly-owned indirect subsidiary of Credit Suisse Group AG.

Credit Suisse First Boston Next Fund, Inc. is a wholly-owned indirect subsidiary of Credit Suisse Group AG.

Credit Suisse Prime Securities Services (USA) LLC is a wholly-owned indirect subsidiary of Credit Suisse Group AG.

## **EquiLend**

EquiLend LLC and EquiLend Europe Limited are wholly owned subsidiaries of EquiLend Holdings LLC.

EquiLend Holdings LLC has no parent company.

Strategic Investments I, Inc.; Credit Suisse First Boston Next Fund, Inc.; Goldman Sachs PSI Global Holdings, LLC; Merrill Lynch L.P. Holdings Inc.;

BlackRock Asset Management International Inc.; National Bank of Canada Financial Group Inc.; J.P. Morgan Securities LLC; SSB Investments, Inc.; Northern Trust Corporation; and UBS Americas Inc. each own 10% or more of the stock of EquiLend Holdings LLC

## Goldman Sachs

Goldman Sachs & Co. LLC is a direct, wholly owned subsidiary of The Goldman Sachs Group, Inc., a publicly traded company. The Goldman Sachs Group, Inc. does not have a parent corporation, and no publicly held company owns 10 percent or more of its stock. Except for *de minimis* non-voting, non-participating interests held by unaffiliated broker-dealers, no other publicly held company owns a 10% or more interest in Goldman Sachs & Co. LLC.

## JPMorgan

JPMorgan Chase Bank, N.A. is a wholly-owned subsidiary of JPMorgan Chase & Co.

J.P. Morgan Securities LLC is an indirect, wholly-owned subsidiary of JPMorgan Chase & Co.

J.P. Morgan Prime, Inc. is an indirect, wholly-owned subsidiary of JPMorgan Chase & Co.

J.P. Morgan Strategic Securities Lending Corp. is an indirect, wholly-owned subsidiary of JPMorgan Chase & Co.

JPMorgan Chase & Co. is a publicly held corporation and does not have a parent corporation. No publicly held corporation owns 10% or more of the stock of JPMorgan Chase & Co. However, The Vanguard Group, Inc., an investment adviser which is not a publicly held corporation, has reported that registered investment companies, other pooled investment vehicles and institutional accounts that it or its subsidiaries sponsor, manage or advise have aggregate ownership under certain regulations of 10% or more of the stock of JPMorgan Chase & Co.

### Bank of America

Merrill Lynch L.P. Holdings, Inc. is a wholly owned subsidiary of Merrill Lynch International Incorporated. Merrill Lynch International Incorporated is a wholly owned subsidiary of NB Holdings Corporation. NB Holdings Corporation is a direct, wholly owned subsidiary of Bank of America Corporation.

Merrill Lynch Professional Clearing Corp. is a wholly owned subsidiary of Merrill Lynch, Pierce, Fenner & Smith Incorporated (n/k/a BofA Securities, Inc.).

Merrill Lynch, Pierce, Fenner & Smith Incorporated (n/k/a BofA Securities, Inc.) is a direct, wholly owned subsidiary of BAC North America Holding Company. BAC North America Holding Company is a direct, wholly owned subsidiary of NB Holdings Corporation. NB Holdings Corporation is a direct, wholly owned subsidiary of Bank of America Corporation.

Bank of America Corporation is a publicly held company whose shares are traded on the New York Stock Exchange and has no parent corporation. Based on the U.S. Securities and Exchange Commission Rules regarding beneficial ownership, Berkshire Hathaway Inc., 3555 Farnam Street, Omaha, Nebraska 68131, beneficially owns greater than 10% of Bank of America Corporation's outstanding common stock.

### Morgan Stanley

Morgan Stanley is a publicly held corporation that has no parent corporation.

Morgan Stanley Capital Management, LLC, is a limited liability company whose sole member is Morgan Stanley.

Morgan Stanley & Co. LLC is a limited liability company whose sole member is Morgan Stanley Domestic Holdings, Inc., a corporation wholly owned by Morgan Stanley Capital Management, LLC, a limited liability company whose sole member is Morgan Stanley.

Morgan Stanley Distribution, Inc. is a corporation wholly owned by Morgan Stanley Investment Management, Inc., a corporation wholly owned by Morgan Stanley Domestic Holdings, Inc., a corporation wholly owned by Morgan Stanley Capital Management, LLC, a limited liability company whose sole member is Morgan Stanley.

Prime Dealer Services Corp. is a corporation wholly owned by Defendant Morgan Stanley & Co. LLC, a limited liability company whose sole member is Morgan Stanley Domestic Holdings, Inc., a corporation wholly owned by Defendant Morgan Stanley Capital Management, LLC, a limited liability company whose sole member is Morgan Stanley.

Strategic Investments I, Inc. is a corporation wholly owned by Morgan Stanley.

Based on Securities and Exchange Commission Rules regarding beneficial ownership, Mitsubishi UFJ Financial Group, Inc. 7-1 Marunouchi 2-chome, Chiyoda-ku, Tokyo 100-8330, beneficially owns greater than 10% of Morgan Stanley's outstanding common stock.

## UBS

UBS AG is wholly owned by UBS Group AG, a publicly traded company.

UBS Americas Inc. is wholly owned by UBS Americas Holding LLC, which is wholly owned by UBS AG. UBS AG is wholly owned by UBS Group AG, a publicly traded company.

The corporate parents of UBS Securities LLC are UBS Americas Inc. and UBS Americas Holding LLC. UBS Americas Inc. is wholly owned by UBS Americas Holding LLC, which is wholly owned by UBS AG. UBS AG is wholly owned by UBS Group AG, a publicly traded company.

UBS Financial Services Inc. is wholly owned by UBS Americas Inc., which is wholly owned by UBS Americas Holding LLC.  UBS Americas Holding LLC is wholly owned by UBS AG, which is wholly owned by UBS Group AG, a publicly traded company.

No publicly held corporation owns 10% or more of UBS Group AG's stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................**Error! Bookmark not defined.**

PRELIMINARY STATEMENT ...............................................................1

JURISDICTIONAL STATEMENT ........................................................4

COUNTERSTATEMENT OF THE ISSUES PRESENTED....................5

COUNTERSTATEMENT OF THE CASE................................................5

I.     STATEMENT OF FACTS...............................................................5

     A.     SL-x's Allegations Concern Conduct More than Four Years
          Before the Parent and Subsidiary Complaints Were Filed. .................5

     B.     SL-x's Allegations Relate to Previously Dissolved SL-x
          Subsidiaries—Not the Parent Company................................................9

II.    PROCEDURAL HISTORY .........................................................10

III.   DISTRICT COURT OPINION ....................................................12

SUMMARY OF THE ARGUMENT .....................................................15

ARGUMENT .........................................................................................18

I.     STANDARD OF REVIEW...........................................................18

     A.     Failure To State a Claim and Lack of Standing. .................................18

     B.     Equitable Tolling...................................................................................19

     C.     Supplemental Jurisdiction. ...................................................................19

     D.     Leave To Amend....................................................................................20

II.   THE DISTRICT COURT PROPERLY DISMISSED SL-X'S
      ANTITRUST CLAIMS AS BARRED BY THE STATUTE OF
      LIMITATIONS ............................................................................. 20

      A.   Legal Standard ................................................................... 20

      B.   SL-x's Claims Are Time-Barred. ....................................... 21

      C.   The "Continuing Violation" Exception Does Not Apply. ................. 24

           1.   SL-x Misconstrues the Continuing Violation Exception. ......... 26

           2.   SL-x Fails Sufficiently To Allege that Defendants
                Continually Conspired and Pressured Third Parties To
                Boycott SL-x. ........................................................... 29

           3.   The 2015 Sale of SL-x's Patents to EquiLend Does Not
                Constitute a New and Independent Antitrust Violation ............ 30

           4.   The Statute of Limitations Begins To Run When Injury Is
                Suffered, Not When Damages Are Calculable. ..................... 32

III.  THE DISTRICT COURT PROPERLY REJECTED SL-X'S CLAIM
      THAT THE STATUTE OF LIMITATIONS SHOULD BE TOLLED
      FOR THE ALLEGED FRAUDULENT CONCEALMENT. ..................... 35

      A.   Legal Standard ................................................................... 35

      B.   SL-x Fails To Plead Fraudulent Concealment. ................... 36

           1.   The Conspiracy Was Not Self-Concealing. ....................... 37

           2.   SL-x Has Failed To Allege that Defendants Actively
                Concealed the Alleged Conspiracy. ................................. 41

      C.   SL-x Was, at the Very Least, on Inquiry Notice of the Alleged
           Conspiracy. ....................................................................... 44

IV. THE DISTRICT COURT PROPERLY DISMISSED THE PARENT COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION BECAUSE THE PARENT COMPANY LACKS ARTICLE III STANDING. ................................................................47

    A. Legal Standard. .......................................................................47

    B. The Parent Company Lacks Article III Standing. ...............48

        1. SL-x Fails To Allege that the Parent Company Suffered Injury. ...................................................48

        2. The Parent Company's Claim of Ownership Over the Subsidiaries Does Not Give Rise to Standing. .........................49

        3. SL-x Fails Adequately To Allege that the Parent Company Is a Successor-in-Interest to the Subsidiary Companies. ...............................................50

        4. The Subsidiary Companies Did Not Exist When the Parent Complaint Was Filed, and Even if They Had Existed, SL-x Still Fails To Satisfy the Article III Standing Requirement. ...............................................52

V. THE DISTRICT COURT CORRECTLY DECLINED TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE REMAINING STATE LAW CLAIMS. ..........................................55

VI. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING LEAVE TO AMEND BECAUSE AMENDMENT WOULD BE FUTILE. ..............................................................56

CONCLUSION ............................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
  671 F.3d 140 (2d Cir. 2011) ................................................48

*Armstrong v. McAlpin*,
  699 F.2d 79 (2d Cir. 1983) ................................................36

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................19, 20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................19, 20

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
  778 F. Supp. 2d 375 (S.D.N.Y. 2011) ................................................49

*Borger v. Yamaha Int'l Corp.*,
  625 F.2d 390 (2d Cir. 1980) ................................................26, 28

*BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC*,
  603 F. App'x 57 (2d Cir. 2015) ................................................45

*Champagne Metals v. Ken-Mac Metals, Inc.*,
  458 F.3d 1073 (10th Cir. 2006) ................................................25

*Chavis v. Chappius*,
  618 F.3d 162 (2d Cir. 2010) ................................................57

*Clarex Ltd. v. Natixis Sec. Am. LLC*,
  No. 12-cv-0722, 2012 WL 4849146 (S.D.N.Y. Oct. 12, 2012) ................................................49, 51

*Conn. Gen. Life Ins. Co. v. BioHealth Labs., Inc.*,
  988 F.3d 127 (2d Cir. 2021) ................................................21, 45

*Creative Copier Servs. v. Xerox Corp.*, No. 01-CV-00155, 2005 WL
  2175138 (D. Conn.
  Sept. 2, 2005) ................................................13, 15

*Cresci v. Mohawk Valley Cmty. Coll.*,
    693 F. App'x 21 (2d Cir. 2017) ...........................................................57

*Cuoco v. Moritsugu*,
    222 F.3d 99 (2d Cir. 2000) .................................................................56

*D'Addario v. D'Addario*,
    901 F.3d 80 (2d Cir. 2018) ...........................................................33, 34

*Delaney v. Bank of Am. Corp.*,
    766 F.3d 163 (2d Cir. 2014) ..............................................................55

*Dodds v. Cigna Sec., Inc.*,
    12 F.3d 346 (2d Cir. 1993) .................................................................44

*DXS, Inc. v. Siemens Med. Sys., Inc.*,
    100 F.3d 462 (6th Cir. 1996) ..............................................................25

*eComSystems, Inc. v. Shared Mktg. Servs., Inc.*,
    No. 10-cv-1531, 2012 WL 171083 (M.D. Fla. Jan. 20, 2012) ..........51

*Edward Hines Lumber Co. v. Vulcan Materials Co.*,
    No. 85 C 1142, 1985 WL 1189, (N.D. Ill. May 8, 1985) ..................52

*EEOC v. KarenKim, Inc.*,
    698 F.3d 92 (2d Cir. 2012) .................................................................19

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
    991 F.3d 370 (2d Cir. 2021) .................................................52, 53, 54

*G.K.A. Beverage Corp. v. Honickman*,
    55 F.3d 762 (2d Cir. 1995) .................................................................49

*Gorss Motels, Inc. v. Lands' End, Inc.*,
    997 F.3d 470 (2d Cir. 2021) ..............................................................19

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968).......................................................................26, 27

*Harris v. City of New York*,
    186 F.3d 243 (2d Cir. 1999) ..............................................................45

*Hennegan v. Pacifico Creative Serv., Inc.*,
  787 F.2d 1299 (9th Cir. 1986) ....................................................28, 29

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
  620 F. Supp. 2d 499 (S.D.N.Y. 2009) .......................................36, 46

*Holmes v. Grubman*,
  568 F.3d 329 (2d Cir. 2009) ...............................................................18

*In re Beck Indus., Inc.*,
  479 F.2d 410 (2d Cir. 1973) ...............................................................51

*In re Citigroup Inc. S'holder Derivative Litig.*,
  No. 07 Civ. 9841, 2009 WL 2610746 (S.D.N.Y. Aug. 25, 2009).....................42

*In re Eur. Gov't Bonds Antitrust Litig.*,
  No. 19-cv-2601, 2020 WL 4273811 (S.D.N.Y. July 23, 2020) ........................36

*In re Int. Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017) .........................................44, 45

*In re Merrill Lynch Ltd. P'ships Litig.*, 7 F. Supp. 2d 256 (S.D.N.Y.
  1997), *aff'd*, 154 F.3d 56
  (2d Cir. 1998)..................................................................................44

*In re Napster, Inc. Copyright Litig.*,
  354 F. Supp. 2d 1113 (N.D. Cal. 2005)..............................................50

*Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith
  Inc.*,
  340 F. Supp. 3d 285 (S.D.N.Y. 2018) .......................................passim

*John Mohr & Sons v. Hanover Ins.*,
  322 F. Supp. 184 (N.D. Ill. 1971)......................................................52

*Kamen v. Am. Tel. & Tel. Co.*,
  791 F.2d 1006 (2d Cir. 1986) ...........................................................18

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997)..................................................................24, 31

*Klipsch Grp., Inc. v. ePRO E-Com. Ltd.*,
  880 F.3d 620 (2d Cir. 2018) ...........................................................19

*LC Cap. Partners, LP v. Frontier Ins. Group*,
    318 F.3d 148 (2d Cir. 2003) ...............................................................44

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) ...............................................................57

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000) ...............................................................18

*Marsh v. Rosenbloom*,
    499 F.3d 165 (2d Cir. 2007) ...............................................................55

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013) ...............................................................37

*Merced Irrigation Dist. v. Barclays Bank PLC*,
    165 F. Supp. 3d 122 (S.D.N.Y. 2016) ...............................................46

*O.E.M. Glass Network, Inc. v. Mygrant Glass Co.*,
    436 F. Supp. 3d 576 (E.D.N.Y. 2020) .......................................25, 26

*Pace Indus., Inc. v. Three Phoenix Co.*,
    813 F.2d 234 (9th Cir. 1987) ...............................................................33

*Perri v. Bloomberg*,
    No. 11-cv-2646, 2012 WL 3307013 (E.D.N.Y. Aug. 13, 2012)........56

*Pinaud v. Cnty. of Suffolk*,
    52 F.3d 1139 (2d Cir. 1995) ...............................................................47

*Port Dock & Stone Corp. v. Oldcastle, Northeast, Inc.*,
    507 F.3d 117 (2d Cir. 2007) ...............................................................50

*Randolph-Rand Corp. of N.Y. v. Tidy Handbags, Inc.*,
    No. 96 Civ. 1829, 2001 WL 1286989 (S.D.N.Y. Oct. 24, 2001).......56

*Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co.*,
    708 F. Supp. 2d 257 (E.D.N.Y. 2010) ...............................................32

*Ruffolo v. Oppenheimer & Co.*,
    987 F.2d 129 (2d Cir. 1993) ...............................................................20

*Samsung Elecs. v. Panasonic Corp.*,
    747 F.3d 1199 (9th Cir. 2014) ........................................................32

*Selevan v. N.Y. Thruway Auth.*,
    584 F.3d 82 (2d Cir. 2009) ...........................................................18

*Solent Freight Servs., Ltd. v. Alberty*,
    914 F. Supp. 2d 312 (E.D.N.Y. 2012) ............................................50

*Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*,
    366 F. Supp. 3d 516 (S.D.N.Y. 2018) ...........................................46

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016).....................................................................48

*State of N.Y. v. Hendrickson Bros.*,
    840 F.2d 1065 (2d Cir. 1988) ..................................................35, 44

*Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236
    (S.D.N.Y.), *aff'd*, 80 F. App'x 722
    (2d Cir. 2003)...............................................................................23

*Thea v. Kleinhandler*,
    807 F.3d 492 (2d Cir. 2015) ....................................................21, 45

*U.S. Football League v. Nat'l Football League*,
    842 F.2d 1335 (2d Cir. 1988) .......................................................34

*United States ex rel. Ladas v. Exelis, Inc.*,
    824 F.3d 16 (2d Cir. 2016) ...........................................................42

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) ...............................................25, 26, 28

*Whiteside v. Hover-Davis, Inc.*,
    995 F.3d 315 (2d Cir. 2021) ....................................................55, 56

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    401 U.S. 321 (1971).............................................................passim

*Zerilli–Edelglass v. N.Y.C. Transit Auth.*,
    333 F.3d 74 (2d Cir. 2003) ...........................................................19

## Statutes & Rules

15 U.S.C. § 15b ................................................................21

28 U.S.C. § 1291 ................................................................4

28 U.S.C. § 1331 ................................................................4

28 U.S.C. § 1367(c)(3) ................................................................55

Fed. R. Civ. P. 9(b) ................................................................36, 42

Fed. R. Civ. P. 12(b)(1) ................................................................18

Fed. R. Civ. P. 12(b)(6) ................................................................21, 45

N.Y. Gen. Bus. Law § 340(5) ................................................................21

## PRELIMINARY STATEMENT

This appeal concerns an improper attempt—first by SL-x IP S.à.r.l. (the "Parent Company") and later by its subsidiaries SL-x Technology UK Limited, SL-x Trading Europe Limited, SL-x Technology USA LLC and SL-x Trading USA LLC (the "Subsidiary Companies") (all together, "SL-x")—to assert time-barred antitrust conspiracy claims.

In nearly identical complaints brought by the Parent Company and Subsidiary Companies, SL-x alleges that Defendants—a group of financial institutions and a joint venture provider for stock lending services, EquiLend—engaged in a group boycott of SL-x's stock lending platform, owned and operated by subsidiaries SL-x Trading Europe Limited and SL-x Technology UK Limited (the "Foreign Subsidiaries"). In the district court, Judge Sullivan correctly dismissed the antitrust claims for two reasons: (1) all alleged conduct underlying the state and federal antitrust violations ceased by the summer of 2014, more than four years before either complaint was filed and thus outside the applicable four-year statute of limitations; and (2) the Parent Company lacks Article III standing to bring any such claims in the first instance. Although the Parent Company attempted to skirt this issue by resurrecting the Subsidiary Companies, Judge Sullivan correctly ruled this was too little, too late: the Parent Company was not the legal successor in interest to any of those claims, and the relevant Subsidiary

Companies did not exist at the time the Parent Complaint was filed. The district court opinion should be affirmed in its entirety.

*First*, the district court correctly held that SL-x's antitrust claims are time-barred by the applicable four-year statute of limitations. Central to SL-x's allegations of the existence of an antitrust conspiracy are numerous statements allegedly made by Defendants' executives directly to SL-x representatives over a period of several years prior to November 1, 2014—all more than four years before the Parent Complaint was filed and thus outside the statutory period for both the Sherman and Donnelly Act. *See infra* Section II.B. SL-x cannot plausibly defend its failure to bring suit earlier based on allegations of fraudulent concealment, as the alleged statements at issue were made directly to SL-x representatives, thus putting SL-x on inquiry notice, if nothing else. *See infra* Section III. Put differently, SL-x cannot have it both ways: it cannot use the very statements made directly to it to plead the existence of the alleged conspiracy while simultaneously arguing that the alleged conspiracy was concealed from it.

SL-x also contends that the alleged group boycott was a "continuing violation" and its claim did not accrue until its technology was sold to EquiLend in May 2015. But that sale, as the district court correctly determined, was not itself an overt act capable of restarting the statute of limitations; to the contrary, it was allegedly the direct result of Defendants' *prior* alleged refusals to deal, which had

2

ceased by the summer of 2014. Nor is there any authority for SL-x's proposition that antitrust *injury* only accrues as of the date that the *damages* stemming from that injury are precisely quantifiable. All that is required is that the injury itself be concrete and not speculative. Here, where SL-x alleges that it was forced out of business by 2014 as a result of Defendants' conspiracy, that standard is easily met, and SL-x's antitrust claims are time-barred. *See infra* Section II.C.

*Second*, the district court also correctly held that the Parent Company lacks Article III standing to bring these claims. The record clearly demonstrates that the platform allegedly victimized was owned and operated by the Parent Company's two previously-dissolved Foreign Subsidiaries—SL-x Trading Europe Limited and SL-x Technology UK Limited—and not the Parent Company. Indeed, SL-x conceded that the Parent Company does not own the claims at issue. (SPA-7.) The Parent Company does not have Article III standing based on its ownership interest in those subsidiaries; having enjoyed the legal benefits of corporate separateness, the Parent Company must live with the legal consequences. The suggestion that the Parent Company somehow became the "successor in interest" after the dissolution of these subsidiaries is also unavailing. As the Parent Complaint itself makes clear, by the time the subsidiaries dissolved in 2016, the platform had shuttered, the intellectual property had been sold and the trading license had been canceled. Simply put, there was no SL-x business left to be

3

continued by the time the Parent Complaint was filed in 2018. *See infra* Section IV.B.

In a last-ditch effort to rescue its claims, the Parent Company asserts that SL-x Technology USA LLC and SL-x Trading USA LLC (the "U.S. Subsidiaries") still existed when the Parent Complaint was filed, based on a provision of Delaware law that allows a "wind-up" period for dissolved businesses. But this, too, is insufficient to confer Article III standing. The U.S. Subsidiaries themselves never suffered any injury, and SL-x misconstrues the relevant Delaware law. *See infra* Section IV.B.4.

*Third*, having properly dismissed the federal and state antitrust claims for the foregoing reasons, the district court also properly declined to exercise supplemental jurisdiction over the remaining state law claims. *See infra* Section V.

Given the significant and dispositive pleading defects in the instant action, this Court should affirm the district court's decision to dismiss the Parent and Subsidiary Complaints with prejudice.

## JURISDICTIONAL STATEMENT

The district court and this Court have subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. SL-x timely filed notices of appeal on October 25, 2021.

## COUNTERSTATEMENT OF THE ISSUES PRESENTED

1.      Did the district court correctly dismiss SL-x's claims as time-barred given that the alleged conspiratorial conduct occurred outside of the applicable statute of limitations period, and the facts alleged to support the existence of the conspiracy consist of numerous statements made directly to SL-x's representatives?

2.      Did the district court correctly dismiss the SL-x Parent Complaint for lack of Article III standing where the Parent Company did not hold the asserted claims and only its previously dissolved subsidiaries were allegedly injured?

## COUNTERSTATEMENT OF THE CASE

## I.      STATEMENT OF FACTS

### A.      SL-x's Allegations Concern Conduct More than Four Years Before the Parent and Subsidiary Complaints Were Filed.

SL-x's allegations of a boycott conspiracy concern conduct that occurred more than four years before SL-x filed its complaints.

The Parent Company initiated its lawsuit on November 1, 2018, alleging that Defendants collectively engaged in a group boycott of SL-x's electronic stock lending platform.  (A-49.)  Thereafter, SL-x revived its previously dissolved Subsidiary Companies:  SL-x Trading Europe Limited; SL-x Technology UK Limited, SL-x Technology USA LLC and SL-x Trading USA LLC.  (A-272; A-292.)  And, on May 24, 2019, the Subsidiary Companies filed the Subsidiary

5

Complaint, asserting claims (and allegations) substantially identical to those in the Parent Complaint. (A-570.)

The complaints rely extensively on statements by Defendants' representatives allegedly made directly to SL-x personnel at various times from 2011 through the summer of 2014—all outside the limitations period and in plain sight of SL-x:

- In 2011, Goldman Sachs allegedly told SL-x personnel that "[i]f the Prime Broker Defendants were to allow a central trading platform with counterparty clearing, it would . . . not be a good development for the Prime Broker Defendants". (A-82-83 ¶¶ 142-43; A-604 ¶¶ 147-48.)

- In September 2011, EquiLend allegedly "declined SL-x's proposal" for a corporate transaction and "rejected any further efforts at negotiation. In essence it stated that EquiLend was not available for sale at any price, no matter how beneficial to its shareholders". (A-79 ¶¶ 118-20; A-601 ¶¶ 123-25.)

- In February 2013, a Credit Suisse executive allegedly told SL-x that "EquiLend was like 'the mafia run by five crime families' and that SL-x should not underestimate it as a competitor". (A-81 ¶¶ 133-34; A-116 ¶ 289; A-603 ¶¶ 138-39; A-638 ¶ 294.)

- In July 2013, the same Credit Suisse executive allegedly "warned" SL-x that "without approval from EquiLend, SL-x was unlikely to be able to achieve a foothold in the industry". The executive also asserted that they would only join if the "Big Boys" committed to the platform. (A-81 ¶¶ 135-36; A-603 ¶¶ 140-41.)

- In August 2013, JPMorgan's EquiLend board representative purportedly "admit[ted]" to SL-x that there was "a general agreement among [EquiLend] Directors that industry advances should be achieved from within EquiLend". (A-84 ¶ 153; A-606 ¶ 158.)

6

- In September 2013, in a meeting with SL-x, UBS allegedly extolled "the benefit of being 'inside the club' of EquiLend member banks to effectuate market changes and suggested that any market transition towards an SL-x platform and central clearing of stock loan trades would need to come from inside EquiLend". (A-86 ¶ 168; A-608 ¶ 173.)

- In July 2014, Morgan Stanley allegedly informed SL-x that it "would not go forward with SL-x and that any further development of a CCP solution would be done through EquiLend". (A-85 ¶ 161; A-607 ¶ 166.)

SL-x also alleges that other third parties made similarly suspicious statements directly to SL-x representatives more than four years prior to the filing of either complaint:

- In October 2012, Northern Trust allegedly informed SL-x that it "could not make any commitment to using SL-x's service until it understood how Goldman Sachs would react". (A-87 ¶ 171; A-609 ¶ 176.)

- At that same time, State Street allegedly told SL-x that it "wanted to know what Defendants' position was, so as not to cross them", before "consider[ing] signing . . . as an SL-x customer". (A-87 ¶ 172; A-609 ¶ 177.)

- In October 2013, Deutsche Bank allegedly told SL-x that "[i]t would not sign up for SL-x until its fellow banks agreed to do so". (A-88 ¶ 175; A-609 ¶ 180.)

In addition, all of the alleged harm to SL-x was inflicted before November 2014—more than four years before SL-x filed either the Parent or Subsidiary Complaints. (A-91-93 ¶¶ 195-204; A-613-14 ¶¶ 200-209.) SL-x alleges that "[b]y the summer of 2013", it was running out of funding due to "resistance that it was facing in the market" from Defendants. (A-91 ¶¶ 195-96; A-613 ¶¶ 200-01.) SL-x therefore "began to look for additional investors to ensure that it had the resources

7

to continue to develop", including a data provider called Markit. (A-91-92 ¶¶ 195-96; A-613 ¶¶ 200-01.) "However, in early 2014, Markit suddenly and unexpectedly withdrew from investment discussions." (A-92 ¶ 199; A-614 ¶ 204.) Once that investment fell through, SL-x began to close its doors and "engaged an investment bank . . . to search for a potential buyer". (A-92 ¶ 201; A-614 ¶ 206.) By September 2014, SL-x applied to cancel its license as a trading facility with the UK Financial Conduct Authority ("FCA"), and was effectively out of business. (A-166 n.3; A-168.)

There are zero allegations of any actions by the Defendants in furtherance of an alleged boycott of SL-x, or of any conduct that allegedly injured SL-x, after the summer of 2014. SL-x alleges that Defendants' pre-2015 conduct forced SL-x to sell its intellectual property at a diminished value (A-95 ¶ 216; A-617 ¶ 221), and that EquiLend purchased SL-x's intellectual property for approximately £500,000 in early 2015. (A-93 ¶ 204; A-614 ¶ 209.) SL-x does not allege that the sale of its intellectual property constituted an act in furtherance of the alleged boycott, but rather the purported effect of it. (A-95 ¶ 216; A-617 ¶ 221 ("Because of Defendants' conduct, SL-x was forced to close its doors and sell off its intellectual property . . . .").)

### B. SL-x's Allegations Relate to Previously Dissolved SL-x Subsidiaries—Not the Parent Company.

The Parent Company alleges it developed "patented software" that "could have revolutionized the stock lending" industry; "entered into a service agreement with Eurex"—a European central counterparty—"to provide central clearing" for European stock-lending transactions; sought to "purchase EquiLend"—a securities-lending platform; and then ultimately sold its intellectual property to EquiLend. (A-73-93 ¶¶ 93, 100, 118, 181, 204.)

None of that is correct. The public record conclusively establishes that the Parent Company was not the entity that did any of those things, and the Parent Company concedes that it did not own the claims at issue. (SPA-7.) In fact, SL-x's allegations relate to the Parent Company's two Foreign Subsidiaries, SL-x Trading Europe Limited and SL-x Technology UK Limited:[1]

- SL-x Trading Europe Limited—not the Parent Company—was registered with the UK Financial Conduct Authority ("FCA") as a multilateral trading facility (A-166) and entered into a clearing agreement with Eurex (*id.*);

---

[1] While both the Parent and Subsidiary Complaints fail to differentiate among SL-x entities, public records reveal—and SL-x did not dispute—that it was the Foreign Subsidiaries that owned the relevant trading facility and intellectual property, and that SL-x applied to cancel the trading facility by September 2014. (*See* A-268.)

9

- SL-x Ventures UK Limited (later renamed SL-x Technology UK Limited (A-198))—not the Parent Company—offered to purchase EquiLend (A-201);

- SL-x Technology UK Limited—not the Parent Company—obtained patents from the U.S. Patent and Trademark Office for "[s]ystems and methods for electronically initiating and executing securities lending transactions" (A-208; A-210 (listing SL-x Technology UK Limited as the "[a]ssignee" of the patents)); and

- SL-x Technology UK Limited—not the Parent Company—sold its intellectual property assets to EquiLend (A-212; A-227).

The Foreign Subsidiaries were not in legal existence at the time the Parent Complaint was filed. SL-x Trading Europe Limited and SL-x Technology UK Limited had been dissolved years beforehand, on October 27, 2015 and May 3, 2016, respectively. (A-232; A-234.) There is no allegation that either SL-x Trading Europe Limited or SL-x Technology UK Limited assigned any claims to the Parent Company before their dissolution. (SPA-8.) SL-x also does not allege that either of the U.S. Subsidiaries operated or owned the SL-x platform, or that they had assigned their rights or liabilities to the Parent Company.

## II. PROCEDURAL HISTORY

On November 1, 2018, the Parent Company filed suit, claiming that SL-x violated federal and state antitrust law—the Sherman Act and New York's Donnelly Act. SL-x also brought claims under New York law for tortious interference with business relations, unjust enrichment, and the Deceptive Trade Practices Act. After Defendants moved to dismiss the Parent Complaint, including

10

for lack of standing, the Parent Company sought to revive the subsidiaries and requested leave to assign the subsidiaries' claims to the Parent Company. (A-293; A-295.) The district court denied the request. (A-318.) The Court suggested that the parties engage in jurisdictional discovery to resolve the standing issue, but SL-x rejected the proposal, characterizing it as unnecessary. (A-520-21.)

On May 24, 2019, the Subsidiary Companies filed a separate and substantially identical suit. (A-570.) The parties agreed to consolidate the actions and, in accordance with the parties' agreement, the Court ordered that Defendants' fully briefed motion to dismiss the Parent Complaint be deemed responsive to the Subsidiary Complaint. (A-666.)

On October 1, 2021, the district court granted Defendants' motion to dismiss the Parent Complaint for lack of standing; granted Defendants' motion to dismiss the federal and state antitrust claims in the Subsidiary Complaint on the grounds that they are time-barred; and denied EquiLend Europe's motion to dismiss for lack of personal jurisdiction. (SPA-1-2.) The district court declined to exercise supplemental jurisdiction over the remaining state law claims due to the dismissal of SL-x's federal and state antitrust claims. (SPA-19-20.)

On October 25, 2021, the Parent and Subsidiary Companies filed notices of appeal on their respective dockets (A-568; A-690) and the appeals were consolidated on December 1, 2021 (Doc. No. 67).

## III.   DISTRICT COURT OPINION

In the district court, Judge Sullivan decided two threshold issues: (1) whether SL-x failed to state a claim because the antitrust claims were time-barred by the four-year statute of limitations and (2) whether the Parent Company lacked Article III standing to bring the Parent Complaint.  (SPA-7-8; SPA-13.)

*First*, the district court held that the antitrust claims are time-barred by the four-year statute of limitations.  In reaching that conclusion, Judge Sullivan analyzed three key questions:  (1) whether the alleged conspiracy constituted a continuing violation (SPA-13-14); (2) whether the 2015 sale of SL-x's intellectual property to EquiLend—the only thing that occurred after the summer of 2014—constituted a new and independent overt act (SPA-17-19); and (3) whether the statute of limitations was equitably tolled due to fraudulent concealment (SPA-14-15).

In response to the first question, Judge Sullivan stated that in the continuing violation context, the statute of limitations restarts each time a defendant commits an act that injures a plaintiff.  (SPA-13-14 (citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971).)  He emphasized, however, that this exception to the statute of limitations does not "permit the plaintiff to recover for injuries caused by acts that occurred before that limitations period".  (SPA-14 (quoting *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,

12

340 F. Supp. 3d 285, 333 (S.D.N.Y. 2018) ("*IPERS*").)  Judge Sullivan concluded that "[b]ased on the Plaintiffs' allegations in their Subsidiary Complaint, Broker Defendants initially expressed enormous amounts of interest in SL-x and its product, but by late summer in 2014, the Broker Defendants had conveyed to SL-x that they were not prepared to invest in or become customers of SL-x".  (*Id.* (internal quotation marks omitted).)  Therefore, the Court held that "the statute of limitations [] started running at the time of this alleged anticompetitive conduct" and the alleged conspiracy did not constitute a continuing violation.  (*Id.*)

On the second question, Judge Sullivan held that "it remains clear from the face of the Subsidiary Complaint that Plaintiffs have failed to establish an independent antitrust injury as a result of the 2015 sale" of SL-x's intellectual property.  (SPA-18.)  "[N]ot every act by an antitrust defendant is sufficient to restart the statute of limitations".  (*Id.* (quoting *Creative Copier Servs. v. Xerox Corp.*, No. 01-cv-155, 2005 WL 2175138, at *1 (D. Conn. Sept. 2, 2005).)  Accordingly, because "the injury realized in the 2015 sale—lost profits on the sale of their patents and business model—was the direct result of Defendants' refusal to deal with [SL-x] in the years prior to the sale", it did not constitute an independent act sufficient to restart the statute of limitations.  (SPA-18.)

With respect to the third question, Judge Sullivan rejected SL-x's argument that the statute of limitations should be equitably tolled due to fraudulent

concealment.  The district court distinguished the instant action from *IPERS*, a related class action filed against the same Defendants by borrowers and lenders of stock.  Specifically, Judge Sullivan held that, in contrast to the present case, in *IPERS* the "plaintiffs . . . had no way of knowing about the alleged threats", as "[they] were *not* owners of the stock lending platforms that Defendants allegedly boycotted . . . .  Plaintiffs here were the owners of SL-x's intellectual property and have alleged that they were at meetings in which individual executives from the Broker Defendants clearly alluded to a conspiracy".  (SPA-15 (emphasis in original).)  Judge Sullivan determined this crucial fact fatal to SL-x's fraudulent concealment argument:  "[T]he fact that executives of the Broker Defendants made these statements directly to SL-x representatives demonstrates that the alleged conspiracy did not 'depend[] on concealment for its success'".  (SPA-16 (quoting *IPERS*, 340 F. Supp. 3d at 334).)

*Second*, the district court held that the Parent Company lacked Article III standing.  Judge Sullivan reasoned that "to meet the requirements of Article III standing here, either (1) [the Parent Company] must have suffered an injury at the time it filed the Parent Complaint by virtue of its status either as a successor in interest or parent to the subsidiaries that owned the SL-x platform, or at least (2) the real parties in interest – the subsidiaries – must have existed at the time [the Parent Company] filed the Parent Complaint".  (SPA-7-8.)  First, Judge Sullivan

14

noted that the Parent Company "concede[d] that it did not own the claims at issue" and held that "[t]he mere fact that [the Parent Company] was the parent of the injured subsidiaries is insufficient alone to establish injury here".  (SPA-8.) Because "[n]othing in the Parent or Subsidiary Complaint sheds any light on how or why [the Parent Company] is the legal successor in interest to its subsidiaries' claims", *id.*, the Court was left with one remaining question to consider, whether any real party in interest existed at the time the Parent Complaint was filed. (SPA-9.)  Judge Sullivan answered that question in the negative, as "Plaintiffs have conceded that the subsidiaries did not exist when [the Parent Company] filed the Parent Complaint".  (*Id.*)  As a result, the Parent Company lacked Article III standing to bring the claims.

*Third*, the Court declined to exercise supplemental jurisdiction over the remaining state law claims because it had dismissed all claims over which it had original jurisdiction.  (SPA-19-20.)

## SUMMARY OF THE ARGUMENT

1.     The district court properly dismissed SL-x's federal and state antitrust claims as time-barred.  *First*, SL-x's antitrust claims are time-barred because the alleged violative conduct does not fall within the four-year statute of limitations period.  *See infra* Section II.B.  While SL-x argues that a group boycott automatically constitutes a continuing violation unless there was a "one-time, final,

and irrevocable refusal to deal" (App. Br. 24), that is wrong. The continuing violation exception only applies when the plaintiff is able to point to new and independent overt acts that inflict new and accumulating injury. Here, SL-x has failed to allege any overt acts that occurred after the summer of 2014. *See infra* Section II.C.1.

Nor can SL-x restart the statute of limitations by characterizing the 2015 sale of SL-x's intellectual property to EquiLend as a new and independent antitrust violation. In this case, the final injury to SL-x's business occurred *before* the intellectual property was sold, when the conspiracy allegedly "destroyed the enterprise value of SL-x" in 2014. (A-285.) Indeed, the complaints allege that the 2015 sale was merely a consequence of the alleged pre-2015 conduct, and SL-x's claims accrued at the moment it suffered injury, long before the sale to EquiLend. (A-95 ¶ 216; A-617 ¶ 221); *see infra* Section II.C.3.

*Second*, the district court correctly rejected SL-x's claim that the statute of limitations should be tolled due to fraudulent concealment. To demonstrate the existence of the alleged boycott conspiracy, SL-x relies on statements allegedly made directly to SL-x personnel. As a result, SL-x's theory of concealment fails because SL-x was told directly of the very conduct that it now claims was concealed. *See infra* Section III.B. At the very least, these statements placed SL-x on inquiry notice of the alleged boycott that "would make a reasonable person

16

suspicious enough to inquire further into the reasons why Defendants were rejecting the platform".  (SPA-16-17); *see infra* Section III.C.

2.      The district court properly held that the Parent Company lacked Article III standing because it did not own the claims asserted.  The Parent Company did not suffer injury because the record demonstrates that the Foreign Subsidiaries were in fact the entities that operated the SL-x stock lending platform and owned the SL-x intellectual property.  Because the law treats parent and subsidiary companies as separate and distinct legal entities, parent companies cannot simply assert claims on behalf of their subsidiaries, especially when those subsidiaries have been dissolved prior to the claims being asserted (and without any assignment of those claims prior to the dissolution).  Thus, SL-x's arguments that the Parent Company can bring these claims because it owned the Subsidiary Companies or is automatically the successor-in-interest to its dissolved subsidiaries, clearly fail.  *See infra* Section IV.B.

SL-x also misconstrues Delaware law to assert that the U.S. Subsidiaries remained in legal existence at the time the Parent Complaint was filed.  The relevant Delaware law is specifically applicable to companies that are in the winding-up process and was not designed as a tool to revive dormant companies with no operations in order to assert otherwise barred claims.  In any event, even if the Court were to find that the U.S. Subsidiaries remained in existence at the time

17

SL-x filed the Parent Complaint, the U.S. Subsidiaries suffered no alleged injury. The only entities that are alleged to have been harmed are the Foreign Subsidiaries that are not governed by Delaware law, and SL-x has not alleged any facts to demonstrate that either of these companies was in legal existence when the Parent Complaint was filed. *See infra* Section IV.B.4.

3.      The district court properly declined to exercise supplemental jurisdiction over the remaining state law claims. *See infra* Section V.

4.      The district court properly declined to grant SL-x leave to amend because any amendments would be futile. *See infra* Section VI.

## ARGUMENT

### I.      STANDARD OF REVIEW.

#### A.      Failure To State a Claim and Lack of Standing.

The Second Circuit "review[s] *de novo* a district court's dismissal of a complaint for lack of standing[2] and for failure to state a claim". *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) (citations omitted). While the Court "accepts as true all factual allegations in the complaint, and draws all reasonable inferences in the plaintiff's favor", *Holmes v. Grubman*, 568 F.3d 329,

---

[2] "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)).

335 (2d Cir. 2009) (internal quotation marks and citation omitted), it is "not bound to accept as true a legal conclusion couched as a factual allegation". *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007))*.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 55).

### B. Equitable Tolling.

The Second Circuit reviews "a district court's decision to deny equitable tolling for abuse of discretion". *Zerilli–Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 81 (2d Cir. 2003) (citations omitted). "A district court abuses its discretion if it (1) bases its decision on an error of law or uses the wrong legal standard; (2) bases its decision on a clearly erroneous factual finding; or (3) reaches a conclusion that, though not necessarily the product of a legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions." *Klipsch Grp., Inc. v. ePRO E-Com. Ltd.*, 880 F.3d 620, 627 (2d Cir. 2018) (quoting *EEOC v. KarenKim*, *Inc.*, 698 F.3d 92, 99-100 (2d Cir. 2012)).

### C. Supplemental Jurisdiction.

This Court "review[s] for abuse of discretion a district court's decision not to exercise supplemental jurisdiction over state law claims". *Gorss Motels, Inc. v.*

*Lands' End, Inc.*, 997 F.3d 470, 475 (2d Cir. 2021) (internal quotation marks and citation omitted).

### D. Leave To Amend.

The Second Circuit reviews the district court's decision not to grant leave to amend for abuse of discretion. "Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (citations omitted).

### II. THE DISTRICT COURT PROPERLY DISMISSED SL-X'S ANTITRUST CLAIMS AS BARRED BY THE STATUTE OF LIMITATIONS.

### A. Legal Standard.

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'". *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged". *Id.* (citing *Twombly*, 550 U.S. at 556). When determining what is plausible, a court should consider the context and "draw on its judicial experience and common sense". *Id.* at 679.

It is well settled that, "a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint". *Conn. Gen. Life Ins. Co. v. BioHealth Labs., Inc.*, 988 F.3d 127, 132 (2d Cir. 2021) (internal quotation marks and citation omitted). As here, "when a plaintiff relies on a theory of equitable estoppel to save a claim that otherwise appears untimely on its face, the plaintiff must specifically plead facts that make entitlement to estoppel plausible (not merely possible)". *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015) (citations omitted).

### B. SL-x's Claims Are Time-Barred.

SL-x's claims under the Sherman Act and the Donnelly Act are subject to a four-year statute of limitations. *See* 15 U.S.C. § 15b; N.Y. Gen. Bus. Law § 340(5). "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp.*, 401 U.S. at 338 (citations omitted). The district court properly held that these claims were time-barred because the alleged unlawful conduct occurred before November 1, 2014—four years before the Parent Complaint was filed.

In support of its antitrust claim, SL-x relies on a series of allegations against Defendants that occurred exclusively from 2011 through mid-2014.

In 2011:

- Goldman Sachs allegedly informed SL-x that supporting a central trading platform with counterparty clearing was "out of the question" because it

would be detrimental to the Prime Broker Defendants.  (A-82-83 ¶¶ 142-43; A-604 ¶¶ 147-48.)

- EquiLend had rejected SL-x's purchase proposal—indicating that EquiLend was not available for sale to SL-x "at any price".  (A-79 ¶¶ 118-20; A-601 ¶¶ 123-25.)

SL-x further alleges that in 2013:

- Credit Suisse executives allegedly told SL-x representatives that Credit Suisse would only join if the "Big Boys" committed to SL-x  (A-81 ¶ 135; A-603 ¶ 140), described EquiLend as "the mafia run by five crime families", and warned that "without approval from EquiLend, SL-x was unlikely to be able to achieve a foothold in the industry".  (A-81 ¶¶ 133-36; A-603 ¶¶ 138-41.)

- JPMorgan allegedly "admit[ted]" to SL-x that there was "general agreement . . . that industry advances should be achieved from within EquiLend".  (A-84 ¶ 153; A-606 ¶ 158.)

- A UBS executive allegedly suggested that any market transition towards SL-x would need to come from within EquiLend.  (A-86 ¶ 168; A-608 ¶ 173)

Ultimately, SL-x's latest-in-time conspiracy allegation dates to July 2014, when Morgan Stanley allegedly informed SL-x that it "would not go forward with SL-x and that any further development of a CCP solution would be done through EquiLend".  (A-85 ¶ 161; A-607 ¶ 166.)  While EquiLend did not purchase SL-x's patents until May 2015, SL-x does not allege—nor could it—that the purchase caused *additional* injury given that it had declared itself out of business eight months prior.  *See infra* Section II.C.4.

Indeed, SL-x alleges that the conspiratorial acts injured its business well before November 1, 2014. By SL-x's own allegations, "[b]y the summer of 2013", SL-x had started to run out of funding because of the "resistance that it was facing in the market" from Defendants—resistance that allegedly was the result of the boycott. (A-91 ¶ 195; A-613 ¶ 200.) In early 2014, SL-x decided to shutter its operations and "engaged an investment bank . . . to search for a potential buyer". (A-92 ¶ 201; A-614 ¶ 206.) Indeed, as the district court aptly summarized: "Based on the Plaintiffs' allegations . . . by late summer in 2014, the Broker Defendants had conveyed to SL-x that they were not prepared to invest in or become customers of SL-x." (SPA-14.) By September 2014, SL-x applied to cancel its license as a trading facility with the FCA, effectively going out of business (A-166, 168). *See, e.g.*, *Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236, 252 (S.D.N.Y.), *aff'd*, 80 F. App'x 722 (2d Cir. 2003) (holding that plaintiff's Sherman Act and Donnelly Act claims were time-barred because the latest possible date that business injury could have been inflicted was when plaintiff went out of business).

SL-x does not allege that Defendants engaged in any further boycott conspiracy after the summer of 2014. Because SL-x did not bring the Parent Action (the earliest filed action) until November 1, 2018—more than four years

after the last alleged unlawful act—the statute of limitations had run for SL-x's Sherman Act and Donnelly Act claims.[3]

### C.    The "Continuing Violation" Exception Does Not Apply.

SL-x attempts to salvage its antitrust claims by arguing that the alleged group boycott constitutes a continuing violation.  (App. Br. 22-25.)  The district court correctly held that the continuing violation doctrine does not apply here.

In *Klehr v. A.O. Smith Corp.*, the Supreme Court held that "[a]ntitrust law provides that, in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff', *e.g.*, each sale to the plaintiff, 'starts the statutory period running again'".  521 U.S. 179, 189 (1997); *Zenith Radio Corp.*, 401 U.S. at 338 ("In the context of a continuing conspiracy to violate the antitrust laws . . . each time a plaintiff is injured by an act of the defendants[,] a cause of action accrues to him . . . [and] the statute of

---

[3] SL-x contends that the parties agreed that the date for computing the statute of limitations is November 1, 2018, the filing date of the Parent Action.  (App. Br. 21-22.)  There has been no such agreement.  As acknowledged by Judge Sullivan below, "[w]hether the Court should view the four-year statute of limitations period as running from the filing date of the Parent Complaint (November 1, 2018) or that of the Subsidiary Complaint (May 24, 2019) was not addressed by either party following Plaintiff's filing of the Subsidiary Complaint".  (SPA-13 n.6.)  The Court, however, determined the issue to be moot because "the outcome would [have been] the same in any event".

limitations runs from the commission of the act.") (citation omitted). For the continuing violation exception to apply, "an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act".[4] *O.E.M. Glass Network, Inc. v. Mygrant Glass Co.*, 436 F. Supp. 3d 576, 589 (E.D.N.Y. 2020) (internal quotation marks and citations omitted). "[A]n overt act . . . is characterized by two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68 (2d Cir. 2019) (adopting *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996) and collecting cases). A refusal to deal does not constitute a continuing violation unless SL-x can point to "new and independent" overt acts that inflict "new and accumulating injury" on SL-x. *See id.*

As discussed above, by the summer of 2014, Defendants' representatives conveyed to SL-x that they would not engage in business with SL-x, and by September 2014 at the latest, SL-x was out of business. In an effort to sidestep its failure to allege any overt acts after this time, SL-x makes four arguments: (1) that

---

[4] This understanding of the "continuing conspiracy" exception is supported by the case law cited by SL-x. (App. Br. 25.) *See Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1088 (10th Cir. 2006) ("[F]or an act to trigger the exception: 1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff.") (internal quotation marks and citations omitted).

"refusals to deal are by definition continuing violations", unless there was a "one time, final and irrevocable refusal to deal" (App. Br. 24-28); (2) the alleged boycott was "continuing" in nature (App. Br. 28-29); (3) the 2015 sale of SL-x's intellectual property to EquiLend constituted an independent overt act that should restart the statute of limitations period (App. Br. 29-30); and (4) the claim did not begin to accrue until SL-x could calculate the specific dollar value of the damages incurred. These arguments are all without merit.

### 1. SL-x Misconstrues the Continuing Violation Exception.

SL-x misconstrues the law by claiming that an alleged "group boycott" automatically constitutes a continuing violation unless there is a "one time, final and irrevocable refusal to deal". (App. Br. 24.) The continuing violation exception only applies when there is "an overt act by [a] defendant [that] . . . restarts the statute of limitations and the statute runs from the last overt act", which SL-x fails to allege here. *O.E.M. Glass Network*, 436 F. Supp. 3d at 589 (internal quotation marks and citations omitted). Therefore, SL-x's reliance on *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968), *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019), and *Borger v. Yamaha Int'l Corp.*, 625 F.2d 390 (2d Cir. 1980), is misplaced.

*First*, in *Hanover Shoe*, there were multiple refusals to deal after the initial refusal was conveyed. In fact, SL-x admits that the Supreme Court in *Hanover*

26

*Shoe* held that "[e]ach refusal to sell was a new actionable act". (App. Br. 24.) It clearly establishes that in order for the continuing violation exception to apply, SL-x must allege new and independent overt acts within the limitations period. Here, by contrast, SL-x does not and cannot point to any other refusals after the summer of 2014, much less refusals that do more than simply "reaffirm" the initial refusal by the Defendants. With the exception of the 2015 sale of SL-x's intellectual property (which does not qualify as actionable for the reasons discussed below), neither complaint mentions a single action taken by Defendants after the summer of 2014. *See supra* II.B.

*Second*, the refusals to deal in *Hanover Shoe* caused new and accumulating injury to the plaintiff. Even if SL-x could point to some new and independent action by Defendants, that would not by itself be sufficient to constitute an overt act because there was no new injury to SL-x's business—because it ceased to operate by September of 2014, there was no further injury to inflict. (A-166; A-168.) By contrast, the lease-only policy in *Hanover Shoe* meant that each time there was a refusal to sell certain machinery, the defendant could demand that the plaintiff rent the machinery at a supracompetitive price. 392 U.S. at 483-85. The plaintiff was thus inflicted with new and accumulating injury on each occasion. *Id.* at 487, 502 n.15.

Similarly, *US Airways* involved a price-fixing conspiracy in which the continuing violation exception did not apply because "each supracompetitive price charged . . . was not an overt act of its own, but a manifestation of the prior overt act". 938 F.3d at 69. Far from supporting SL-x's position, this case only further undermines its erroneous invocation of the continuing violation exception.

*Third*, SL-x relies heavily on *Borger v. Yamaha International Corporation*, 625 F.2d 390 (2d Cir. 1980), to assert that refusals to deal are continuing violations unless there was a "one-time, final, and irrevocable refusal to deal". (App. Br. 24.) This is not the law. In *Borger*, this Court was determining how to calculate the amount of damages to be awarded to the plaintiff, not whether the continuous violation exception applied. 625 F.2d at 398. Application of *Borger* outside of the damages context does not make sense: if a clear and absolute refusal to deal such as the one conveyed in *Borger* (where Yamaha asserted that it would "absolutely . . . not" deal) does not qualify as final and irrevocable for statute of limitations purposes, as SL-x asserts that it does not (App. Br. 27), it is hard to imagine what would qualify.[5] *See id.* at 393.

---

[5] SL-x also cites *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299 (9th Cir. 1986), as holding that "a conspiracy to shepherd tourists away from plaintiff's gift shop constituted a continuing antitrust violation because there was nothing irrevocable, immutable, permanent and final about it". (App. Br. 27.) But in *Hennegan*, the Ninth Circuit explained that the plaintiff had "alleged numerous overt acts [within the limitations period]" including "payments by the souvenir vendors to the tour operators and the tour operators' shepherding of tourists away

28

### 2. SL-x Fails Sufficiently To Allege that Defendants Continually Conspired and Pressured Third Parties To Boycott SL-x.

SL-x argues that the alleged boycott was necessarily a continuing violation because "Defendants acted collectively and regularly pressured third parties not to do business with SL-x". (App. Br. 28.) But again SL-x alleges no facts that would show that Defendants threatened or pressured any third parties after the summer of 2014. Indeed, the Subsidiary Complaint states that by early 2014, no parties were "willing to risk the ire of Defendants by investing in SL-x" (A-92 ¶¶ 199-201; A-614 ¶¶ 204-06) and that third-party investors "suddenly and unexpectedly withdrew from investment discussions". (A-92 ¶ 199; A-614 ¶ 204.) SL-x fails to identify a single instance of Defendants threatening or pressuring third parties after November 1, 2014. SL-x's vague and conclusory allegations regarding unspecified conduct that ostensibly took place after November 1, 2014 also get SL-x nowhere; by then, SL-x had already gone out of business. (App. Br. 28-29.)

---

from the Hennegans' shop and to the shops of the souvenir vendors", constituting "separate antitrust violations within the limitations period". *See id.* 1300-01. Here, by contrast, SL-x alleges no overt acts taken by Defendants within the limitations period. Further, in *Hennegan* the acts outside of the limitations period did not "permanently destroy the Hennegans' business" and therefore separate injury could "flow[] from the alleged overt acts [that took place] within the limitations period". 787 F.2d at 1301. But here, SL-x had fully shut down its business operations by September 2014. (A-166; A-168.)

### 3. The 2015 Sale of SL-x's Patents to EquiLend Does Not Constitute a New and Independent Antitrust Violation.

SL-x argues that EquiLend's purchase of SL-x's intellectual property constitutes a new and independent overt act that restarted the statute of limitations. (App. Br. 29.) But that argument is undermined by the specific allegation in SL-x's complaints that "[b]ecause of Defendants' conduct SL-x was forced to close its doors and sell off its intellectual property for a fraction of the true value of the company". (A-95 ¶ 216; A-617 ¶ 221.) The "conduct" SL-x is referring to, however, is not the sale itself but rather the pre-2015 alleged unlawful conduct that caused SL-x's business to fail and thus necessitated the sale of its patents.

SL-x also has failed to properly allege facts that show that the sale inflicted "new and accumulating injury". First, because SL-x was already out of business by November 2014, SL-x has not and could not allege any possible "new and accumulating" injury that could have been inflicted on SL-x after that time. SL-x's own allegations make clear that Defendants' alleged conduct had driven SL-x out of business before November 2014. (A-92-93 ¶¶ 195-204; A-613-14 ¶¶ 200-209.) As early as the summer of 2013, while facing resistance in the market, SL-x was already searching for additional investors in an effort to continue operating. (A-91 ¶ 195; A-613 ¶ 200.) By early 2014, potential investors withdrew from investment discussions and "SL-x engaged an investment bank, Wells Fargo to prepare additional marketing materials and to search for a potential buyer". (A-92

¶¶ 199-201; A-614 ¶¶ 204-06.) And by September 2014, SL-x had filed to cancel its license as a trading facility with the FCA, effectively declaring itself out of business. (A-166; A-168.) Therefore, SL-x cannot credibly allege that it suffered any "new and accumulating" injuries after November 2014; by that point SL-x had run out of funding options, faced incredible resistance in the market and, as a result, shuttered its business. The only thing left for SL-x to do was to sell the company's remaining assets.

Second, SL-x does not allege that EquiLend's purchase of its intellectual property further injured SL-x. The fact that the patents were purchased by EquiLend, rather than some other third-party buyer, is irrelevant for statute of limitations purposes. EquiLend's purchase of SL-x's intellectual property was not a "new act" that "could have caused [SL-x] harm over and above the harm that the earlier acts caused". *See Klehr*, 521 U.S. at 190 ("[A]s in the antitrust cases, the plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period."). As Judge Sullivan properly reasoned, the sale was "merely the abatable but unabated inertial consequence of Defendants' [alleged] pre-limitations period boycott of SL-x". (SPA-19.)

31

### 4. The Statute of Limitations Begins To Run When Injury Is Suffered, Not When Damages Are Calculable.

SL-x also contends that its claims did not accrue until the 2015 sale to EquiLend because the specific dollar value of the damages suffered by SL-x was not calculable until the sale was completed. (App. Br. 31.) SL-x is wrong.

"An antitrust cause of action generally accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *See Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 264 (E.D.N.Y. 2010) (internal quotation marks and citations omitted). "[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." *Zenith*, 401 U.S. at 338 (internal quotation marks and citations omitted).

Indeed, in *Samsung Elecs. v. Panasonic Corp.*, 747 F.3d 1199 (9th Cir. 2014), cited by SL-x (App. Br. 32), the Ninth Circuit addressed the conceptual difference between (1) when harm resulting from the conspiracy becomes sufficiently concrete and not "speculative" (which is required for accrual) and (2) when damages are calculable to a specific dollar value (which is not required for accrual). The court explained that "'uncertain damages, which prevent recovery, are distinguishable from uncertain extent of damage, which does not

32

prevent recovery'" and "the key question in determining whether damages were overly speculative such that recovery would be unavailable at the time of the initial act is whether the existence of the harm is determinable, not the specific dollar value of that harm". *Id.* (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 240 (9th Cir. 1987)). Here, while the dollar value of SL-x's alleged injury may have been uncertain when it shut down its business in 2014, the "existence of harm" was clearly "determinable".[6]

The Court's decision in *D'Addario v. D'Addario*, 901 F.3d 80, 93 (2d Cir. 2018), does not help SL-x. The language SL-x relies on from that case relates to the accrual standard for RICO violations, not Sherman Act claims. Defendants are unaware of any authority requiring that damages become "clear and definite"[7] for

---

[6] Indeed, according to SL-x's theory, its injury would never have accrued and the limitations period could be extended indefinitely if SL-x had decided not to sell off its intellectual property after shuttering its operations.

[7] Plaintiffs misinterpret the words "clear and definite". In *D'Addario*, the plaintiff was suing for lost debt injuries (damages that are owed but have not yet been collected). This Court reasoned that the claim was not "ripe" because in cases involving RICO treble damages, the outcome of parallel proceedings "could significantly affect the total amount owed". Therefore, the term "clear and definite" was not a declaration by this Court that somehow plaintiffs are required to know the specific dollar amount of damages incurred every time they bring a claim but rather that the damages must be sufficiently "clear and definite" and not subject to change, to render the injury ripe for resolution. 901 F.3d 80, 93. Accordingly, this Court noted that under the Sherman Act, a cause of action does not accrue when "*the fact* of [future damages] is speculative or their amount and *nature* are unprovable". *Id.* (quoting *Zenith Radio Corp.*, 401 U.S. at 339) (emphasis added).

33

antitrust claims to accrue. In fact, in *D'Addario* when this Court specifically addressed claims brought under the Sherman Act, it cited *Zenith Radio Corp.*, which as discussed above, held that "if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues [] to recover . . . all provable damages". *See D'Addario*, 901 F.3d at 93; *Zenith Radio Corp.*, 401 U.S. at 339. This Court did not require that the specific dollar value of damages be calculable for the claims to accrue, only that injury occur. *See D'Addario,* 901 F.3d at 93.

Here, SL-x does not dispute that a concrete harm had crystallized by the time SL-x effectively shut down its business in September 2014. (A-166; A-168.) SL-x merely complains that it could not calculate the exact dollar value of that harm until the sale of its intellectual property to EquiLend. (App. Br. 32.) That makes no sense, however, because: the 2015 sale of intellectual property to EquiLend has nothing to do with the concrete harm that had been supposedly inflicted on SL-x's business operations of running a stock loan trading platform. Indeed, SL-x could calculate its damages in a number of ways. "[O]nce proof of injury causation has been established, courts have allowed antitrust plaintiffs considerable latitude in proving the amount of damages. Proof of amount of damages [] need not conform to a particular theory or model [] and exact proof of the amount of damages is not required." *U.S. Football League v. Nat'l Football*

*League*, 842 F.2d 1335, 1378 (2d Cir. 1988) (citations omitted). SL-x fails to sufficiently explain why waiting for the sale of SL-x's intellectual property was necessary as opposed to using other models to determine the specific amount of damages allegedly owed. Had there been no sale, SL-x would have had to rely on another theory or model to determine damages, and nothing would prevent it from doing so in this action. As Judge Sullivan aptly concluded: "Had Plaintiffs sold their patents at fire sale prices to a party other than EquiLend, or not sold them at all, they still would have realized the same injury resulting from Defendants' earlier anticompetitive conduct." (SPA-18-19.)

## III. THE DISTRICT COURT PROPERLY REJECTED SL-X'S CLAIM THAT THE STATUTE OF LIMITATIONS SHOULD BE TOLLED FOR THE ALLEGED FRAUDULENT CONCEALMENT.

### A. Legal Standard.

To plead fraudulent concealment, an antitrust plaintiff must adequately allege "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988). "[I]t is appropriate for [a district court] to assess the sufficiency of [SL-x's] pleading of fraudulent concealment at the motion to dismiss stage. The issue is not whether [SL-x]

35

exercised due diligence, as [SL-x] argue[s], but rather whether [it has] pled fraudulent concealment with particularity." *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 522 (S.D.N.Y. 2009); *see also Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983) ("Appellants' generalized and conclusory allegations of fraudulent concealment do not satisfy the requirements of Fed. R. Civ. P. 9(b)."); *In re Eur. Gov't Bonds Antitrust Litig.*, No. 19-cv-2601, 2020 WL 4273811, at *10 (S.D.N.Y. July 23, 2020) ("A claim of fraudulent concealment must be pled with particularity, in accordance with the heightened pleading standards of Federal Rule of Civil Procedure 9(b).").

Here, the district court did not abuse its discretion in holding that SL-x did not adequately plead fraudulent concealment. The very statements on which SL-x relies to plead the existence of a conspiracy were made directly to SL-x's representatives, which is fatal to fraudulent concealment. (SPA-14-17.)

## B. SL-x Fails To Plead Fraudulent Concealment.

SL-x argues that the alleged conspiracy was concealed from existence. (App. Br. 34-35.) In reality, however, SL-x's complaints detail how the alleged conspiracy unfolded in plain view of SL-x, belying its contention that the alleged conduct was somehow self-concealing or that Defendants actively concealed it.

### 1. The Conspiracy Was Not Self-Concealing.

SL-x relies heavily on *IPERS*—a putative class action of individuals and entities who entered into stock loan transactions—to assert that its fraudulent concealment defense applies to the instant action. (App. Br. 34-35.) Yet, *IPERS* is distinguishable on precisely this issue. As the district court explained: "In contrast to the present case . . . the plaintiffs in [*IPERS*] were *not* owners of the stock lending platforms that Defendants allegedly boycotted" and therefore "the plaintiffs . . . had no way of knowing about the alleged threats". (SPA-15.)

In direct contrast to *IPERS*, SL-x relies extensively on statements allegedly made by Defendants (or other third parties) about the alleged conspiracy *directly to SL-x representatives*. For instance, at an August 2013 meeting with SL-x representatives, John Shellard (a JPMorgan Managing Director and EquiLend Board member) allegedly stated "there is general agreement among [EquiLend] Directors that industry advances should be achieved from within EquiLend and that JP Morgan participated in discussions with other banks about industry direction at the EquiLend meetings". (A-84 ¶¶ 152-53; A-606 ¶¶ 157-58.) In *IPERS*, Judge Failla credited Mr. Shellard's statement as a direct allegation of the existence of a conspiracy. 340 F. Supp. 3d at 317-18; *see also Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (explaining that "direct evidence" of conspiracy constitutes "smoking gun" evidence such as "a

37

recorded phone call"). It defies logic for SL-x to suggest fraudulent concealment when it was directly confronted with what the *IPERS* court considered "direct evidence" of this alleged conspiracy.

Indeed, "[t]he fact that executives of the Broker Defendants made these statements directly to SL-x representatives demonstrates that the alleged conspiracy did not 'depend[] on concealment for its success.'" (SPA-16 (quoting *IPERS*, 340 F. Supp. 3d at 334).) SL-x improperly attempts to limit this Court's review to just four of the statements made directly to SL-x. (App. Br. 46.) But the district court focused on four statements in its opinion as illustrative of the many allegations in the complaints that could not have been concealed from SL-x because they were made directly to SL-x. (SPA-15.) These allegations include:

- In 2011, Goldman Sachs allegedly told SL-x personnel that "[i]f the Prime Broker Defendants were to allow a central trading platform with counterparty clearing, it would . . . not be a good development for the Prime Broker Defendants". (A-82-83 ¶¶ 142-43; A-604 ¶¶ 147-48.)

- In September 2011, EquiLend allegedly "declined SL-x's proposal" for a corporate transaction and "rejected any further efforts at negotiation. In essence it stated that EquiLend was not available for sale at any price, no matter how beneficial to its shareholders". (A-79 ¶¶ 118-20; A-601 ¶¶ 123-25.)

- In October 2012, Northern Trust allegedly informed SL-x that it "could not make any commitment to using SL-x's service until it understood how Goldman Sachs would react". (A-87 ¶ 171; A-609 ¶ 176.)

- At that same time, State Street allegedly told SL-x that it "wanted to know what Defendants' position was, so as not to cross them", before

"consider[ing] signing . . . as an SL-x customer". (A-87 ¶ 172; A-609 ¶ 177.)

- In February 2013, a Credit Suisse executive allegedly told SL-x that "EquiLend was like 'the mafia run by five crime families' and that SL-x should not underestimate it as a competitor". (A-81 ¶¶ 133-34; A-603 ¶¶ 138-39.)

- In July 2013, the same Credit Suisse executive allegedly "warned" SL-x that "without approval from EquiLend, SL-x was unlikely to be able to achieve a foothold in the industry". The executive also asserted that they would only join if the "Big Boys" committed to the platform. (A-81 ¶¶ 135-36; A-603 ¶¶ 140-41.)

- In August 2013, JPMorgan's EquiLend board representative purportedly "admit[ted]" to SL-x that there was "a general agreement among [EquiLend] Directors that industry advances should be achieved from within EquiLend". (A-84 ¶ 153; A-606 ¶ 158.)

- In September 2013, in a meeting with SL-x, UBS allegedly extolled "the benefit of being 'inside the club' of EquiLend member banks to effectuate market changes and suggested that any market transition towards an SL-x platform and central clearing of stock loan trades would need to come from inside EquiLend". (A-86 ¶ 168; A-608 ¶ 173.)

- In October 2013, Deutsche Bank allegedly told SL-x that "[i]t would not sign up for SL-x until its fellow banks agreed to do so". (A-88 ¶ 175; A-609 ¶ 180.)

- In July 2014, Morgan Stanley allegedly informed SL-x that it "would not go forward with SL-x and that any further development of a CCP solution would be done through EquiLend". (A-85 ¶ 161; A-607 ¶ 166.)

These allegations, both individually and collectively, demonstrate that the

"alleged conspiracy did not 'depend[] on concealment for its success'". (SPA-16.)

SL-x also contends that the district court disregarded the greater context in

which some of these statements to the SL-x representatives were made. SL-x

asserts that Defendants were sending mixed messages that left SL-x unable to discern whether there was a conspiracy. (App. Br. 36-40.) SL-x's arguments, however, are not supported by its own allegations. First, as discussed above, the overwhelming number of statements made directly to SL-x clearly indicated that Defendants were refusing to participate on the platform. Second, that some of Defendants' representatives allegedly expressed positive views of SL-x's platform only to refuse to commit at the last second should only have heightened the suspicions of SL-x representatives that something was awry. As Judge Sullivan noted, the complaints characterize the conduct of third parties that rejected SL-x after initially showing interest as "unexpected", "strange and sudden". (SPA-17 (quoting A-88; A-92 ¶¶ 175, 199; A-609; 614 ¶¶ 180, 204).) In other words, SL-x has conceded that it viewed such puzzling and inconsistent behavior as suspicious.

Finally, SL-x argues that "[w]hile [Defendants' comments] suggested that some of the Broker Defendants—who owned EquiLend—may have preferred that EquiLend develop a platform with SL-x's capabilities, none of these communications stated that the bank was refusing to do business with SL-x, nevermind that the banks had conspired with each other to boycott SL-x." (App. Br. 39.) This is not the standard: every detail of the conspiracy need not be disclosed; a plaintiff need only suspect wrongdoing in order for them to have an obligation to conduct due diligence to uncover the details of the alleged

40

conspiracy. *See infra* Section III.C. And even if that were the standard, SL-x's

argument cannot be squared with its allegations that Defendants told SL-x they

could not provide support without the approval of EquiLend: (1) that "EquiLend

was like 'the mafia run by five crime families'" (A-81 ¶ 134; A-603 ¶ 139);

(2) that "without approval from EquiLend, SL-x was unlikely to be able to achieve

a foothold in the industry" (A-81 ¶ 136; A-603 ¶ 141); and (3) that "any market

transition towards an SL-x platform and central clearing of stock loan trades would

need to come from inside EquiLend" (A-86 ¶ 168, A-608 ¶ 173). SL-x's

allegations clearly showed that Defendants were not concealing their views from

SL-x.

### 2. SL-x Has Failed To Allege that Defendants Actively Concealed the Alleged Conspiracy.

SL-x also attempts to argue that Defendants took specific steps to conceal

this conspiracy including: (1) engaging in "secret meetings and communications",

(2) using code words and secret names, (3) making false statements of support for

the emergence of transparent trading platforms like SL-x and (4) being dishonest

about EquiLend's actual intentions for buying SL-x's intellectual property. (App.

Br. 40-44.) None of these actions constitute affirmative acts of concealment.

*First*, SL-x's allegation that Defendants had private meetings and

communications is both conclusory and insufficient to demonstrate that Defendants

were attempting to conceal the alleged conspiracy. (App. Br. 40-41.) Indeed, in

*IPERS*, Judge Failla rejected substantially similar allegations of secret meetings, holding that "alleg[ations] that Defendants conspired during private meetings, without more, [are] insufficient to plead affirmative acts of concealment." *IPERS*, 340 F. Supp. 3d at 336.

*Second*, SL-x improperly alleges that Defendants used code words and secret names to mask the conspiracy. (App. Br. 41.) The only example offered to support SL-x's allegation pertained to the alleged use of the code word: "Project Gateway". SL-x, however, fails to explain the meaning of this word, how it relates to SL-x and how it was supposedly used to conceal the alleged conspiracy. In fact, the allegation regarding "Project Gateway" has nothing to do with SL-x at all—it allegedly was formulated in 2016, *two years* after SL-x had already gone out of business. (A-180.)

*Third*, SL-x alleges that Defendants made numerous false statements and misrepresented material facts (App. Br. 42), but fails to plead with particularity any facts that demonstrate that any statements made by Defendants were intentionally false when made or were made with the intent to deceive or conceal. *See, e.g., United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016) ("To satisfy [Rule 9(b)], a complaint alleging fraud must . . . explain why the statements were fraudulent.")*; In re Citigroup Inc. S'holder Derivative Litig.*, No. 07 Civ. 9841, 2009 WL 2610746, at *10 (S.D.N.Y. Aug. 25, 2009) (holding that Rule 9(b)

is not satisfied where "the complaint does not allege with specificity *why* any alleged misstatement is fraudulent"). In fact, SL-x does not identify any specific examples of material misrepresentations by Defendants and instead merely lists a number of paragraphs in the Parent Complaint, without explaining how these allegations amount to material misrepresentations that concealed the alleged conspiracy. The paragraphs cited by SL-x merely reference instances in which SL-x received positive feedback from Defendants about its product, but as discussed above, the fact that Defendants gave high praise to SL-x yet suddenly rejected the platform only served to put SL-x on further notice of the alleged conspiracy, not help to conceal it.

*Finally*, SL-x points to EquiLend's purchase of its intellectual property as an act that concealed the alleged conspiracy. As previously noted, however, SL-x's allegations regarding Defendants' alleged conspiratorial conduct all involved conduct before 2015, and SL-x was already out of business by September 2014. (A-166; A-168.) Therefore, SL-x fails to explain how buying SL-x's intellectual property in 2015 could have concealed all of the relevant pre-2015 alleged conduct, particularly considering that much of the earlier conduct involved direct statements made by the Defendants to SL-x representatives.

Simply put, SL-x cannot have it both ways. It cannot use the very statements made directly to it to plead the existence of the alleged conspiracy while simultaneously arguing that the alleged conspiracy was concealed from it.

**C.  SL-x Was, at the Very Least, on Inquiry Notice of the Alleged Conspiracy.**

At the very least, Defendants' statements placed SL-x on inquiry notice of the alleged conspiracy and therefore SL-x was under an obligation to exercise due diligence so "that [its] continu[ed] ignorance was not attributable to lack of diligence on [its] part". *Hendrickson Bros.*, 840 F.2d at 1083.

To establish inquiry notice, "all that is necessary . . . is for there to be reason to suspect the probability of any manner of wrongdoing". *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 489 (S.D.N.Y. 2017) (citations omitted); *see also LC Cap. Partners, LP v. Frontier Ins. Group*, 318 F.3d 148, 154 (2d Cir. 2003) ("As we have explained, '[w]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises.' 'Such circumstances are often analogized to 'storm warnings.'" (quoting *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993))). A "plaintiff need not be aware of all aspects of the alleged fraud to be on inquiry notice[.]" *In re Merrill Lynch Ltd. P'ships Litig.*, 7 F. Supp. 2d 256, 266 (S.D.N.Y. 1997), *aff'd*, 154 F.3d 56 (2d Cir. 1998).

*First*, the clear statements allegedly conveyed to SL-x during meetings with Defendants' executives, in addition to the supposed unnatural behavior of third parties that were contrary to SL-x's expectations, means that SL-x was "[a]t a minimum . . . on inquiry notice" because SL-x "had every basis, in real time, [to suspect the alleged conspiracy]". *See In re IRS*, 261 F. Supp. 3d at 489. SL-x therefore, by its own admission, "ha[d] an obligation to use due diligence to investigate the tort" when put on inquiry notice.[8] (App. Br. 47.)

SL-x references other inapplicable cases, none of which involves anything close to the facts here—statements allegedly made directly to SL-x's representatives about the conspiracy. As discussed above, this case is in direct contrast to *IPERS*, where named plaintiffs and putative class members were not

---

[8] SL-x cites to two cases from this Circuit to argue that it is not obligated to plead due diligence at the motion to dismiss stage. (App. Br. 48-49.) These cases, *Harris v. City of New York*, 186 F.3d 243, 251 (2d Cir. 1999) and *BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC*, 603 F. App'x 57, 59 (2d Cir. 2015), state that because the statute of limitations is an affirmative defense, a plaintiff is not required in a complaint to plead facts to overcome the defense. Neither case applies here, however, because as discussed above this Court subsequently has held that "[a]lthough the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint". *Connecticut Gen. Life Ins. Co. v. BioHealth Labs., Inc.*, 988 F.3d 127, 131-32 (2d Cir. 2021) (internal quotation marks and citations omitted). As is the case here, "when a plaintiff relies on a theory of equitable estoppel to save a claim that otherwise appears untimely on its face, the plaintiff must specifically plead facts that make entitlement to estoppel plausible (not merely possible)". *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015).

alleged to have been present at any meetings that revealed facts concerning the conspiracy. In *Merced Irrigation Dist. v. Barclays Bank PLC*, the only notice available was a "single, speculative . . . article, about which there [was] no evidence plaintiffs were aware at the time". 165 F. Supp. 3d 122, 136 (S.D.N.Y. 2016). In *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, the court held that the relevant reports did not suggest that banks were manipulating LIBOR and therefore did not qualify as inquiry notice. 366 F. Supp. 3d 516, 530 (S.D.N.Y. 2018). Unlike in the cases cited by SL-x, the direct statements to SL-x representatives were more than sufficient to put SL-x on inquiry notice.

*Second*, SL-x's attempt to recharacterize its normal business activities, including conducting meetings with prospective customers and communicating with other market participants, as fulfilling the due diligence requirement does not pass muster. (App. Br. 49-50.) "Due diligence is not adequately pled if [SL-x] did not allege in the [complaint] that [it] exercised due diligence or if [SL-x] make[s] no allegation of any specific inquiries of [defendants], [or] detail[s] when such inquiries were made, to whom, regarding what, and with what response." *Hinds Cnty., Miss.*, 620 F. Supp. 2d at 521 (internal quotation marks and citation omitted). SL-x did not allege any due diligence inquiry and in fact claimed the opposite—that it could not have discovered the conspiracy if it had exercised due diligence. (A-121-22 ¶ 300; A-642-43 ¶ 305.)

46

*Third*, SL-x states that even if it failed to exercise due diligence, the statute of limitations would have been tolled until SL-x should have discovered the alleged conspiracy. SL-x admits that its representatives attended meetings in 2013 with Defendants' executives, in which SL-x was allegedly given warnings that would have caused a reasonable party to further investigate and inquire as to the causes underlying the behavior of Defendants' representatives. (A-81 ¶¶ 134, 136; A-84-86 ¶¶ 153, 168; A-603 ¶¶ 139, 141; A-606-08 ¶¶ 158, 173.) SL-x cannot credibly allege that it would have taken a full year for it to have discovered the alleged conspiracy, particularly in light of the specific statements made to SL-x from 2011 through 2013, as described above. Indeed, in *Pinaud v. Cnty. of Suffolk* (cited by SL-x), this Court held that the plaintiff was barred by the statute of limitations in part because he failed to "indicat[e] why 'by the exercise of reasonable diligence' he was only able to 'discover' the wrongs against him after" a certain period of time given that "he was clearly aware of these acts when, or not long after, they occurred." 52 F.3d 1139, 1158 (2d Cir. 1995) (citation omitted).

## IV. THE DISTRICT COURT PROPERLY DISMISSED THE PARENT COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION BECAUSE THE PARENT COMPANY LACKS ARTICLE III STANDING.

### A. Legal Standard.

To establish Article III standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant

and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). "[A]t the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element" of Article III standing. *Id*. (citation omitted); *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 149 (2d Cir. 2011) ("[A] plaintiff bears the burden of alleging facts that demonstrate its standing . . . .").

## B. The Parent Company Lacks Article III Standing.

The Parent Company conceded that it did not own the claims at issue. (SPA-7.) Its dissolved Foreign Subsidiaries, SL-x Trading Europe Limited and SL-x Technology UK Limited, are the rightful owners of those claims, but those entities did not even exist when the Parent Complaint was filed. None of SL-x's arguments for standing alters the following dispositive points: (1) the Parent Company did not suffer injury; (2) the Parent Company may not assert standing by virtue of its ownership over the Subsidiaries; (3) the Parent Company did not become the successor-in-interest to the rights and liabilities of the Subsidiary Companies and (4) none of the Subsidiary Companies existed at the time the Parent Complaint was filed.

### 1. SL-x Fails To Allege that the Parent Company Suffered Injury.

The Parent Company did not operate the SL-x trading platform or own the platform's intellectual property and therefore could not have been the entity to

48

suffer the injury alleged.  The public record clearly demonstrates—and SL-x does

not dispute—that the platform was owned and operated by two of the Subsidiary

Companies—SL-x Trading Europe Limited, which was registered with the FCA as

a multilateral trading facility (A-166), and SL-x Technology UK Limited, which

owned the relevant SL-x technology (A-207; A-209).  The Parent Company cannot

assert claims based on injuries it never suffered.  *See BNP Paribas Mortg. Corp. v.*

*Bank of Am., N.A.*, 778 F. Supp. 2d 375, 420 (S.D.N.Y. 2011) (holding that the

parent company lacked standing to assert its subsidiary's claims); *see also Clarex*

*Ltd. v. Natixis Sec. Am. LLC*, No. 12-cv-0722, 2012 WL 4849146, at *6 (S.D.N.Y.

Oct. 12, 2012) (collecting cases).

### 2. The Parent Company's Claim of Ownership Over the Subsidiaries Does Not Give Rise to Standing.

SL-x argues that even though the Subsidiary Companies owned and

managed the relevant assets, the Parent Company would still have standing to

assert claims on their behalf because there was "unity of ownership".  (App. Br.

54.)  SL-x is wrong.

In the Second Circuit, indirectly affected parties that suffer only derivative

injury lack antitrust standing.  *See G.K.A. Beverage Corp. v. Honickman*, 55 F.3d

762, 766 (2d Cir. 1995).  As Judge Sullivan reasoned, "[t]he mere fact that [the

Parent Company] was the parent of the injured subsidiaries is insufficient alone to

establish injury here".  (SPA-8.)

SL-x's reliance on *In re Napster, Inc. Copyright Litig.* is misplaced, because it relates to antitrust standing, not Article III standing.[9]  354 F. Supp. 2d 1113, 1118, 1121 (N.D. Cal. 2005).  "Antitrust standing is distinct from constitutional standing, in which a mere showing of harm will establish the necessary injury." *Port Dock & Stone Corp. v. Oldcastle, Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citation omitted); *see also Solent Freight Servs., Ltd. v. Alberty*, 914 F. Supp. 2d 312, 318 (E.D.N.Y. 2012) ("[A]ntitrust standing . . . is distinct from and additional to the constitutional standing requirement.").

### 3. SL-x Fails Adequately To Allege that the Parent Company Is a Successor-in-Interest to the Subsidiary Companies.

SL-x's own allegations contradict its argument that the Parent Company qualifies as a successor-in-interest under the law.

*First*, SL-x makes the conclusory statement that the Parent Company "continue[d] the business of its wholly owned subsidiaries".  (App. Br. 54.)  That is simply false.  SL-x's allegations make clear that it had no prospect of doing business with Defendants (or anyone else) once SL-x had canceled its trading facility license with the FCA by September 2014, engaged Wells Fargo to find buyers to sell the business in early 2014 and SL-x Technology UK Limited had

---

[9] In addition, *Napster* pertains to injuries suffered by investors and not subsidiaries, and specifically notes that many circuits disagree with the ruling of that court.  354 F. Supp. 2d at 1121.

already sold SL-x's "intellectual property" to EquiLend by early 2015. (*See* A-91-93 ¶¶ 195-201, 205; A-166; A-168; A-613-15 ¶¶ 200-06, 210.) Thus, by the time SL-x Trading Europe Limited and SL-x Technology UK Limited were dissolved on October 27, 2015 and May 3, 2016, respectively (A-231; A-233), there were no conceivable SL-x business operations left to be "continued".

*Second*, SL-x provides no factual allegations of how or why the Parent Company became the legal successor of the Subsidiary Companies, including no allegation that the Subsidiary Companies assigned any rights or claims to the Parent Company before their dissolution. As the district court properly held, a parent company does not automatically become the legal successor to its subsidiary. (SPA-8.) The corporate form of a company matters and the separate nature of distinct legal entities cannot be ignored. *See, e.g.*, *Clarex Ltd.*, 2012 WL 4849146, at *6. "Where a parent corporation desires the legal benefits to be derived from organization of a subsidiary that will function separately and autonomously in the conduct of its own distinct business, the parent must accept the legal consequences, including its inability later to treat the subsidiary as its alter ego". *In re Beck Indus., Inc.*, 479 F.2d 410, 418 (2d Cir. 1973).

SL-x relies on several district court cases, none of which hold that a parent company automatically becomes a successor-in-interest when its subsidiaries are dissolved. (App. Br. 54-55.) For instance, *eComSystems, Inc. v. Shared Mktg.*

*Servs., Inc.*, involved the assignment of patents under Florida law to a newly

formed parent corporation created for the explicit purpose of replacing a subsidiary

company.  No. 10–cv–1531, 2012 WL 171083, at *3 (M.D. Fla. Jan. 20, 2012).  In

*Edward Hines Lumber Co. v. Vulcan Materials Co.*, the district court held that the

parent company had standing because it had directly suffered harm through

incurred fees.  No. 85 C 1142, 1985 WL 1189, at *1 (N.D. Ill. May 8, 1985).

Finally, in *John Mohr & Sons v. Hanover Ins.*, the subsidiary company transferred

its assets and liabilities to the parent company before dissolution.  322 F. Supp.

184, 187 (N.D. Ill. 1971).  Thus, the district court correctly ruled that SL-x failed

to allege or otherwise provide a sufficient legal basis to find that the Parent

Company is a successor-in-interest to the Subsidiary Companies.

> **4.    The Subsidiary Companies Did Not Exist When the Parent
>         Complaint Was Filed, and Even if They Had Existed, SL-x
>         Still Fails To Satisfy the Article III Standing Requirement.**

SL-x does not dispute—because it cannot—that the Subsidiary Companies

were dissolved long before this litigation was initiated.  Instead, relying on *Fund*

*Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 386 (2d Cir. 2021),

SL-x argues that under Delaware law, dissolved companies remain legally existent

during a three-year "wind-up" period, and that as a result, the Parent Company has

standing.  (App. Br. 55.)  SL-x is wrong, both because the U.S. Subsidiaries

themselves never suffered any injury that could be assumed by the Parent Company, and because SL-x misconstrues the relevant Delaware law.

*First*, even if the U.S. Subsidiaries had legal existence when the Parent Complaint was filed—which, as discussed below, they did not—those entities suffered no injury that could have been transferred to or assumed by the Parent Company in order to confer standing. SL-x does not allege that either of the U.S. Subsidiaries owned the relevant technology or operated the SL-x trading platform. Nor could it—as the public record demonstrates conclusively that the Foreign Subsidiaries—operated the SL-x trading platform and owned the intellectual property that was ultimately sold to EquiLend. (A-166; A-168; A-208; A-210; A-212; A-227.) SL-x concedes that the Foreign Subsidiaries were dissolved at the time the Parent Complaint was filed (SPA-9; A-266), and SL-x's reference to Delaware law is irrelevant to those entities that were not Delaware corporations. As a result, no "party with standing to prosecute the specific claim in question exist[ed] at the time the [Parent Complaint] was filed." *Fund Liquidation*, 991 F.3d at 386.

*Second*, even assuming the U.S. Subsidiaries were the entities that suffered alleged injury that could have been passed on to the Parent Company for purposes of establishing standing, SL-x misinterprets Delaware law. While SL-x contends that because Delaware allows for a three-year "wind-up" period for dissolved

businesses, the U.S. subsidiaries were technically in existence when the Parent

Complaint was filed (App. Br. 55-56), Judge Sullivan observed that "[SL-x] ha[s]

conceded that the subsidiaries did not exist when [the Parent Complaint] was

filed". (SPA-9.) SL-x admittedly had already wound up the Subsidiary

Companies and the only reason that the Subsidiary Companies have since been

revived was to file the Subsidiary Complaint. (SPA-25 ("In light of Defendants'

argument that [the Parent Company] lacked standing to pursue the claims of its

since-dissolved subsidiaries, . . . [the Parent Company] requested leave to file a

supplemental declaration once it had revived its subsidiaries and assigned the

subsidiaries' claims to [the Parent Company].").)

    While the three-year period under Delaware law allows a corporation to

continue for a time to accomplish certain "wind-up" continuities, it was not created

as a tool to empower dormant companies to continue some sort of phantom

existence even after they have fully shuttered any business operations. As noted in

*Fund Liquidation*, most U.S. jurisdictions give a "wind-up" period so that

dissolved entities can have the opportunity to distribute assets, pursue liquidation

through bankruptcy and eventually cease to do business. 991 F.3d at 383-84 ("The

courts indicated that state law granted the dissolved entities continued existence

. . . after dissolution so that they could wind up their affairs, which included

seeking liquidation under the bankruptcy code."). Indeed, Delaware's post-

dissolution statute was enacted in order "to formalize the continued existence of corporate assets and to provide a mechanism for the assertion of claims as part of the 'winding up' process". *Marsh v. Rosenbloom*, 499 F.3d 165, 172-73 (2d Cir. 2007) (internal quotation marks and citation omitted). Here, by contrast, the U.S. Subsidiaries were not actively bringing their businesses to a close—they had already closed, and SL-x is wrong to contend that Delaware law permits a corporate resurrection in order to pursue litigation.

## V. THE DISTRICT COURT CORRECTLY DECLINED TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE REMAINING STATE LAW CLAIMS.

District courts may "decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). SL-x does not dispute that the district court had such power.

Nor did the district court abuse its discretion in exercising that power. "[W]here, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise [supplemental] jurisdiction over remaining state law claims." *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 325 (2d Cir. 2021) (internal quotation marks and citation omitted); *see also Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 170 (2d Cir. 2014) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as

55

well." (internal quotation marks and citation omitted)).  This principle controls.

SL-x's federal claims were dismissed at an "early stage[] of litigation"—on

Defendants' motion to dismiss—and SL-x offers no reason to depart from the

"well-settled" rule that the district court should decline jurisdiction over the state-

law claims.  *Whiteside*, 995 F.3d at 325.  Therefore, the district court appropriately

declined to exercise supplemental jurisdiction.

## VI. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING LEAVE TO AMEND BECAUSE AMENDMENT WOULD BE FUTILE.

SL-x has not identified any specific allegations that it would plead if granted

leave to amend, let alone explain why such amendments would cure the

deficiencies in its original pleadings.  As this Court explained in *Cuoco v.

Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000):  "[Appellant] has suggested no new

material she wishes to plead.  The problem with [her] causes of action is

substantive; better pleading will not cure it.  Repleading would thus be futile.  Such

a futile request to replead should be denied".  Where, as here, "the proposed

amended complaint would be subject to 'immediate dismissal' for failure to state a

claim or on some other ground, the Court will not permit the amendment."

*Randolph-Rand Corp. of N.Y. v. Tidy Handbags, Inc.*, No. 96 Civ. 1829, 2001 WL

1286989, at *5 (S.D.N.Y. Oct. 24, 2001) (internal quotation marks and citation

omitted); *see also Perri v. Bloomberg*, No. 11-cv-2646, 2012 WL 3307013, at *4

(E.D.N.Y. Aug. 13, 2012) (citing *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) ("A district court has the discretion to deny leave to amend where there is no indication from a liberal reading of the complaint that a valid claim might be stated.")). That is precisely the situation here—amendment would be futile. The district court did not abuse its discretion in denying leave to amend.[10]

---

[10] SL-x cites *Cresci v. Mohawk Valley Cmty. Coll.*, 693 F. App'x 21, 25 (2d Cir. 2017) and *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015), but neither of those cases considered whether a district court could deny leave to amend on the basis of futility. In *Cresci*, this Court determined that the district court improperly denied leave to amend because the plaintiff could have cured the deficiencies identified by the motion to dismiss. *See* 693 F. App'x at 24-25. And in *Loreley*, this Court reaffirmed futility as a proper basis for allowing a district court to deny a plaintiff leave to amend. *See* 797 F.3d at 190 ("Our opinion today, of course, leaves unaltered the grounds on which denial of leave to amend has long been held proper, such as undue delay, bad faith, dilatory motive, and futility—none of which were a basis for the denial here.").

# CONCLUSION

For the foregoing reasons, the district court properly dismissed SL-x's complaints with prejudice. Its decision should be affirmed.

Dated: May 9, 2022

Respectfully submitted,

/s/ Michael A. Paskin
Michael A. Paskin
Lauren M. Rosenberg
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Tel: (212) 474-1000
Fax: (212) 474-3700
mpaskin@cravath.com
lrosenberg@cravath.com

*Attorneys for Defendants Morgan Stanley, Morgan Stanley Capital Management, LLC, Morgan Stanley & Co. LLC, Morgan Stanley Distribution, Inc., Prime Dealer Services Corp., and Strategic Investments I, Inc.*

| | |
|---|---|
| _/s/ Adam S. Hakki_ | _/s/ David G. Januszewski_ |
| Adam S. Hakki | David G. Januszewski |
| Richard F. Schwed | Herbert S. Washer |
| SHEARMAN & STERLING LLP | Elai Katz |
| 599 Lexington Avenue | Jason M. Hall |
| New York, NY 10022 | Margaret A. Barone |
| Tel: (212) 848-4000 | CAHILL GORDON & REINDEL LLP |
| ahakki@shearman.com | 80 Pine Street |
| richard.schwed@shearman.com | New York, NY 10005 |
| | Tel: (212) 701-3000 |
| Michael P. Mitchell | djanuszewski@cahill.com |
| 401 9th Street, NW | hwasher@cahill.com |
| Washington, DC 20004 | ekatz@cahill.com |
| Tel: (202) 508-8100 | jhall@cahill.com |
| michael.mitchell@shearman.com | mbarone@cahill.com |

_Attorneys for Defendants Merrill Lynch Professional Clearing Corp., Merrill Lynch L.P. Holdings, Inc., and Merrill Lynch, Pierce, Fenner & Smith Incorporated_

_Attorneys for Defendants Credit Suisse AG, Credit Suisse Securities (USA) LLC, Credit Suisse First Boston Next Fund, Inc., and Credit Suisse Prime Securities Services (USA) LLC_

*/s/ Robert Y. Sperling*
Robert Y. Sperling
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Tel: (312) 558-7941
Fax: (312) 558-5700
rsperling@winston.com

George Mastoris
Staci Yablon
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
gmastoris@winston.com
syablon@winston.com

*Attorneys for Defendant Goldman Sachs & Co. LLC*

*/s/ Robert D. Wick*
Robert D. Wick
Henry B. Liu
John S. Playforth
Jeffrey Cao
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tel: (202) 662-6000
Fax: (202) 662-6291
rwick@cov.com
hliu@cov.com
jplayforth@cov.com
jcao@cov.com

*Attorneys for Defendants J.P. Morgan Securities LLC, J.P. Morgan Prime, Inc., J.P. Morgan Strategic Securities Lending Corp., and J.P. Morgan Chase Bank, N.A.*

*/s/ Peter G. Wilson*
Peter G. Wilson
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661-3693
Tel: (312) 902-5200
Fax: (312) 902-1061
peter.wilson@kattenlaw.com

*Attorneys for Defendants UBS AG, UBS Americas Inc., UBS Securities LLC, and UBS Financial Services Inc.*

*/s/ Carmine D. Boccuzzi, Jr.*
Carmine D. Boccuzzi, Jr.
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Tel: (212) 225-2508
Fax: (212) 225-3999
cboccuzzi@cgsh.com

*Attorneys for Defendants EquiLend LLC, EquiLend Europe Limited, and EquiLend Holdings LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A), because this brief contains 13,924 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).

Dated: May 9, 2022

_____*/s/ Michael A. Paskin*_____
Michael A. Paskin